

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |  |
|---|---|---|
| KENNETH BELL, SHERRY DABBS-LAURY, CHARLENE  DIRKS, WENDY BROWN, and TONNIE WALKER-BECK, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:20-CV-00461-RP |
| CAL-MAINE FOODS, ROSE ACRE FARMS, INC., HILLANDALE FARMS, TRILLIUM FARM HOLDINGS, LLC, REMBRANDT ENTERPRISES, INC., HICKMAN EGG RANCH, INC., DAYBREAK FOODS, INC., WEAVER BROS., INC., SPARBOE FARMS, INC., HERBRUCK'S POULTY RANCH, INC., CENTRUM VALLEY FARMS, L.P., OPAL FOODS, LLC, MIDWEST POULTRY SERVICES, L.P., and LUCERNE FOODS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

1

## INTRODUCTION

1.      This statewide class action concerns the despicable and illegal practice of price-gouging of essential groceries, specifically eggs, in the midst of the ongoing and unprecedented pandemic. Plaintiffs and the class they seek to represent bought grossly marked-up eggs produced by the Defendants, some of the largest egg producers in Texas and the United States.

2.      The world is in the midst of a global pandemic involving a novel coronavirus called COVID-19 that causes an often severe and sometimes fatal respiratory infection. The outbreak originated in December, 2019, in Wuhan, Hubei Province, China, and in short order the local epidemic spread globally and was deemed a pandemic by the World Health Organization in March, 2020.

3.      The first reported case of COVID-19 in the United States was diagnosed in Washington state in late January, 2020. The case involved a man who had recently travelled to the epicenter of the outbreak in Wuhan. Although this was the first case confirmed by the Centers for Disease Control, scientists and public health officials now believe that there may have been other cases of COVID-19 in the United States prior to that date.

4.      By mid-March 2020, there were reported cases in all 50 American states. The federal government, most states, and many local governments called for

stay-at-home and social distancing measures designed to slow the spread of the disease. Texas Governor Greg Abbott declared a state of emergency in this state on March 13, 2020 and extended it on April 12, 2020, May 12, 2020, June 11, 2020, and July 10, 2020. As of the writing of this complaint, the vast majority of Americans are subject to similar measures. Even in areas not subject to government-mandated stay-at-home orders, many people are voluntarily staying at home except to shop for necessities and to go to work in "essential" occupations such as healthcare and food sales and delivery services. The undersigned counsel writing this complaint is doing so from his home office.

5.     The economic effect of the government-mandated and voluntary measures to combat the pandemic have been extreme. Many people are out of work or have had their wages and salaries reduced. Bars and restaurants throughout the state have closed down or been limited to curbside and home delivery. Many will likely never re-open.  Professional and college sports seasons have either been canceled or are playing a reduced season in empty stadiums, throwing many out of work. Schools, colleges, and universities in the state are limited to online classes. Those in the business of putting on concerts, plays, and other forms of entertainment are idle as many public gatherings have been banned. Most casinos are closed, throwing many more out of work. Oil prices are at their lowest point in decades. The stock market is as volatile as it has ever been. Sadly, the state of the pandemic in

Texas has barely improved, if at all, in the months since Plaintiffs originally filed this suit on April 30, 2020. The second quarter of 2020 was the worst on record in the history of the United States, as GDP collapsed by an annualized rate of 32.9%, plunging the country into recession for the first time in eleven years.

6.      As in any time of economic turmoil, there are those who seek to profit from the misery of millions. Defendants, many of the nation's largest producers of eggs, comprise one such set of actors seeking to unfairly profit from the increased consumer demand for eggs in the midst of the ongoing crisis.

7.      Between the onset of the COVID-19 pandemic and March 30, 2020, the price of eggs nearly tripled in Texas. Plaintiffs seek to represent a class of individuals who purchased eggs during this spike. Since the filing of this suit, Plaintiffs have determined that the spike in egg prices came almost entirely from the producers and distributors, not the retailers, who are no longer named as defendants in this suit.

## PARTIES

8.      Plaintiff Kenneth Bell is an adult resident citizen of Hays County, Texas.

9.      Plaintiff Sherry Dabbs-Laury is an adult resident citizen of Tarrant County, Texas.

10.     Plaintiff Charlene Dirks is an adult resident citizen of Lamar County, TX.

11.    Plaintiff Wendy Brown is an adult resident citizen of Tom Green County, Texas.

12.    Plaintiff Tonnie Walker-Beck is an adult resident citizen of Harris County, Texas.

13.    Defendant Cal-Maine Foods, Inc. is a corporation organized under the laws of Delaware with its principal place of business in Jackson, Mississippi. It is a corporate citizen of Delaware and Mississippi.

14.    Defendant Rose Acre Farms, Inc. is a corporation organized under the laws of Indiana with its principal place of business in Seymour, Indiana. It is a corporate citizen of Indiana.

15.    Defendant Hillandale Farms is a corporation organized under the laws of Ohio, with its principal place of business in Newark, Ohio. It is a corporate citizen of Ohio.

16.    Defendant Trillium Farm Holdings, LLC is an entity organized under the laws of Ohio, with its principal place of business in Johnstown, Ohio. It is a corporate citizen of Ohio.

17.    Defendant Rembrandt Enterprises, Inc. is a corporation organized under the laws of Iowa, with its principal place of business in Spirit Lake, Iowa. It is a corporate citizen of Iowa.

18.     Defendant Hickman's Egg Ranch, Inc. is a corporation organized under the laws of Arizona, with its principal place of business in Buckeye, Arizona. It is a corporate citizen of Arizona.

19.     Defendant Daybreak Foods, Inc. is a corporation organized under the laws of Wisconsin, with its principal place of business in Lake Mills, Wisconsin. It is a corporate citizen of Wisconsin.

20.     Defendant Weaver Bros., Inc. is a corporation organized under the laws of Ohio, with its principal place of business in Versailles, Ohio. It is a corporate citizen of Ohio.

21.     Defendant Sparboe Farms, Inc. is a corporation organized under the laws of Minnesota, with its principal place of business in Litchfield, Minnesota. It is a corporate citizen of Iowa and Minnesota.

22.     Defendant Herbruck's Poultry Ranch, Inc. is a corporation organized under the laws of Michigan, with its principal place of business in Saranac, Michigan. It is a corporate citizen of Michigan.

23.     Defendant Centrum Valley Farms, L.P., is an entity organized under the laws of Indiana, with its principal place of business in Clarion, Iowa. It is a corporate citizen of Iowa and Indiana.

24.     Defendant Opal Foods, LLC is an entity organized under the laws of Delaware, with its principal place of business in Neosho, MO. It is a corporate citizen of Delaware and Missouri.

25.     Defendant Midwest Poultry Services, L.P., is an entity organized under the laws of Indiana, with its principal place of business in Mentone, Indiana. It is a corporate citizen of Indiana.

## JURISDICTION AND VENUE

26.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because the claims in this case form part of a class action in which the amount in controversy exceeds the sum of $5,000,000.00 and the members of the class include citizens of different states than some or all of the defendants.

27.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to plaintiffs' complaint occurred in this district.

28.     Each defendant is a distributor or producer of eggs, in the business of supplying eggs to customers in this federal district. Each defendant is part of the supply chain for eggs in Texas.

## LEGAL FRAMEWORK AND BACKGROUND

29.     The Texas Deceptive Trade Practices Act contains a section that specifically addresses the pricing of necessities like food in an emergency situations.

7

Section 17.46(b)(27) of the Texas Business and Commerce Code prohibits "selling or leasing fuel, food, medicine, lodging, building materials, construction tools, or another necessity at an exorbitant or excessive price."

30.    This section applies when Section 17.4625 of the same code is triggered. Section 17.4625 states that the "designated disaster period" begins, inter alia, when the Governor issues a proclamation or executive order declaring the disaster. This period ends thirty days after the disaster declaration expires.

31.    Governor Greg Abbott issued a disaster declaration on March 13, and extended it for an additional 30 days on April 12, May 12, 2020, June 11, 2020, and July 10, 2020.

32.    Because a declared disaster has existed in this state since March 13th, the provisions of Section 17.46(b)(27) have been in effect, making it unlawful for anyone in the state to sell food at an exorbitant or excessive price.

33.    Nothing in the Texas Code limits this provision to food or other necessities being sold at retail, rather than by producers, distributors, or wholesalers. On the contrary, the natural implication of the provision is that all sales at an exorbitant or excessive price, at any level of the supply chain, are prohibited during a declared disaster.

34. Before the pandemic, the price for generic eggs in Texas hovered near $1.00 per dozen. During the month of March, that average price nearly tripled to

almost $3.00 per dozen. This increase has not been caused by an increase in the cost or difficulty in producing eggs. Rather, it has been driven by increased demand, caused by the emergency situation. The price-gouging statute exists to prevent unscrupulous companies from taking advantage of such demand in emergencies. Yet many egg producers and distributors have done precisely that. As will be explained below, the producers claim that they are simply following contracts that are tied to something called the Urner-Barry index. However, this index is not an independent market that sets the price. Rather it is simply a reflection of how much the producers choose to charge for eggs. Thus, driving the index price up is price gouging.

**THE PLAINTIFFS' PURCHASES**

**KENNETH BELL**

35.    Plaintiff Kenneth Bell purchased 18-Count large Hill Country Fare eggs from an H-E-B store in Hays County, Texas, on multiple occasions before and after the pandemic, including on May 13, 2020.

36.    Before the pandemic, Mr. Bell typically paid approximately $1.25, and never more than $1.50, for these eggs. After the pandemic, the price rose to between $3.00 and $4.00.

37.    The price paid by Mr. Bell after the declaration of disaster by Governor Abbott on March 13, 2020 constitutes an "exorbitant or excessive price" as prohibited by Section 17.46(b)(27) of the Texas Business and Commerce Code.

38.     Pursuant to information printed on the packaging, including the plant codes, Plaintiff Bell believes that H-E-B's Hill Country Fare eggs are produced or distributed by Defendant Cal-Maine.

39.     Plaintiff Bell was directly harmed by the illegal price gouging of Defendant Cal-Maine.

## SHERRY DABBS-LAURY

40.     Plaintiff Sherry Dabbs-Laury purchased 18-Count large Kroger eggs from a Kroger Store in Dallas County, Texas, on multiple occasions before and after the pandemic.

41.     Before the pandemic, these eggs typically cost between $1.50 and $1.75. After the pandemic, the price rose to approximately $3.00.

42.     The price paid by Ms. Dabbs-Laury after the declaration of disaster by Governor Abbott on March 13, 2020 constitutes an "exorbitant or excessive price" as prohibited by Section 17.46(b)(27) of the Texas Business and Commerce Code.

43.     Pursuant to information printed on Kroger's egg packaging, including the plant codes, Plaintiff Dabbs-Laury believes that Kroger's store-branded eggs are produced or distributed by Defendant Cal-Maine.

44.     Plaintiff Dabbs-Laury was directly harmed by the illegal price gouging of Defendant Cal-Maine.

45.     Plaintiff Dabbs-Laury also purchased 18-Count large store brand eggs from a Lowe's Market store on multiple occasions before and after the pandemic.

46.     Before the pandemic, Ms. Dabbs-Laury typically paid less than $2.00 for these eggs. After the pandemic, the price rose to approximately $3.00.

47.     The price paid by Ms. Dabbs-Laury after the declaration of disaster by Governor Abbott on March 13, 2020 constitutes an "exorbitant or excessive price" as prohibited by Section 17.46(b)(27) of the Texas Business and Commerce Code.

48.     Plaintiff Dabbs-Laury believes that Lowe's Market store brand eggs are produced or distributed by Defendant Cal-Maine.

49.     Plaintiff Dabbs-Laury was directly harmed by the illegal price gouging of Defendant Cal-Maine.

## CHARLENE DIRKS

50.     Plaintiff Charlene Dirks purchased one dozen large Brookshire's brand eggs at a Brookshire's store in Lamar County, Texas, on multiple occasions before and after the pandemic, including on May 5, 2020.

51.     Before the pandemic, these eggs were typically priced between $1.00 and $1.50. During the pandemic, the price rose as high as $3.96.

52.     The price paid by Ms. Dirks after the declaration of disaster by Governor Abbott on March 13, 2020 constitutes an "exorbitant or excessive price" as prohibited by Section 17.46(b)(27) of the Texas Business and Commerce Code.

53.     Pursuant to information on Brookshire's egg packaging, including the plant codes, Plaintiff Dirks believes that Brookshire brand eggs are produced or distributed by Defendant Cal-Maine.

54. Plaintiff Dirks was directly harmed by the illegal price-gouging of Defendant Cal-Maine.

### WENDY BROWN

55.     Plaintiff Wendy Brown purchased 18-Count Great Value eggs at a store in Tom Green County, Texas, on multiple occasions before and after the pandemic.

56.     The brand name of these eggs, along with the name of the retailer, are being withheld from this public complaint at the retailer's request, but are being provided to the Defendants in a letter contemporaneously with the filing of this amended complaint.

56.     Before the pandemic, these eggs typically cost between $1.00 and $1.50, but after the pandemic, the price rose to more approximately $3.00.

57.     The price paid by Ms. Brown after the declaration of disaster by Governor Abbott on March 13, 2020 constitutes an "exorbitant or excessive price" as prohibited by Section 17.46(b)(27) of the Texas Business and Commerce Code.

58.     Based on information on the packaging, including the plant codes, Plaintiff Brown believes that Defendants Trillium, Centrum, and Cal-Maine participated in the production, packing, or distribution of these eggs.

59.     Plaintiff Brown was directly harmed by the illegal price gouging of Defendants Trillium, Centrum, and Cal-Maine.

## TONNIE WALKER-BECK

60.     Plaintiff Tonnie Walker-Beck purchased one dozen large Lucerne brand eggs at a Randall's store in Harris County, Texas, on multiple occasions before and after the pandemic, including March 27, 2020.

61.     Before the pandemic, Plaintiff Walker-Beck typically paid between $0.99 and $1.29 for these eggs, but after the pandemic she paid $2.29.

62.     The price paid by Ms. Walker-Beck after the declaration of disaster by Governor Abbott on March 13, 2020 constitutes an "exorbitant or excessive price" as prohibited by Section 17.46(b)(27) of the Texas Business and Commerce Code.

63.     Pursuant to information on Lucerne's packaging, including the plant codes, Plaintiff Walker-Beck believes that Defendants Lucerne and Cal-Maine participated in the production, packing, or distribution of these eggs.

64.     Plaintiff Walker-Beck was directly harmed by the illegal price-gouging of Defendants Lucerne and Cal-Maine.

## THE URNER-BARRY INDEX

65.     Urner Barry Publications, Inc. is a business publisher that specializes in market reports on the food industry. Founded in 1858, the company has, from the beginning, reported on what various producers and sellers were charging in order to

allow those producers to standardize their prices. Urner-Barry does not independently set or determine market prices.

66.    In other words, as the New York Attorney General wrote in a lawsuit against an egg producer, the Urner Barry indices, including the egg index, "work like a feedback loop. Egg producers … tell Urner Barry their 'assessments' of egg prices; Urner Barry then repeats back to the egg industry their collective assessment, distilled into indexed prices; and egg producers…then use Urner Barry's indexed prices as benchmarks to price their eggs." <u>New York v. Hillandale Farms Corp. et al.</u>, attached as Ex. A.

67.    All of the egg producers named in this lawsuit participated in the feedback loop that creates the Urner-Barry Price Index during the pandemic. In this case, these producers helped create a sharp spike in the price index directly following the onset of the pandemic, as can be seen in this chart.



68.    As the chart shows, before the declaration of disaster at the beginning of March and after April 30, the price of eggs in 2020 was very close to the average price at the same part of the year for the previous five years. However, between February 29 and March 31, the price essentially tripled, rising from approximately $1.00 to approximately $3.00.

69.    The Texas Business and Commerce Code bars such a spike in a time of disaster, and does not contain an exception for contracts tied to an index.

70.    The increase in price was not created by an increase in the costs of producing or distributing eggs. Rather, Urner-Barry has essentially admitted that the increase in its index was caused instead by increased demand. As quoted by the New York Attorney General:

> People see a sharp increase in prices and assume they're being gouged, but it's just a function of the market[].' . . . 'Egg prices are up because demand is up sharply. Suppliers are seeing four, five, six times the level of demand as before . . . . 'It's like ahead of a major snowstorm, when people are not sure if they'll be able to go out again, other than this is happening on a national scale.

New York v. Hillandale et al., attached as Exhibit A.

71.    All of the producer defendants participated in manipulating the Urner-Barry index to raise the prices of eggs for no reason other than to take advantage of increased demand and profit off the misery of millions during the pandemic.

## CLASS ALLEGATIONS

72.     This statewide class action is maintainable against the defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following class against each defendant:

> All consumers who purchased eggs in the state of Texas that were sold, distributed, produced, or handled by any of the defendants during the state of emergency declared by Governor Greg Abbott on March 13, 2020. All employees of the Court and plaintiffs' counsel are excluded.

73.     Pursuant to Rule 23(a)(1), the class is so numerous that joinder of all class members is impracticable. Texas is the nation's second most populous state, with more than 28 million residents. Since the average per capita egg consumption in the United States is more than 285 per year, this means that Texans purchase almost eight billion eggs per year. See https://www.statista.com/statistics/183678/per-capita-consumption-of-eggs-in-the-us-since-2000/. The vast majority of these eggs are sold by the defendants named in this lawsuit, who represent a large percentage of the Texas grocery market, as well as the thirteen largest wholesalers of eggs in Texas. The number of people who purchased eggs during the state of emergency is far too large for practicable joinder in a single suit.

74.     Pursuant to Rule 23(a)(2), this case is predominated by questions of law and fact common to all class members, including whether the defendants charged an excessive or exorbitant price for eggs during the COVID-19 emergency.

75.     Pursuant to Rule 23(a)(3), the claims of the named plaintiffs are typical of those of the class. Every member of the class is a consumer who purchased eggs during the emergency.

76.     Pursuant to Rule 23(a)(4), the named plaintiffs will fairly and adequately represent the interests of the class. The named plaintiffs have no interest adverse to the interests of absent class members. The named plaintiffs have hired experienced class action plaintiff lawyers as class counsel, who will diligently and competently represent the interests of the class.

77.     Pursuant to Rule 23(b), questions of law and fact common to all class members predominate over any questions affecting only individual class members. The claims of the named plaintiff, like those of all class members, arise out of conduct by one or more of the defendants to raise the price of eggs in Texas, affecting all Texas consumers, and thus all class members, in the same fashion. For these reasons, a class action is far superior to other available methods of adjudicating this controversy. Individual lawsuits would be inefficient and duplicative by comparison.

## COUNT ONE: VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT

## CLAIM FOR INJUNCTIVE RELIEF

78.     Plaintiffs incorporate by reference the factual averments of the preceding paragraphs as if fully set forth herein.

79.     The Texas Deceptive Trade Practices Act (DTPA, Tex. Bus. & Comm. Code Chapter 17) prohibits businesses from engaging "false, misleading, or deceptive practices," and contains an illustrative list of such practices.

80.     One of the practices explicitly banned in the DTPA's list is "selling or leasing fuel, food, medicine, lodging, building materials, construction tools, or another necessity at an exorbitant or excessive price." Tex. Bus. & Comm. Code § 17.46(b)(27). Subsection 27 also bans "demanding an exorbitant or excessive price" for such items. Id.

81.     Defendants violated § 17.46(b)(27) by unjustifiably raising the price of eggs to an exorbitant or excessive price during the declared state of emergency, and by participating in the price spike in the Urner-Barry Index.

82.     Plaintiffs sent the notice required by Section 17.505 of the Business and Commerce Code prior to filing this action, and intend to proceed with the case sixty days after the date of the notice. In addition, plaintiffs sent a copy of these notices to the Consumer Protection Division of the Texas Attorney General's office.

83.     The Texas Deceptive Trade Practices Act Authorizes injunctive relief for violation of any of the enumerated categories in Section 17.46 of the Business and Commerce Code. Tex. Bus. & Comm. Code 17.50(b)(2).

84.     Plaintiffs seek to enjoin all defendants from selling (at any level in the supply chain) eggs at a price more than ten percent greater than the price of eggs prior to the declaration of emergency on March 13, 2020.

## COUNT TWO: VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT

## CLAIM FOR DAMAGES, INCLUDING TREBLE DAMAGES

85.     Plaintiffs incorporate by reference and reallege all factual averments of the preceding paragraphs as if fully set forth herein.

86.     As explained in Count One, the defendants violated the Texas Deceptive Trade Practices Act, specifically subsection 27 of Section 17.46(b) of the Texas Business and Commerce Code, by selling eggs at an exorbitant or excessive price.

87.     Defendants, set the exorbitant or excessive price of eggs intentionally, and manipulated the Urner-Barry index to increase the price.

88.     This intentional violation entitles plaintiffs and the class to damages, including up to three times the excess amount paid for eggs during the emergency.

## PRAYER FOR RELIEF

Plaintiff respectfully prays for the following relief,

(A) An order certifying the above-described class pursuant to Federal Rule of Civil Procedure 23, with appropriate notice to absent class members;

(B) An order appointing plaintiffs' counsel as class counsel for the statewide class;

(C) A declaratory ruling that the defendants have engaged in the practices alleged herein in violation of Texas law;

(D) A permanent injunction enjoining defendants from selling eggs at prices prohibited by Section 17.46(b)(27) of the Texas Business & Commerce Code for the remainder of the COVID-19 emergency;

(E) After a jury trial, and award of damages, including treble damages, to plaintiffs and absent class members in an amount determined by the court pursuant to Texas law;

(F) Attorneys' fees as authorized by Section 17.50(d) of the Texas Business & Commerce Code;

(G) Any further or different relief the Court may find appropriate.

## JURY DEMAND

Plaintiffs demand trial by jury for all issues so triable.

Respectfully submitted this 24th day of September, 2020,

/s/     Wesley W. Barnett
Attorney for Plaintiffs

**OF COUNSEL:**
Wesley W. Barnett
DAVIS & NORRIS, LLP
2154 Highland Avenue South
Birmingham, Alabama 35205
Telephone: 205.930.9900
Facsimile: 205.930.9989
wbarnett@davisnorris.com

Alexander McSwain
THE CARLSON LAW FIRM
Texas State Bar No. 24106292
100 E. Central Texas Expy.
Killeen, Texas 76541
Telephone: 800.259.5690
Facsimile: 254.526.8204
amcswain@carlsonattorneys.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing amended complaint was served on all counsel of record through the CM/ECF system of the United States District Court for the Western District of Texas on September 24, 2020.

/s/ Wesley W. Barnett
Attorney for Plaintiffs