**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

KENNETH BELL, et al.,

      Plaintiffs

v.

CAL-MAINE FOODS, et al.,

      Defendants.

Case No. 1:20-cv-00461-RP

**DEFENDANTS' MOTION TO DISMISS
<u>PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

Page

I. INTRODUCTION ...............................................................................................1

II. RELEVANT ALLEGATIONS ..........................................................................5

III. ARGUMENT ....................................................................................................6

    A.    Plaintiffs Fail to Establish Subject Matter Jurisdiction Under the Class Action Fairness Act............................................................................6

    B.    Plaintiffs Fail to Establish Subject Matter Jurisdiction Under Article III and Their Claims Must Be Dismissed for Lack of Standing. ...............7

        1.    Plaintiffs lack standing to sue Defendants who did not produce or distribute the eggs they purchased. ...........................................10

        2.    Even as to the three Defendants that Plaintiffs contend "participated in the production, packing or distribution" or eggs they bought, Plaintiffs still lack Article III standing...............................11

            a.    The allegations against Centrum and Trillium fail to establish Article III standing.......................................11

            b.    The allegations against Cal-Maine Foods fail to establish Article III standing. ........................................12

    C.    The Amended Complaint Fails to Satisfy Both Minimum and Heightened Pleading Standards.................................................................14

    D.    The Amended Complaint Fails to State a Claim Under the DTPA. ....................16

    E.    DTPA § 17.46(b)(27) Is Unconstitutional As It Is Void For Vagueness And Violates The Dormant Commerce Clause. ...................................20

        1.    DTPA § 17.46(b)(27) is unconstitutionally vague....................................20

        2.    DTPA § 17.46(b)(27) violates the dormant Commerce Clause.................22

            a.    DTPA § 17.46(b)(27) has impermissible extraterritorial effects.......................................................................23

            b.    As applied here, DTPA § 17.46(b)(27) unconstitutionally burdens interstate commerce.......................................28

IV. CONCLUSION.................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*,
  881 F.2d 1396 (7th Cir. 1989) ...........................................................................1

*A.B. Small Co. v. Am. Sugar Ref. Co.*,
  267 U.S. 233 (1925)...........................................................................................21

*ABC Arbitrage v. Tchuruk*,
  291 F.3d 336 (5th Cir. 2002) ............................................................................14

*Amstadt v. U.S. Brass Corp.*,
  919 S.W.2d 644 (Tex. 1996)...................................................................16, 18, 19

*Anderson v. Kutak, Rock & Campbell (In re Taxable Mun. Bond Sec. Litig.)*,
  51 F.3d 518 (5th Cir. 1995) ..............................................................................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................15

*Ass'n for Accessible Medicines v. Frosh*,
  No. CV MJG-17-1860, 2017 WL 4347818 (D. Md. Sept. 29, 2017), *rev'd*, 887
  F.3d 664 (4th Cir. 2018) ..............................................................................21, 25

*Ass'n for Accessible Meds. v. Frosh*,
  887 F.3d 664 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1168 (2019)............24, 25, 29

*Audler v. CBC Innovis Inc.*,
  519 F.3d 239 (5th Cir. 2008) ..............................................................................8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................................15

*Bige, Inc. v. Penn-Am. Ins. Co.*,
  No. 1-15-CV-292RP, 2015 WL 5227726 (W.D. Tex. Sept. 8, 2015) ....................14

*C & A Carbone, Inc. v. Town of Clarkstown*,
  511 U.S. 383 (1994)......................................................................................24, 26

*Cameron v. Terrell & Garrett, Inc.*,
  618 S.W.2d 535 (Tex. 1981)...............................................................................18

*Carrea v. Dreyer's Grand Ice Cream, Inc.*,
  No. C 10–01044 JSW, 2011 WL 159380 (N.D.Cal. Jan.10, 2011).........................12

*Chavez v. Ford Motor Co.*,
  No. EP-18-CV-109-KC, 2018 WL 6190601 (W.D. Tex. Sept. 26, 2018)...................14, 18, 19

*Coates v. City of Cincinnati*,
  402 U.S. 611 (1971).............................................................................................................21

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)...............................................................................................................8

*Dickerson v. Bailey*,
  336 F.3d 388 (5th Cir. 2003) ...............................................................................................23

*Doe v. Boys Clubs of Greater Dall., Inc.*,
  907 S.W.2d 472 (Tex. 1995)..............................................................................................9, 17

*Gartheiser Honea, P.C. v. Moskowitz*,
  2018 WL 6617780 (E.D. Tx. Dec. 18, 2018) ......................................................................25

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
  425 F.3d 158 (2d Cir. 2005)................................................................................................28

*Granfield v. NVIDIA Corp.*,
  No. C 11-05403 JW, 2012 WL 2847575 (N.D. Cal. July 11, 2012) .....................................12

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)........................................................................................................20, 21

*Healy v. Beer Inst., Inc.*,
  491 U.S. 324 (1989)..................................................................................................... *passim*

*Hines v. Hash*,
  843 S.W.2d 464 (Tex. 1992)................................................................................................16

*Holliday v. Weaver*,
  410 S.W. 439 (Tex. App.—Dallas 2013, pet. denied) .............................................................7

*Hollinger v. Home State Cty. Mut. Ins. Co.*,
  No 5:09-CV-118, 2010 WL 11530632 (E.D. Tex. Aug. 5, 2010) .......................................6, 7

*Int'l Dairy Foods Ass'n v. Boggs*,
  622 F.3d 628 (6th Cir. 2010) ...........................................................................................23, 28

*Jewell v. Grain Dealers Mut. Ins. Co.*,
  290 F.2d 11 (5th Cir. 1961) ..................................................................................................6

*Jim Walter Homes, Inc. v. Valencia*,
  690 S.W.2d 239 (Tex. 1985).................................................................................................16

*Johnson v. City of Dallas*,
   61 F.3d 442 (5th Cir. 1995) ........................................................................8

*Kassel v. Consol. Freightways Corp. of Del.*,
   450 U.S. 662 (1981) ...............................................................24, 26, 29

*KT & G Corp. v. Att'y Gen. of Okla.*,
   535 F.3d 1114 (10th Cir. 2008) ...............................................................28

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................7

*Meadowbriar Home for Children, Inc. v. Gunn*,
   81 F.3d 521 (5th Cir. 1996) ........................................................................8

*North Dakota v. Heydinger*,
   825 F.3d 912 (8th Cir. 2016) ...............................................................23, 26

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ...................................................................................8

*Online Merchants Guild v. Cameron*,
   --- F. Supp. 3d ----, No. 3:20 CV 29 ...............................................26, 27

*Online Merchants Guild v. Cameron*,
   --- F. Supp. 3d ----, No. 3:20 CV 29 GVFT, 2020 WL 3440933, at *11 (E.D. Ky. June 23, 2020) .........................................................................24

*Online Merchants Guild v. Cameron*,
   --- F. Supp. 3d ----, No. 3:20 CV 29 GVFT, 2020 WL 3440933 (E.D. Ky. June 23, 2020) .............................................................................22

*Paterson v. Weinberger*,
   644 F.2d 521 (5th Cir. 1981) ........................................................................6

*Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*,
   128 F.3d 910 (5th Cir. 1997) ...............................................................23, 28

*Perry v. Brassell*,
   No. 18-cv-00062-ADA, 2018 U.S. Dist. LEXIS 221386 (W.D. Tex. Oct. 18, 2018) .........................................................................................8

*Pharm. Research & Mfrs. of Am. v. D.C.*,
   406 F. Supp. 2d 56 (D.D.C. 2005), *aff'd sub nom. Biotechnology Indus. Org. v. D.C.*, 496 F.3d 1362 (Fed. Cir. 2007) ...............................................24

*Pike v. Bruce Church, Inc.*,
   397 U.S. 137 (1970) ...............................................................23, 28, 29, 30

*Pilgrim's Pride Corp. v. Frisco Food Servs., Inc.*,
   No. CIVA 206-CV-512 TJW, 2007 WL 508365 (E.D. Tex. Feb. 13, 2007) ...........................7

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
   245 F. Supp. 3d 870 (S.D. Tex. 2017), *aff'd on other grounds sub nom. Police
   & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F.
   App'x 726 (5th Cir. 2019) ...................................................................................................9

*Ramirez v. GEICO*,
   548 S.W.3d 761 (Tex. App.—El Paso 2018, pet. denied) ...................................................16

*Ramming v. United States*,
   281 F.3d 158 (5th Cir. 2001) ...............................................................................................6

*Richardson v. Foster & Sear, L.L.P.*,
   257 S.W.3d 782 (2008)........................................................................................................16

*Rivera v. Wyeth-Averst Labs*,
   283 F.3d 315 (5th Cir. 2002) .....................................................................................9, 13, 14

*Schlesinger v. Reservists Comm. to Stop the War*,
   418 U.S. 208 (1974).............................................................................................................12

*Scottsdale Ins. Co. v. Knox Park Constr., Inc.*,
   488 F.3d 680 (5th Cir. 2007) ................................................................................................8

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976)................................................................................................................8

*Smith v. Goguen*,
   415 U.S. 566 (1974).............................................................................................................21

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016).......................................................................................................7, 8

*Spradling v. Williams*,
   566 S.W.2d 561 (Tex. 1978)................................................................................................17

*State v. Cal-Maine Foods, Inc.*,
   215th Dist. Ct. Harris Cty, No. 2020-25427 ........................................................................4

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 693 (2013)..............................................................................................................7

*Streber v. Hunter*,
   221 F.3d 701 (5th Cir. 2000) ..............................................................................................17

*Todd v. Perry Homes*,
    156 S.W.3d 919 (Tex. App.—Dallas 2005, no pet.).................................................19

*U. S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
    413 U.S. 548 (1973)....................................................................................20, 21

*United States ex. rel. Campbell v. KIC Dev., LLC*,
    No. EP-18-CV-193-KC, 2019 WL 6888525 (W.D. Tex. Dec. 10, 2019) ..............................6

*United States ex rel. Steury v. Cardinal Health, Inc.*,
    625 F.3d 262 (5th Cir. 2010) ........................................................................14

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
    125 F.3d 899 (5th Cir. 1997) ........................................................................14

*United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*,
    336 F.3d 375 (5th Cir. 2003) ........................................................................14

*United States v. Flores*,
    No. 16-40622, 730 F. App'x 216, 2018 WL 1864956 (5th Cir. Apr. 18, 2018)....................25

*United States v. Harriss*,
    347 U.S. 612 (1954)....................................................................................20

*United States v. L. Cohen Grocery Co.*,
    255 U.S. 81 (1921)......................................................................................21

*Villarreal v. Wells Fargo Bank, N.A.*,
    814 F.3d 763 (5th Cir. 2016) ..........................................................................9

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990)....................................................................................10

*Wyble v. Gulf S. Pipeline Co., L.P.*,
    308 F. Supp. 2d 733 (E.D. Tex. 2004)................................................................10

**STATUTES, RULES & REGULATIONS**

28 U.S.C. § 1332.............................................................................................2, 6

28 U.S.C. § 1332(d)(2) .........................................................................................6

Fed. R. Civ. P. 8.............................................................................................3, 16

Fed. R. Civ. P. 8(a) .............................................................................................15

Fed. R. Civ. P. 9(b) ...........................................................................................3, 14

Fed. R. Civ. P. 12(b)(1)...........................................................................................2

Fed. R. Civ. P. 12(b)(6) .................................................................................14

Fed. R. Evid. 201 ..........................................................................................25

Fla. Stat. Ann. § 501.160(1)(b), (5) ..............................................................28

Ky. Rev. Stat. Ann. § 367.37 4(1)(c) .............................................................23

S.C. Code Ann. § 39-5-145(I) .......................................................................28

S.C. Code Ann. § 39-5-145(A)(5)(a)(i) ..........................................................28

Tenn. Code Ann. § 47-18-5103(b)(1) .............................................................28

Tex. Bus. & Com. Code Ann. § 17.45 ...........................................................24

Tex. Bus. & Com. Code Ann. § 17.45(11) ........................................................7

Tex. Bus. & Com. Code Ann. § 17.46(a) .......................................................23

Tex. Bus. & Com. Code Ann. § 17.46(b)(27) ........................................ *passim*

Tex. Bus. & Com. Code Ann. § 17.47(c) .......................................................20

Tex. Bus. & Com. Code Ann. § 17.49(f)(1) ....................................................17

Tex. Bus. & Com. Code Ann. § 17.49(f)(2) ....................................................17

Tex. Bus. & Com. Code Ann. § 17.49(g) ........................................................17

Tex. Bus. & Com. Code Ann. § 17.50(a)(1) ......................................................9

Tex. Bus. & Com. Code Ann. § 17.50(b) ..........................................................7

Tex. Bus. & Com. Code Ann. § 17.505(a) ..................................................2, 16

Tex. Bus. & Com. Code Ann. § 17.505(d) ..................................................2, 16

Tex. Bus. & Com. Code Ann. § 17.505(e) .....................................................16

U.S. Const., Article I, Section 8, Clause 3 (Commerce Clause) ..................... *passim*

U.S. Const., Article III ................................................................... *passim*

# I.
## INTRODUCTION

Plaintiffs purport to represent a class of consumers who purchased shell eggs at retail from various outlets ("Retailers") at various times following Governor Abbott's March 13, 2020 emergency declaration related to COVID-19. Defendants[1] are producers of shell eggs, none of whom are alleged to have sold eggs directly to any Plaintiff or any other consumer, at any price, as Plaintiffs admit. Am. Compl. (ECF No. 119) ¶¶ 35-64. Nevertheless, Plaintiffs accuse Defendants of raising prices in violation of the Texas Deceptive Trade Practices Act's ("DTPA") prohibition against price gouging. *See* Tex. Bus. & Com. Code Ann. § 17.46(b)(27).[2]

In their Original Complaint, Plaintiffs expressly admitted that they were unable to allege that any specific Defendant charged "exorbitant or excessive" prices in violation of Section 17.46(b)(27). *See* Orig. Compl. (ECF No. 1) ¶ 1 ("Plaintiffs cannot assert that every defendant engaged in price-gouging [sic], but plaintiffs can and do assert that some or all of these defendants illegally marked up egg prices . . ."). In response to Defendants' first motion to dismiss (ECF No. 110-1), Plaintiffs now proffer an entirely new theory: that Defendants are to blame for an alleged brief spike in *wholesale* egg prices tied to the Urner Barry price index.[3] Am. Compl. ¶ 67.

---

[1] Cal-Maine Foods, Inc., Rose Acre Farms, Inc., Hillandale Farms, Trillium Farm Holdings, LLC, Rembrandt Enterprises, Inc., Hickman's Egg Ranch, Inc., Daybreak Foods, Inc., Weaver Bros., Inc., Sparboe Farms, Inc., Herbruck's Poultry Ranch, Inc., Centrum Valley Farms, LLP, Opal Foods LLC, and Midwest Poultry Services, L.P. (collectively, "Defendants").

[2] Section 17.46(b)(27) prohibits, in relevant part: "taking advantage of a disaster declared by the governor under Chapter 418, … by: (A) selling or leasing fuel, food, medicine, lodging, building materials, construction tools, or another necessity at an exorbitant or excessive price."

[3] The Urner Barry price index is published by Urner Barry Publications, Inc. (www.urnerbarry.com), "a business publisher that specializes in market reports on the food industry" and "report[s] on what various producers and sellers were charging in order to allow those producers to standardize their prices." Am. Compl. ¶ 65. The Urner Barry price index is the most commonly used benchmark for establishing wholesale prices of commodity eggs between producers and purchasers in the United States. *See A.A. Poultry Farms, Inc. v. Rose Acre Farms,*

Specifically, Plaintiffs allege that Defendants "helped create a sharp spike in the price index directly following the onset of the pandemic" by "manipulating the Urner-Barry [sic] index." *See id.* ¶¶ 67, 71. But what any particular Defendant did to "manipulate" the Urner Barry price index is left to the reader's imagination, as is how the Urner Barry price index relates to the retail prices Plaintiffs paid. Critically, Plaintiffs do not allege that any Defendants specifically charged exorbitant or excessive wholesale prices to anyone, nor do Plaintiffs allege any connection between unspecified wholesale price increases and the retail prices of which they complain. Plaintiffs' vague, generalized, conclusory allegations fail to cure the defects in their Original Complaint. Indeed, considering the heightened pleading standard that applies to DTPA actions, such allegations provide no more support for bringing suit against Defendants than did the self-defeating allegations in Plaintiffs' initial pleading.

As detailed below, the Amended Complaint should be dismissed on multiple, independent grounds.[4] *First*, dismissal is warranted under Rule 12(b)(1) because Plaintiffs have failed to allege facts sufficient to establish subject matter jurisdiction. The Class Action Fairness Act or "CAFA," 28 U.S.C. § 1332, limits federal subject matter jurisdiction to class actions in which the amount in controversy against each defendant exceeds $5 million. Here, the Amended Complaint fails to

---

*Inc.*, 881 F.2d 1396, 1398 (7th Cir. 1989) ("Pricing in the egg business is based on the 'Urner Barry index', a daily compendium of egg prices. Processors bid in relation to that scale—e.g., 'five cents per dozen back of [= under] Urner Barry'—so that they may strike long-term deals in a fluctuating market. A buyer who receives a bid well under the Urner Barry scale is assured of a relatively good buy even though the delivered price may move up or down with the market."). *See also* https://www.urnerbarry.com/Methodology (last visited Nov. 19, 2020); disc. *infra* note 6.

[4] Concurrent with this Motion, certain Defendants will file individual verified pleas in abatement due to Plaintiffs' failure to provide the pre-suit notice required by Tex. Bus. & Com. Code Ann. § 17.505(a). If the Court finds it has jurisdiction over any of these Defendants, and does not entirely dismiss the pleading as to all of them, then for the reasons set forth in each of the pleas in abatement, the Court must abate these proceedings pursuant to Tex. Bus. & Com. Code Ann. § 17.505(d). Any Defendant not concurrently filing a plea in abatement does not concede that Plaintiffs satisfied the pre-suit notice requirement and reserves all rights.

plead that $5 million in economic damages is recoverable from any single Defendant. Under CAFA, therefore, subject matter jurisdiction is absent.

*Second*, Plaintiffs lack standing under Article III to assert claims against Defendants. As to ten Defendants – Rose Acre Farms, Inc., Hillandale Farms, Rembrandt Enterprises, Hickman's Egg Ranch, Inc, Daybreak Foods, Inc., Weaver Bros, Inc., Sparboe Farms, Inc., Herbruck's Poultry Ranch, Inc, Opal Foods, LLC, and Midwest Poultry Services, L.P. – none of the Plaintiffs alleges that he or she purchased eggs produced by these Defendants. Whatever injury-in-fact each Plaintiff claims to have suffered as a result of his or her egg purchases, therefore, that injury could not possibly be attributed to Defendants who did not even supply the eggs in question. As to all thirteen Defendants, Plaintiffs fail to allege how any Defendant's conduct resulted in their alleged injury or how the injunctive relief and damages they seek against Defendants would redress the harm caused by paying prices independently determined by retailers.

*Third*, the Amended Complaint should be dismissed because Plaintiffs' DTPA claims fail to meet the requisite heightened pleading standards of Rule 9(b). Indeed, Plaintiffs' allegations are so vague that they fall below even the more lenient notice pleading standard of Rule 8. Despite amending their complaint, Plaintiffs still fail to allege what Defendants did to any individual Plaintiff that was unlawful beyond broad, conclusory allegations that do not put Defendants on reasonable notice of the specific facts supporting any DTPA claims against them.

*Fourth*, Plaintiffs fail to state a claim under the DTPA, which requires Plaintiffs to allege that Defendants' purported conduct occurred "in connection with a consumer transaction." The Amended Complaint does not allege that Defendants sold eggs directly to Plaintiffs (it admits the opposite). Indeed, nothing in the Amended Complaint establishes that any Defendant actually sold

eggs at unlawful prices to anyone in or outside the State of Texas. Based on such fundamental defects, the Amended Complaint should be dismissed with prejudice.

*Fifth*, dismissal with prejudice is required because Section 17.46(b)(27) is unconstitutionally vague and violates the dormant Commerce Clause. One Texas state court recently dismissed a similar case filed by the Texas Attorney General when presented with similar arguments. On August 13, 2020, the 215th District Court in Harris County dismissed, *with prejudice*, an initial petition filed by the Texas Attorney General ("State") against Defendant Cal-Maine Foods, Inc. ("Cal-Maine Foods"), alleging violations of the DTPA, just as do Plaintiffs here. *State v. Cal-Maine Foods, Inc.*, 215th Dist. Ct. Harris Cty, No. 2020-25427 (Petition attached hereto as Exhibit A). The State's petition accused Cal-Maine Foods of price gouging based on allegations that in March 2020, Cal-Maine Foods' generic shell egg prices in Texas rose in the same manner as did national and regional market prices. *See* Ex. A ¶¶ 4-5, 21, 34.

Cal-Maine Foods moved to dismiss the petition. *See State v. Cal-Maine Foods*, Rule 91a Motion to Dismiss (filed June 26, 2020) (attached hereto as Exhibit B). Among other arguments, Cal-Maine Foods asserted that Section 17.46(b)(27) was void for vagueness, violated the dormant Commerce Clause by having extraterritorial effect and impeding interstate commerce, and constituted an unconstitutional taking without just compensation as applied by the State. After extensive oral argument, the District Court dismissed the State's initial petition with prejudice. *State v. Cal-Maine Foods*, Order on Defendants' Rule 91a Motion to Dismiss (Aug. 13, 2020) (attached hereto as Exhibit C). Although the District Court did not specify the grounds for its ruling, the dismissal with prejudice reflects a judicial determination that the State could not remedy the initial petition's infirmities through re-pleading their initial petition. Considering the dearth of

Texas state court interpretation of Section 17.46(b)(27), the result is noteworthy and merits consideration.[5]

## II.
## RELEVANT ALLEGATIONS

In response to the COVID-19 pandemic, Texas Governor Greg Abbott declared a state of emergency on March 13, 2020. Am. Compl. ¶ 4. Plaintiffs allege that "[b]etween the onset of the COVID-19 pandemic and March 30, 2020, the price of eggs nearly tripled in Texas," and that "the spike in egg prices came almost entirely from the producers and distributors[.]" *Id.* ¶ 7.

Plaintiffs allege that they purchased eggs from various Retailers, each of whom was named as a defendant in the Original Complaint but was subsequently dropped from the Amended Complaint. *See* Am. Compl. ¶¶ 35-64. Certain individual Plaintiffs allege that they purchased eggs allegedly produced, packaged or distributed by three named Defendants, but there are no allegations (nor could there be) that any Plaintiff purchased eggs directly from any Defendant. *See id*. ¶¶ 38, 43, 48, 53, 58, 63.

Plaintiffs do not allege what specific action any particular Defendant took, if any, to raise the price of eggs sold at wholesale or retail. Instead, Plaintiffs allege that Defendants are "part of the supply chain for eggs in Texas" and "simply following contracts that are tied to something called the Urner-Barry [sic] Index." Am. Compl. ¶¶ 28, 34. The Amended Complaint alleges that "[a]ll of the egg producers named in this lawsuit participated in the feedback loop that creates the Urner-Barry [sic] Index" during the pandemic, which "helped create a sharp spike in the price index directly following the onset of the pandemic." *Id.* ¶ 67. That is the complete universe of facts alleged against Defendants. The allegations do not specify how any Defendants participated in the

---

[5] The State of Texas has appealed the ruling to the Texas Court of Appeals, First District.

so-called (undefined) "feedback loop"; what Defendants communicated to Urner Barry, if anything; who communicated with whom; how such alleged communications could possibly have "manipulated" the Urner Barry price index; or how the Urner Barry price index impacted Plaintiffs.

## III.
## ARGUMENT

**A.    Plaintiffs Fail to Establish Subject Matter Jurisdiction Under the Class Action Fairness Act.**

Plaintiffs assert subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332. Am. Compl. ¶ 26. Under CAFA, federal district courts possess diversity jurisdiction over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action[.]" 28 U.S.C. § 1332(d)(2).

The Fifth Circuit recognizes a distinction between a "facial attack" and "factual attack" to subject matter jurisdiction. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). Defendants are lodging a "facial attack," for which "the trial court is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true." *Id.* In such a case, Plaintiffs bear the burden of establishing that jurisdiction does in fact exist. *See United States ex. rel. Campbell v. KIC Dev., LLC*, No. EP-18-CV-193-KC, 2019 WL 6888525, at *1 (W.D. Tex. Dec. 10, 2019) (citing *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).

"[W]here a suit is brought against several defendants asserting claims against each of them which are separate and distinct, the test of jurisdiction is the amount of each claim, and not their aggregate." *Hollinger v. Home State Cty. Mut. Ins. Co.*, No 5:09-CV-118, 2010 WL 11530632, at *8 (E.D. Tex. Aug. 5, 2010) (quoting *Jewell v. Grain Dealers Mut. Ins. Co.*, 290 F.2d 11, 13 (5th Cir. 1961)). In this case, jurisdiction is absent because Plaintiffs allege no facts suggesting that damages against any single Defendant will exceed $5 million. The Amended Complaint alleges

"separate and distinct" claims against each Defendant, arising out of separate alleged violations of DTPA § 17.46(b)(27), for which Plaintiffs seek unspecified economic damages. *See* Am. Compl. ¶¶ 85-88. *See* Tex. Bus. & Com. Code Ann. § 17.50(b) (authorizing recovery of "economic damages"). "Economic damages" are defined as "compensatory damages for pecuniary loss, including costs of repair and replacement." Tex. Bus. & Com. Code Ann. § 17.45(11); *see also Holliday v. Weaver*, 410 S.W. 439, 443 (Tex. App.—Dallas 2013, pet. denied) (noting that courts construe "economic damages" synonymously with "actual damages" under the common law).

Nor may Plaintiffs argue that their claims against Defendants should be aggregated to reach the required $5 million amount in controversy. Aggregation is proper only "if the defendants are jointly liable to the plaintiff." *Hollinger*, 2010 WL 11530632, at *9 (quoting *Pilgrim's Pride Corp. v. Frisco Food Servs., Inc.*, No. CIVA 206-CV-512 TJW, 2007 WL 508365, at *2 (E.D. Tex. Feb. 13, 2007)). The DTPA claims against Defendants in this case do not, nor could they, rest on a theory of joint liability in connection with Plaintiffs' individual consumer transactions (again, transactions to which no Defendant was party). The Amended Complaint must be dismissed, therefore, based on the failure to satisfy CAFA's minimum amount in controversy.

**B.    Plaintiffs Fail to Establish Subject Matter Jurisdiction Under Article III and Their Claims Must Be Dismissed for Lack of Standing.**

Plaintiffs lack standing under Article III of the Constitution, which allows the federal courts to decide only "Cases" and "Controversies." *See* U.S. Const., Art. III § 2. To establish a case or controversy, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-56 (1992)). This test is "inflexible and without exception." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 693, 705 (2013). Plaintiffs bear the burden of showing that

they have standing for each claim alleged. *See, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). When a plaintiff lacks standing, the case must be dismissed for lack of subject matter jurisdiction. *See, e.g.*, *Perry v. Brassell*, No. 18-cv-00062-ADA, 2018 U.S. Dist. LEXIS 221386, *5 (W.D. Tex. Oct. 18, 2018) ("[s]tanding is a jurisdictional issue; therefore, a plaintiff who lacks standing cannot litigate his claims in federal court") (citing *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 529 (5th Cir. 1996)).

The fact that this action is brought as a proposed class action "adds nothing to the question of standing." *Spokeo*, 136 S. Ct. at 1547 n.6 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976)). "[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *Johnson v. City of Dallas*, 61 F.3d 442, 445 (5th Cir. 1995) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). Therefore, "under the general principles of standing, 'a litigant may not merely champion the rights of another.'" *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 248 (5th Cir. 2008) (quoting *Scottsdale Ins. Co. v. Knox Park Constr., Inc.*, 488 F.3d 680, 684 (5th Cir. 2007)) (citation and quotation marks omitted).

None of the named Plaintiffs alleges that he or she purchased eggs directly from any of the Defendants (in fact, they concede they did not); nor do Plaintiffs contend that any of the Defendants set the (allegedly excessive) retail prices Plaintiffs paid for the eggs they purchased (because, in fact, Defendants did not). Therefore, Plaintiffs cannot amend their pleading to state a claim. None of the Plaintiffs alleges any conduct by Defendants that resulted in their paying an "excessive price" for eggs. Plaintiffs' alleged "injury" boils down to their claim that Defendants allegedly charged wholesale prices to Retailers pursuant to contracts that somehow violate the DTPA (never mind that the DTPA does not even apply to large commercial transactions between

8

sophisticated commercial parties – disc. *infra* Section III.D.). Plaintiffs' convoluted claim relating to wholesale prices, however, is not theirs to make. Plaintiffs' only proffered "harm" derives from the prices they paid when they bought eggs from Retailers who decided (and continue to decide) how much to charge for eggs. Retailers are sophisticated entities who price their products for their own reasons. Indeed, oftentimes they sell eggs at a loss as "loss leaders."[6] A consumer DTPA plaintiff must show, among other things, that the defendant's false, misleading, or deceptive acts constituted "a producing cause" of the consumer's damages. Tex. Bus. & Com. Code § 17.50(a)(1); *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 768 (5th Cir. 2016) (citing *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 478 (Tex. 1995)).

Moreover, because Plaintiffs admit they did not purchase eggs at prices set by Defendants, whatever "injury" they purport to have suffered is not traceable to Defendants. To the contrary, Defendants could not possibly be the "producing cause" of Plaintiffs' alleged "damages." The Retailers' intervening pricing decisions preclude finding any causal link between Plaintiffs' alleged injury and the Defendants, depriving Plaintiffs of Article III standing. *See, e.g.*, *Rivera v. Wyeth-Averst Labs*, 283 F.3d 315, 320-321 (5th Cir. 2002) ("Where an element of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict" a plaintiff must "adduce facts showing that these choices have been or will be made in such a manner as to produce causation."). Defendants having not caused the injury or harm Plaintiffs contend to have suffered, Plaintiffs lack standing to sue them. *See*, *e.g.*, *In re Plains All*

---

[6] *See, e.g.*, Eric Troy, What Are Loss Leaders in Grocery Stores? CulinaryLore Blog (Aug. 9, 2016), at https://culinarylore.com/food-culture:what-are-loss-leaders-in-grocery-stores/#:~: text=Two%20typically%20identified%20loss%20leaders,plenty%20of%20regular%20priced%2 0items (last visited Nov. 16, 2020).

*Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 932 (S.D. Tex. 2017), *aff'd on other grounds sub nom. Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726 (5th Cir. 2019).

> **1.    Plaintiffs lack standing to sue Defendants who did not produce or distribute the eggs they purchased.**

None of the individual Plaintiffs alleges that he or she actually purchased any eggs produced or distributed by Defendants Rose Acre Farms, Inc., Hillandale Farms, Rembrandt Enterprises, Hickman Egg Ranch, Inc, Daybreak Foods, Inc., Weaver Bros, Inc., Sparboe Farms, Inc., Herbruck's Poultry Ranch, Inc, Opal Foods, LLC, and Midwest Poultry Services, L.P. *See* Am. Compl. ¶¶ 35-64. As against these ten Defendants, Plaintiffs have not pleaded any element necessary to establish Article III standing.

For example, Plaintiffs do not plead injury-in-fact from conduct traceable to these Defendants because their alleged purchases admittedly do not involve these Defendants or eggs they produced, packaged, or distributed. *Id.* Indeed, none of Plaintiffs' purchase allegations even mentions these Defendants. *Id*. Similarly, Plaintiffs fail to plead the third standing element of redressability, because the Amended Complaint is bereft of any allegation as to eggs produced or distributed by these Defendants, and thus it is insufficient as a matter of law to establish that Plaintiffs' alleged injury could be redressed by the claims against these Defendants. *See Wyble v. Gulf S. Pipeline Co., L.P.*, 308 F. Supp. 2d 733, 742 (E.D. Tex. 2004) ("if a Plaintiff cannot establish that he has been injured . . . he cannot seek redress for that violation"). The claims against these Defendants must therefore be dismissed. *See Whitmore v. Arkansas*, 495 U.S. 149, 155-56 (1990) ("[a] federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing").

2.    **Even as to the three Defendants that Plaintiffs contend "participated in the production, packing or distribution" or eggs they bought, Plaintiffs still lack Article III standing.**

Plaintiffs also lack standing to pursue claims against Centrum, Trillium and Cal-Maine Foods, regardless of the Amended Complaint's threadbare and insufficient allegations that certain Plaintiffs purchased eggs purportedly produced, packed, or distributed by those Defendants.

a.    **The allegations against Centrum and Trillium fail to establish Article III standing.**

Ms. Brown is the one Plaintiff who alleges that she bought eggs produced by Centrum or Trillium.[7] *Id.* ¶ 58. She maintains that she "purchased 18-Count Great Value eggs at a retail grocery store in Tom Green County, Texas"; that those eggs cost between $1.00 and $1.50 before the pandemic and $3.00 after the pandemic; and that "[b]ased on information on the packaging, including the plant codes, Plaintiff Brown believes that Defendants Trillium [and] Centrum . . . participated in the production, packing, or distribution of these eggs." *Id.* ¶¶ 56-58.[8]

Regardless of her *belief* that Centrum or Trillium produced eggs that she ultimately purchased at retail at an alleged excessive price, Ms. Brown does not allege any unlawful conduct by either Trillium or Centrum that resulted in her alleged injury. Whether viewed as a failure to plead injury caused by conduct traceable to Trillium and Centrum, or as a failure to plead injury redressable by her putative claim against Centrum and Trillium, Ms. Brown fails to establish Article III standing.[9]

Further, even if Ms. Brown's limited purchase allegations were sufficient to satisfy Article

---

[7] No other named Plaintiff attempts to allege a personal injury fairly traceable to Trillium or Centrum's conduct that could be redressed by this lawsuit. *See* Am. Compl. ¶¶ 35-54, 60-64.

[8] The Complaint has two paragraphs numbered 56.

[9] The absence of any such pleading also dooms Plaintiffs' claims for failure to state a proper DTPA claim. *See infra* Section III.D.

III (they are not), she would have standing only to pursue claims based solely on the purchase of the single product she allegedly purchased—18-Count Great Value eggs—and on her purchases of that product from the (unnamed) Retailer where she purchased it. *See Anderson v. Kutak, Rock & Campbell (In re Taxable Mun. Bond Sec. Litig.)*, 51 F.3d 518, 522 (5th Cir. 1995) ("[I]t is well-established that to have standing to sue as a class representative it is essential that a plaintiff . . . must possess the same interest and suffer the same injury shared by all members of the class he represents.") (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974)); *see also Granfield v. NVIDIA Corp.*, No. C 11-05403 JW, 2012 WL 2847575, at *6 (N.D. Cal. July 11, 2012) (finding "claims relating to products not purchased must be dismissed for lack of standing"); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, No. C 10–01044 JSW, 2011 WL 159380, at *3 (N.D.Cal. Jan.10, 2011) (dismissing claims on same ground). As a matter of law, Ms. Brown cannot pursue any broader of a claim against Centrum and Trillium. Moreover, no other named Plaintiff has standing to seek relief against them in any capacity whatsoever.

        **b.**      **The allegations against Cal-Maine Foods fail to establish Article III standing.**

The foregoing principles apply equally to the claims asserted against Cal-Maine Foods. *See* Am. Compl. ¶¶ 38, 43, 48, 53, 58, 63. Although several Plaintiffs (including Ms. Brown) claim to have purchased eggs for which they believe Cal-Maine Foods supposedly "participated in the production, packing or distribution" of (*e.g.*, *id.* ¶ 63), they fail to plead any nexus between Cal-Maine Foods and their alleged "injuries." Plaintiff Bell alleges only that he bought "18-Count large Hill Country Fare eggs from an H-E-B store in Hays County, Texas" (*id.* ¶ 35); Plaintiff Dabbs-Laury alleges only that she bought "18-Count large Kroger eggs from a Kroger store in Dallas County, Texas" (*id.*, ¶ 40); Plaintiff Dirks alleges only that he bought "one dozen large Brookshire brand eggs at a Brookshire's store in Lamar County, Texas" (*id.*, ¶ 50); as noted above, Plaintiff

Brown alleges she purchase "18-Count Great Value eggs" at an unnamed retail store in Tom Green County, Texas (*id.* ¶¶ 55, 58); and Plaintiff Walker-Beck asserts only that she bought "one dozen large Lucerne brand eggs at a Randall's store in Harris County, Texas" (*id.* ¶ 60).

None of the Plaintiffs alleges any conduct by Cal-Maine Foods that resulted in their paying an "excessive price" for eggs. No Plaintiff alleges Cal-Maine Foods set the retail prices Plaintiffs paid for the eggs they bought. As with Trillium and Centrum, whether viewed as a failure to plead injury caused by conduct traceable to Cal-Maine Foods, or as a failure to plead a redressable injury, Plaintiffs fail to plead facts requisite to establish standing to sue Cal-Maine Foods.

In all events, none of the named Plaintiffs has standing to represent a proposed class of "[a]ll consumers who purchased eggs in the state of Texas that were sold, distributed, produced, or handled" by Cal-Maine during the state of emergency declared in Texas. *Id.* ¶ 72; disc. *supra* Section III.B.ii. *First*, it is evident from the face of the Amended Complaint that Plaintiffs themselves paid wildly different prices for the eggs they purchased, underscoring the huge variation between and among retail prices for eggs (which as Plaintiffs tacitly concede, Defendants do not set). *Compare, e.g.*, Am. Compl. ¶ 51 (claiming that Ms. Dirks paid as much as "$3.96" for one dozen eggs); *with id.* ¶ 56 (claiming that Ms. Brown paid "approximately $3.00" for 18 eggs).

*Second*, because egg producers like Cal-Maine Foods neither set retail prices for eggs nor sell eggs to consumers, these Plaintiffs do not (and cannot) assert claims based solely on who may have produced, packaged, and/or distributed the eggs. *See, e.g.*, *Rivera v. Wyeth-Averst Labs*, 283 F.3d 315, 320 (5th Cir. 2002).

*Third*, Plaintiffs do not complain about the quality of the eggs allegedly purchased, only the money they alleged they paid *to the Retailers* from which they purchased eggs – not to Cal-Maine Foods or any other Defendant. *Id.* at 321 ("Where an element of standing depends on the

13

unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict" a plaintiff must "adduce facts showing that these choices have been or will be made in such a manner as to produce causation."). If Plaintiffs have any complaint, it is against the Retailers who set the prices for the eggs Plaintiffs claim to have purchased, not Cal-Maine Foods or any other egg producer. Plaintiffs' claims must be dismissed for lack of standing. *Id.*

C.     **The Amended Complaint Fails to Satisfy Both Minimum and Heightened Pleading Standards.**

"Federal courts in Texas consistently apply Rule 9(b)'s heightened pleading requirements to claims brought under the DTPA." *Chavez v. Ford Motor Co.,* No. EP-18-CV-109-KC, 2018 WL 6190601, at *2 (W.D. Tex. Sept. 26, 2018) (slip op.); *see also Bige, Inc. v. Penn-Am. Ins. Co.*, No. 1-15-CV-292RP, 2015 WL 5227726, at *4 (W.D. Tex. Sept. 8, 2015) (listing cases). Under Federal Rule of Civil Procedure 9(b), a party alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Rule 9(b) requires, at a minimum, 'that the plaintiff set forth the who, what, when, where, and how of the alleged fraud.'" *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 265 (5th Cir. 2010). "A dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6)." *Chavez*, 2018 WL 6190601, at *2 (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 900 (5th Cir. 1997)).

A plaintiff who sues under the DTPA may not "base claims of fraud on speculation and conclusory allegations." *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 385 (5th Cir. 2003) (quoting *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 350 n.67 (5th Cir. 2002)). In this case, the Amended Complaint alleges little more than that each Defendant "is a distributor or producer of eggs, in the business of supplying eggs to customers in this federal

14

district" and that "each defendant is part of the supply chain for eggs in Texas." Am. Compl. ¶ 28. Plaintiffs do not plead the "who, what, when, where, and how" of Defendants' alleged DTPA violations.

The allegations that the Defendants violated the DTPA by "unjustifiably raising the price of eggs to an exorbitant or excessive price" (Am. Compl. ¶ 81), "participat[ing] in the feedback loop that creates the Urner-Barry [sic] Price Index" and "help[ing] create a sharp spike in the price index" (Am. Compl. ¶ 67)," are conclusory and lacking in particularity with respect to the nature (i.e., the who, what, where, and how), of each Defendant's actual pricing or participation in the alleged "feedback loop" (whatever that means).

So deficient are these allegations that they fail to meet even basic notice pleading standards. Federal Rule of Civil Procedure 8(a) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

In their Original Complaint, Plaintiffs effectively admitted that they guessed about which egg producers to name in this lawsuit, and "sued all the defendants in the alternative" because they could not "assert that every defendant engaged in price-gouging [sic]." Orig. Compl. ¶ 1; *see also*

*id.* ¶¶ 6-7, 55. Despite amending their complaint, Plaintiffs still fail to allege what Defendants did to any individual Plaintiff that was unlawful beyond broad, conclusory allegations that do not put Defendants on reasonable notice.[10] Filling these gaping factual holes in the Amended Complaint is a matter of sheer guesswork. Indeed, there is no factual basis on which to conclude that any Defendants took any action, lawful or unlawful, that affected any Plaintiff in the slightest.

**D.    The Amended Complaint Fails to State a Claim Under the DTPA.**

To recover under the DTPA, a plaintiff must show that: "(1) he is a consumer; (2) the defendant engaged in a false, misleading, or deceptive act; and (3) the act constituted a producing cause of the plaintiff's damages." *Ramirez v. GEICO*, 548 S.W.3d 761, 770 (Tex. App.—El Paso 2018, pet. denied). Moreover, for liability to be imposed, "the defendant's deceptive conduct must occur *in connection with* a consumer transaction." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996) (emphasis added). In addition to the reasons set forth above, dismissal is warranted because of the failure to state a claim under the DTPA in at least three important respects.

*First*, nowhere in the Amended Complaint do Plaintiffs allege that any Defendant sold eggs to *anyone* at unlawful prices in violation of Section 17.46(b)(27). The Amended Complaint offers no basis for concluding that any prices charged by any Defendant—or indeed, any retail prices

---

[10] More than compliance with Rule 8 is at stake here. The importance of fair notice to DTPA defendants is reflected by Section 17.505(a), which requires a consumer to send written notice to a defendant at least 60 days before filing suit. *See* Tex. Bus. & Com. Code § 17.505(a). As set forth in certain Defendants' respective verified pleas in abatement, the notice must disclose, "in reasonable detail," the plaintiff's "specific complaint," "the amount of economic damages" attributable to the defendant's alleged violation of the DTPA, and any attorneys' fees reasonably incurred as of the date of the notice. *Id.* The remedy for lack of proper notice is abatement of any pending DTPA lawsuit until the sixtieth day after the date on which proper written notice is served on the defendant. Tex. Bus. & Com. Code § 17.505(d), (e). "If a plaintiff fails to give notice while the action is abated for that purpose, it should be dismissed." *Richardson v. Foster & Sear, L.L.P.*, 257 S.W.3d 782, 785 (2008), quoting *Hines v. Hash*, 843 S.W.2d 464, 469 (Tex. 1992) (quoting *Jim Walter Homes, Inc. v. Valencia*, 690 S.W.2d 239, 242 (Tex. 1985)).

paid by Plaintiffs—were "exorbitant" or "excessive" and therefore proscribed by Section 17.46(b)(27). Plaintiffs attempt to obfuscate this omission by "seek[ing] to enjoin all defendants from selling (at any level in the supply chain) eggs at a price more than ten percent greater than the price of eggs prior to the declaration of emergency on March 13, 2020." Am. Compl. ¶ 84. Notably, this arbitrary "ten percent" standard is made up, not based on Texas law or precedent.

Furthermore, not every allegedly "excessive or exorbitant" price increase is actionable under the DTPA. The statute excludes claims arising out of a written contract involving total consideration of more than $100,000 where counsel has represented the purchaser in connection with a transaction (Section 17.49(f)(1), (f)(2)); as well as any transaction or set of transactions involving "more than $500,000" (Section 17.49(g)). Here, Plaintiffs' allegations on their face pertain to wholesale transactions between large commercial enterprises—i.e., large Retailers and wholesale egg producers—under negotiated market price-indexed contracts for the purchase and supply of significant quantities of shell eggs. Am. Compl. ¶¶ 28, 34. As described by the Amended Complaint, it is more plausible than not that these transactions would not be actionable under the DTPA.

*Second*, the Amended Complaint fails to allege that any Defendants engaged in any other "false, misleading, or deceptive act." "An act is false, misleading, or deceptive if it has the capacity to deceive an 'ignorant, unthinking, or credulous person.'" *Spradling v. Williams*, 566 S.W.2d 561, 562 (Tex. 1978); *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 479 (Tex. 1995); *see also Streber v. Hunter*, 221 F.3d 701, 728 (5th Cir. 2000) (finding that an act is "false, misleading, or deceptive" within the meaning of the Texas DTPA if it has the capacity to deceive an ignorant, unthinking, or credulous person). Plaintiffs do not allege, on any level, that the Defendants engaged in any activity that has the capacity to deceive a person under the standards set forth by

law. Nor could they, given Defendants do not advertise or have any consumer-facing disclosures concerning the store brands Plaintiffs allege to have purchased.

*Third,* Plaintiffs cannot sue Defendants under the DTPA for wholesale egg sales and transactions. Plaintiffs allege (Am, Compl. ¶ 73) that Defendants' sales all occurred on the wholesale market to Retailers, like supermarkets, not to consumers like Plaintiffs. But for liability to be imposed under the Texas DTPA, "the defendant's deceptive conduct must occur in connection with a consumer transaction." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996). The DTPA does not impose liability on upstream manufacturers and suppliers that never directly transacted with the consumer. *Amstadt*, 919 S.W.2d at 650; *Chavez*, 2018 WL 6190601, at *3 (Cardone, J.) ("The Texas Supreme Court has made clear that DTPA claims based on allegedly false, misleading, deceptive, or unconscionable acts cannot be brought against remote, or 'upstream,' manufacturers and suppliers that never directly transacted with the plaintiff-consumer.").[11]

This Court's decision in *Chavez* is illustrative. There, the plaintiff asserted DTPA violations against Ford Motor Company, alleging that she purchased a Ford vehicle from an authorized dealer and that "an unidentified salesperson at the dealership claimed the vehicle was 100% perfect and the airbags were also 100% perfect and all airbags should deploy properly in case of an accident." *Chavez*, 2018 WL 6190601, at *1 (citations and quotation marks omitted).

---

[11] "The [DTPA] Act is designed to protect consumers from any deceptive trade practices made in connection with the purchase or lease of any goods or services." *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 541 (Tex. 1981). "The in-connection-with requirement imposes a limitation on liability that is consistent with the underlying purposes of the DTPA. Without this limitation, we would merely substitute the defendant's introduction of a particular product into the stream of commerce for the conduct that was found to have violated the DTPA. There is no authority for shifting the focus of a DTPA claim from whether the defendant committed a deceptive act to whether a product that was sold caused an injury." *Amstadt*, 919 S.W.2d at 649-650.

The Plaintiff claimed that the airbags did not deploy as represented. *Id.* The court concluded that the plaintiff failed to state a DTPA claim against Ford, in part, because plaintiff did not "plead any facts indicating that [Ford] 'committed a deceptive act . . . in connection with' her purchase of the Ford Focus." *Id.* at 4 (quoting *Amstadt*, 919 S.W.3d at 649-50). In other words, "Plaintiff does not claim that Defendant was involved in the sale of the Ford Focus or that Defendant took any action in relation to the sale. And Plaintiff does not indicate how Defendant, an automobile manufacturer, can be held liable for the salesperson's statements at an independent dealership." *Id.* Because the plaintiff did not allege that Ford "committed any deceptive act 'in connection with' her purchase," the court held that "[Ford] cannot be held liable under the DTPA as an 'upstream' manufacturer." *Id.* at 4 (citations omitted).

The same is true here. Plaintiffs do not allege that Defendants' alleged conduct occurred "in connection with a consumer transaction." Nor do Plaintiffs specifically allege that any Defendants charged exorbitant or excessive wholesale prices to anyone, what those prices were, or any connection between unspecified wholesale price increases and the retail prices of which Plaintiffs complain. Plaintiffs allege in conclusory fashion that they were "directly harmed" by Defendants Cal-Maine Foods, Trillium, and Centrum by virtue of those Defendants' alleged involvement in the supply chain for the specific eggs purchased by Plaintiffs. *See* Am. Compl. ¶¶ 38, 43, 48, 53, 58, 63. But as explained above with regard to Article III standing, Plaintiffs fail to allege any facts connecting the prices they allegedly paid to the Retailers from whom they allegedly purchased eggs and any unlawful conduct by these Defendants. *See Todd v. Perry Homes*, 156 S.W.3d 919, 922 (Tex. App.—Dallas 2005, no pet.) (defendant homebuilder had no connection with plaintiffs' purchase of home because plaintiffs did not contract with, receive representations from, or confer benefits on defendant). As to the remaining Defendants, the

Amended Complaint pleads no nexus to the eggs that any Plaintiff purchased at retail, nor does it otherwise identify any actions those Defendants took "in connection with" those purchases.

**E.      DTPA § 17.46(b)(27) Is Unconstitutional As It Is Void For Vagueness And Violates The Dormant Commerce Clause.**

As shown, Plaintiffs' Amended Complaint should be dismissed because it fails to establish subject matter jurisdiction and standing, fails to satisfy the most elementary pleading requirements, and fails to state a cognizable claim under the DTPA. But Plaintiffs' claims independently fail because the statute under which they have brought suit, Section 17.46(b)(27) of the DTPA, is fundamentally unconstitutional.

**1.      DTPA § 17.46(b)(27) is unconstitutionally vague.**

The Constitution's due process clause guarantees that a statute "is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). In relevant part, Section 17.46(b)(27) prohibits: "taking advantage of a disaster declared by the governor" by either selling food at "an exorbitant or excessive price" or demanding such a price in connection with its sale. Tex. Bus. & Com. Code Ann. § 17.46(b)(27). Section 17.46(b)(27) does not define what constitutes "an exorbitant or excessive price."

The language of Section 17.46(b)(27) is so imprecise as to leave the reasonable person to guess at its meaning and whether any given price is permissible or will subject that person to up to $250,000 in penalties per violation. It therefore fails to provide the constitutionally required notice of the scope of behavior that it prohibits. *See U. S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 579 (1973) (statutes must be "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with" (citing *United States v. Harriss*, 347 U.S. 612, 618 (1954)); *see also* Tex. Bus. & Com. Code Ann. § 17.47(c) (setting forth penalty ranges).

Vague statutes violate due process in two ways. *First*, a vague statute fails to give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited," and threatens to "trap the innocent by not providing fair warning." *Grayned*, 408 U.S. at 108; *see also Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971); *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921) (a statute that "forbids no specific or definite act . . . leaves open . . . the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against"). *Second*, a vague statute invites discriminatory enforcement, as "language of . . . a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections." *Smith v. Goguen*, 415 U.S. 566, 575 (1974). Section 17.46(b)(27) does both and is thus void for vagueness.

Absent any standard by which to gauge unlawful prices, Section 17.46(b)(27) does not identify the prohibited conduct "in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." *U.S. Civil Serv. Comm'n*, 413 U.S. at 579; *see also Grayned*, 408 U.S. at 112. Without any guidance or clarity in the DTPA about what prices are "exorbitant or excessive," no person can know what prices are prohibited. Plaintiffs underscore this truth by literally fabricating a standard ("ten percent") in their pleading. Am. Compl. ¶ 84.

The United States Supreme Court has long held that similar price control statutes are unconstitutionally vague because the "terms 'unjust,' 'unreasonable,' and 'excessive' as applied to prices . . . had no commonly recognized or accepted meaning" absent a standard or baseline against which to measure the terms. *A.B. Small Co. v. Am. Sugar Ref. Co.*, 267 U.S. 233, 239 (1925); *see also L. Cohen Grocery Co.*, 255 U.S. at 89 (statute prohibiting "any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries" was unconstitutionally vague); *Ass'n for Accessible Medicines v. Frosh*, No. CV MJG-17-1860, 2017

21

WL 4347818, at *10-11 (D. Md. Sept. 29, 2017), *rev'd*, 887 F.3d 664 (4th Cir. 2018). Section 17.46(b)(27) contains no standard or baseline against which to determine whether prices are "exorbitant or excessive." And absent such a standard, Section 17.46(b)(27)'s prohibition of an "exorbitant or excessive price" likewise lacks a commonly recognized or accepted meaning and is thus similarly unconstitutionally vague.

Plaintiffs' only allegations about pricing are that shell egg prices were excessive or exorbitant because they were higher after the declared disaster than before the declared disaster. Am. Compl. ¶ 34. But Plaintiffs point to nothing in the statute on which they base this view because Section 17.46(b)(27) does not tie the terms "exorbitant or excessive price" to some change from the price before the declared disaster. Instead, Section 17.46(b)(27) provides for absolutely no framework at all to determine when prices violate the statute.

Accordingly, Section 17.46(b)(27) is void for vagueness, requiring the dismissal of Plaintiffs' claims with prejudice.

### 2.  DTPA § 17.46(b)(27) violates the dormant Commerce Clause.

Plaintiffs' claims also must be dismissed because Section 17.46(b)(27) violates the dormant Commerce Clause by regulating transactions wholly outside of Texas and unduly interfering with the interstate market for shell eggs. Even a price gouging statute that provides a benchmarking standard (unlike the vague provisions of Section 17.46(b)(27)), may nonetheless be unconstitutional as a dormant Commerce Clause violation. *See Online Merchants Guild v. Cameron*, --- F. Supp. 3d ----, No. 3:20 CV 29 GVFT, 2020 WL 3440933 (E.D. Ky. June 23, 2020) (slip op.) (enjoining application of Kentucky price gouging statute to online marketplace sales

because of the unconstitutional impact that Kentucky prices would have on creating a national price ceiling).[12]

Because Congress has full power to regulate interstate commerce under the Commerce Clause, Article I, Section 8, Clause 3 of the Constitution, the corollary doctrine—the dormant Commerce Clause—holds that "states lack the power to impede this interstate commerce with their own regulations." *Dickerson v. Bailey*, 336 F.3d 388, 395 (5th Cir. 2003).

State statutes that are protectionist or that practically control commerce outside the state's borders are facially or *per se* invalid. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989); *North Dakota v. Heydinger*, 825 F.3d 912, 919 (8th Cir. 2016); *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 646 (6th Cir. 2010). A state law also can violate the dormant Commerce Clause if, as applied, it places burdens on interstate commerce that are "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *see also Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*, 128 F.3d 910, 918 (5th Cir. 1997). Section 17.46(b)(27) violates the dormant Commerce Clause in both ways.

### a.      DTPA § 17.46(b)(27) has impermissible extraterritorial effects.

Section 17.46(b)(27) unlawfully impacts sales outside the state of Texas in "practical effect" and is thus *per se* invalid. The purpose of the DTPA is to prevent "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code Ann. § 17.46(a).

---

[12] Specifically, Ky. Rev. Stat. Ann. § 367.37 4(1)(c) provides that prices are not unlawful if they are "consistent with fluctuations in applicable commodity, regional, national, or international markets, or seasonal fluctuations," or follow the "contract price, or the result of a price formula, established" before the emergency).

Section 17.45 defines "trade" and "commerce" to include the "advertising, offering for sale, sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, *wherever situated*, and shall include any trade or commerce *directly or indirectly affecting the people of this state*." DTPA § 17.45 (emphasis added.) Section 17.46(b)(27), on which plaintiffs sue, makes price gouging a "false, misleading, or deceptive act[] or practice[]." Thus, when read as a whole, the statute applies to activity occurring wholly outside of Texas if the indirect result affects Texans. That is facially an unconstitutional overreach. *Healy*, 491 U.S. at 336 (a statute that "controls commerce occurring wholly outside the boundaries of a State . . . exceeds the inherent limits of the enacting state's authority").

For this reason, price gouging statutes must not have the practical effect of regulating "upstream pricing" for transactions that occur wholly outside the state. *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 666 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1168 (2019); *see also Pharm. Research & Mfrs. of Am. v. D.C.*, 406 F. Supp. 2d 56, 67-71 (D.D.C. 2005), *aff'd sub nom. Biotechnology Indus. Org. v. D.C.*, 496 F.3d 1362 (Fed. Cir. 2007) (price gouging statute had a *per se* invalid extraterritorial reach as it applied to transactions between manufacturers and wholesalers that occur wholly outside the District of Columbia). The same is true of the DTPA.

Moreover, the Texas statute must be considered in light of actual or potential other state laws of a similar nature. *Healy*, 491 U.S. at 337. If it would be virtually impossible for a company to conduct interstate business while complying with a patchwork of kindred statutes in different states, this weighs in favor of finding a statute to have unconstitutional extraterritorial impact. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 406 (1994) (O'Connor, J., concurring); *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 671-75 (1981); *Online Merchants*

*Guild v. Cameron*, --- F. Supp. 3d ----, No. 3:20 CV 29 GVFT, 2020 WL 3440933, at *11 (E.D. Ky. June 23, 2020) (slip op.).

Like the unconstitutional price control statute in *Frosh* that did "not limit the Act's application to sales that actually occurred within Maryland," nothing in Section 17.46(b)(27) limits its application to transactions in Texas. 887 F.3d at 671. The practical effect of Section 17.46(b)(27) is to set prices at which companies can sell their goods, including to national Retailers. Section 17.46(b)(27) impacts out-of-state sales by mandating some unknown maximum price that would impact pricing through the distribution chain for companies with operations both in and outside of Texas. Therefore, if Plaintiffs are successful, companies based in other states, with no operations in Texas, could be required to set prices in their national contracts to comply with Section 17.46(b)(27) in the event that any of the shell eggs sold under the contract could impact shell egg prices in Texas. This problem is compounded by the vagueness of Section 17.46(b)(27), which provides no indication of what prices those companies would need to charge to comply with Section 17.46(b)(27).

A review of the allegations and Defendants in this suit make that point clear. As noted previously, many of the Defendants are not based in Texas and have no operations in Texas. For example, Trillium Farm Holdings, LLC, is an Ohio company headquartered in Croton, Ohio with operations only in Ohio. Am. Compl. ¶ 16; Trillium Farms Ohio, *Trillium Farms*, trilliumfarmsohio.com/index.cfm (last visited August 19, 2020).[13] The following Defendants

---

[13] The Court may take judicial notice of party websites. *See Gartheiser Honea, P.C. v. Moskowitz*, 2018 WL 6617780 *2 & n.1 (E.D. Tx. Dec. 18, 2018) (citing, Fed. R. Evid. 201 and noting that "[t]he Fifth Circuit has found that 'publicly available [information] on [a company's] official website' may be considered 'an authoritative source' in certain contexts where the facts a court is taking notice of may be 'accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"), citing *United States v. Flores*, No. 16-40622, 730 F. App'x 216, 2018 WL 1864956 (5th Cir. Apr. 18, 2018) (internal citation omitted).

similarly do not have operations in Texas: Centrum Valley Farms, http://www.centrumvalleyfarms.com (last visited September 3, 2020), Opal Foods, LLC, http://www.opal-foods.com (last visited September 3, 2020), Daybreak Foods, Inc., http://www.daybreakfoods.com (last visited September 3, 2002), and Weaver Bros., Inc., https://www.weavereggs.com (last visited September 3, 2020). Some of those with operations in Texas also operate outside the State and do business with national Retailers operating both in and out of Texas. Yet, Plaintiffs in this suit seek to punish conduct that occurred wholly outside of Texas, including by entities that played any part "at any level in the supply chain." Am. Compl. ¶ 33. "A state statute has undue extraterritorial reach and is *per se* invalid when it requires people or businesses to conduct their out-of-state commerce in a certain way." *Heydinger*, 825 F.3d at 919.

Section 17.46(b)(27)'s extraterritorial impact is even more evident when considering the effect of every state adopting similar legislation, a key test the United States Supreme Court outlined in *Healy*: "[T]he practical effect of the statute must be evaluated . . . by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." 491 U.S. at 337. If every state had a different price gouging statute in effect during emergencies, with different definitions of unlawful prices, it would be virtually impossible for a company to conduct interstate business while complying with this patchwork of differing statutes. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 406 (1994) (O'Connor, J., concurring); *Kassel*, 450 U.S. at 671-75; *Online Merchants Guild*, 2020 WL 3440933, at *11 ("Consideration of the potential for conflicting state requirements cuts in favor of finding that [a state]'s price gouging statutes violate the extraterritoriality doctrine."). And as noted below, this web of conflicting state price gouging

laws unfortunately is a reality here as one federal court and arguably one Texas state court have determined already.[14]

In *Online Merchants Guild*, the Eastern District of Kentucky recently enjoined the Kentucky Attorney General from enforcing Kentucky's price gouging statute because of its extraterritorial effects.[15] The Court explained that because Amazon sellers post one price for their goods across the country on the "nationwide" online marketplace, "to avoid potential liability Merchants Guild members must either treat Kentucky prices as a national ceiling, or exit the national marketplace." *Online Merchants Guild*, 2020 WL 3440933, at *10 (internal citation and quotation omitted). In effect, enforcement of the statute "ha[s] the practical effect of controlling the price of transactions that occur wholly outside the state." *Id.* The court ruled that this "type of extraterritorial impact appears violative of the principles expressed in *Healy*." *Id.* (citing *Healy*, 491 U.S. at 336 ("A State may not adopt legislation that has the practical effect of establishing a scale of prices for use in other states[.]") (internal citation and quotation marks omitted)). The reasoning in *Online Merchants Guild* applies with equal force in this case. Similar to the plaintiffs there, Defendants sell shell eggs in a national market – *i.e.*, throughout the United States. The "practical effect" of the DTPA is to control the price of transactions occurring wholly outside of Texas by requiring Defendants to either treat Texas prices as a national ceiling or exit the national marketplace.

---

[14] Although the 215th District Court in Harris County did not issue a written order of specific findings, it dismissed with prejudice the State of Texas' price gouging suit, in which these same arguments, among others, were raised.

[15] In its complaint and motion for a preliminary injunction, the Guild also challenged Kentucky's price gouging statutes as void for vagueness. In its order, the court declined to consider this argument, finding the analysis "unnecessary" at the "preliminary stage" of the case. *Online Merchants Guild*, 2020 WL 3440933, at *11 n.11.

In sum, because Section 17.46(b)(27) is not limited to transactions in Texas and includes upstream transactions in other states, it has the practical effect of impermissibly regulating extraterritorial transactions and is thus *per se* unconstitutional under the dormant Commerce Clause. *See KT & G Corp. v. Att'y Gen. of Okla.*, 535 F.3d 1114, 1143 (10th Cir. 2008) ("[A] statute will be invalid *per se* if it has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question.") (citing *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 168 (2d Cir. 2005)); *see also Int'l Dairy Foods Ass'n*, 622 F.3d at 645.

### b.   As applied here, DTPA § 17.46(b)(27) unconstitutionally burdens interstate commerce.

Not only is Section 17.46(b)(27) *per se* unconstitutional by virtue of its impermissible extraterritorial effects as described above, the statute as applied in this case also violates the dormant Commerce Clause, because the "burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142; *Pelican Chapter*, 128 F.3d at 918.

As noted previously, Defendants sell their eggs at wholesale to Retailers operating in many states in addition to Texas. Several states, recognizing the volatility of food commodity pricing, exempt such commodities from their price gouging statutes (if they have price gouging statutes at all). *See*, *e.g.*, Fla. Stat. Ann. § 501.160(1)(b), (5) (excluding from the price gouging statute prices that increase due to "regional, national, or international market trends" and exempting "growers, producers, or processors of raw or processed food products"); S.C. Code Ann. § 39-5-145(A)(5)(a)(i), (I) (excluding from the price gouging statute prices that increase due to "local, regional, national, or international market trends" and exempting "sales by growers, producers, or processors of raw or processed food products"); Tenn. Code Ann. § 47-18-5103(b)(1) (excluding from the price gouging statute "[p]rice increases in applicable regional, national, or international

28

commodity markets"). Put differently, the exact same egg sales Plaintiffs contend are somehow unlawful in Texas would be unquestionably legal in other states.

As it stands, Plaintiffs urge this Court to hold Defendants subject to suit in Texas for charging the same wholesale prices, to the same Retailers, and under the same contracts for which they sell identical goods in other states where the prices are indisputably legal. But if every state (or even multiple states) had a provision akin to Section 17.46(b)(27) of the DTPA, an egg producer buying and selling eggs both in and out of Texas would have to enter into a multiplicity of contracts with a single Retailer, all while trying to navigate and anticipate how enforcement might occur within the various regulatory frameworks in each state in which the Retailer operates. As such, Section 17.46(b)(27), and Plaintiffs' application of that Section, unduly burdens interstate commerce in violation of the dormant Commerce Clause. *See Healy*, 491 U.S. at 337, 340 (considering the impact on regional and national markets if all states had statutes "essentially identical to" the challenged statute); *Frosh*, 887 F.3d at 673-74 (finding that statute that "would force [defendants] to enter into a separate transaction for each state in order to tailor their conduct so as not to violate any state's price restrictions" was a "real and significant" burden on interstate commerce); *see also Kassel*, 450 U.S. at 671-75 (invalidating state truck-length limitation unconstitutionally burdened interstate commerce).

There are no putative local benefits against which to weigh this excessive and undue burden. *Pike*, 397 U.S. at 142. Plaintiffs' interference in interstate commerce through invocation of the DTPA does not serve the proposed class members' or the public's interest in having access to affordable groceries during the current emergency. Plaintiffs' proffered application of Section 17.46(b)(27) simply encourages the Defendants, and every other egg producer, to sell shell eggs in states other than Texas where market prices are permissible, or at the very least increases the

cost of doing business in Texas, all making it more difficult for Retailers in Texas to buy eggs to put on their shelves and consumers to access the eggs they want and need. Plaintiffs' application of Section 17.46(b)(27) in this suit against the Defendants *for offering prices entirely consistent with the egg market in Texas* discourages these companies—and other national companies who fear being the next target of the State—from selling their products in Texas during a declared disaster when these prices are recognized as reasonable in other states, including under various other states' price gouging statutes. *See* Am. Compl. ¶¶ 7 (pleading that the price of eggs increased "in Texas" generally), 34 (alleging that the "price for generic eggs in Texas" rose from about $1.00 per dozen to $3.00 per dozen because of "increased demand[] caused by the emergency"). In effect, the Plaintiffs' application of the statute would make it *more* difficult for Texans to access essential foodstuffs like eggs, not less. Without any "putative local benefits," the burden on the Defendants imposed by Plaintiffs' application of Section 17.46(b)(27) clearly outweighs any benefit. *Pike*, 397 U.S. at 142.

## IV.
## CONCLUSION

For the abovementioned reasons, the Defendants respectfully request that the Court enter an Order in the form submitted herewith and dismiss the Amended Complaint in its entirety and with prejudice.

Dated: November 20, 2020

Respectfully submitted,

*/s/ Kathy L. Osborn*
Kathy L. Osborn (admitted *pro hac vice*)
Elizabeth B. Boggia (admitted *pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
300 N. Meridian Street, Suite 2500
Indianapolis, IN 46204
Tel:    317.237.0300
Fax:    317.237.1000
Kathy.Osborn@Faegredrinker.com
Elizabeth.Boggia@Faegredrinker.com

E. Paul Cauley, Jr. (TX #4018900)
S. Vance Wittie (TX #21832980)
**FAEGRE DRINKER BIDDLE & REATH LLP**
1717 Main Street, Suite 5400
Dallas, TX 75201
Tel:    469.357.2500
Fax:    469.327.0860
Paul.Cauley@Faegredrinker.com
Vance.Wittie@Faegredrinker.com

**ATTORNEYS FOR MIDWEST
POULTRY SERVICES, L.P.**

*/s/ Craig Stanfield*
Craig Stanfield (TX #24051371)
**KING & SPALDING LLP**
1100 Louisiana Street, Suite 4000
Houston, TX 77002
Tel:    713.751.3200
Fax:    713.751.3900
cstanfield@kslaw.com

Livia M. Kiser
(admitted *pro hac vice*)
Zachary Fardon
(admitted *pro hac vice*)
**KING & SPALDING LLP**
353 N. Clark Street, Twelfth Floor
Chicago, IL 60654
Tel:    312.995.6333
Fax:    713.751.3900
lkiser@kslaw.com
zfardon@kslaw.com

**ATTORNEYS FOR CAL-MAINE
FOODS, INC.**

*/s/ Jeffrey R. Lilly*
Jeffrey R. Lilly
Leslie Benitez
**GORDON REES SCULLY MANSUKHANI LLP**
816 Congress Avenue, Suite 1510
Austin, TX 78701
Tel:    512.391.0197
jlilly@grsm.com
lbenitez@grsm.com

Jay L. Levine
**PORTER, WRIGHT, MORRIS & ARTHUR
LLP**
2020 K Street N.W., Suite 600
Washington, D.C. 20006
Tel:    202.778.3021
jlevine@porterwright.com

James A. King
**PORTER, WRIGHT, MORRIS & ARTHUR
LLP**
41 South High Street
Columbus, OH 43215
Tel:    614.227.2051
jking@porterwright.com

**ATTORNEYS FOR ROSE ACRE
FARMS, INC.**

*/s/ David P. Blanke*
David P. Blanke (TX #02453600)
**EWELL BROWN BLANKE & KNIGHT LLP**
111 Congress Avenue, 28th Floor
Austin, TX 78701
Tel:    512.770.4011
Fax:    877.851.6384
dblanke@ebbklaw.com

Jan P. Levine (admitted *pro hac vice*)
Robin P. Sumner (admitted *pro hac vice*)
Michael J. Hartman (admitted *pro hac vice*)
Robyn R. English-Mezzino (admitted *pro hac vice*)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103
(215) 981-4000
jan.levine@troutman.com
robin.sumner@troutman.com
michael.hartman@troutman.com
robyn.english-mezzino@troutman.com

**ATTORNEYS FOR TRILLIUM FARM HOLDINGS, LLC AND CENTRUM VALLEY FARMS, LLP**

*/s/ Ashley Allen Carr*
Ashley Allen Carr (TX #24082619)
**DLA PIPER LLP (US)**
401 Congress Avenue, Suite 2500
Austin, TX 78701
Tel:     512.457.7251
Fax:     512.721.2251
ashley.carr@dlapiper.com

Jeffery E. Tsai (*pro hac vice* anticipated)
John P. Phillips (*pro hac vice* anticipated)
**DLA PIPER LLP (US)**
555 Mission Street, Suite 2400
San Francisco, CA 94105-2933
Tel:     415.836.2500
Fax:     415.836.2501
jeff.tsai@us.dlapiper.com
john.phillips@us.dlapiper.com

**ATTORNEYS FOR HICKMAN'S
EGG RANCH, INC.**

*/s/ Michael D. Marin*
Michael D. Marin (TX #00791174)
Boulette Golden & Marin, L.L.P.
2801 Via Fortuna, Suite 530
Austin, TX 78746
Tel:     512.732.8924
Fax:     512.732.8905
mmarin@boulettegolden.com

Christopher E. Ondeck (*pro hac vice*
anticipated)
Stephen Chuk (*pro hac vice* anticipated)
**PROSKAUER ROSE LLP**
1001 Pennsylvania Ave., Suite 600S
Washington, DC 20004
Tel:     (202) 416-5865
Fax:     (202) 416-5800
Email: condeck@proskauer.com
Email: schuk@proskauer.com

**ATTORNEYS FOR DAYBREAK
FOODS, INC.**

*/s/ Katherine P. Chiarello*
Katherine P. Chiarello (TX #24006994)
**WITTLIFF | CUTTER PLLC**
1209 Nueces Street
Austin, TX 78701
Tel:     512.960.4524
Fax:     512.960.4869
katherine@wittliffcutter.com

Joseph S. Leventhal (admitted *pro hac vice*)
Shelby K. Kroeger (admitted *pro hac vice*)
**DINSMORE & SHOHL LLP**
655 W. Broadway, Suite 800
San Diego, CA 92101
Tel:     619.400.0498
Fax:     619.400.0501
joseph.leventhal@dinsmore.com
shelby.kroeger@dinsmore.com

**ATTORNEYS FOR WEAVER
BROS., INC.**

*/s/ Alicia L. Downey*
Alicia L. Downey (admitted *pro hac vice*)
**Downey Law LLC**
155 Federal Street, Suite 300
Boston, MA 02110
Tel:     617.444.9811
alicia@downeylawllc.com

Jason E. Wright (TX #24063896)
**J. WRIGHT LAW PLLC**
700 Central Expy S, Suite 400
Allen, TX 75013
Tel:     469.270.7820
Fax:     469.270.7822
jason@jwrightlaw.com

**ATTORNEYS FOR OPAL FOODS LLC**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November 20, 2020, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record who are deemed to have consented to electronic service.

*/s/ Kathy L. Osborn*

# EXHIBIT A

4/23/2020 12:50 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 42506727
By: Bernitta Barrett
Filed: 4/23/2020 12:50 PM

## CAUSE NO. _____

| | | |
|---|---|---|
| **STATE OF TEXAS,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY,** |
| | § | |
| **Cal-Maine Foods, Inc. d/b/a Wharton;** | § | |
| **and Wharton County Foods, LLC;** | § | |
| *Defendants.* | § | **_____ JUDICIAL DISTRICT** |

## PLAINTIFF'S PETITION AND APPLICATION
## FOR TEMPORARY AND PERMANENT INJUNCTIONS

COMES NOW THE STATE OF TEXAS, hereinafter referred to as Plaintiff, acting by and through Attorney General of Texas, KEN PAXTON, complaining of **Defendants Cal-Maine Foods, Inc. d/b/a Wharton and Wharton County Foods, LLC,** for selling eggs at an exorbitant or excessive price during a disaster declared by the governor and other violations of the Texas Deceptive Trade Practices—Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41–17.63 ("DTPA"), and for cause of action would respectfully show:

## I.   DISCOVERY CONTROL PLAN

1.      The discovery in this case is intended to be conducted under Level 2 pursuant to Texas Rule of Civil Procedure 190.3.

2.      This case is not subject to the restrictions of expedited discovery under Texas Rule of Civil Procedure 169 because the relief sought by the State includes non-monetary injunctive relief.

3.      In addition to the claim for non-monetary injunctive relief, the State seeks monetary relief in excess of $100,000, including civil penalties, attorney's fees and costs.

## II.   INTRODUCTION

4.      On March 13, 2020, the Texas governor declared a disaster due to the COVID-19

pandemic, and he renewed this declaration on April 12, 2020. The pandemic increased purchasing of eggs and other necessities because families are eating at home more. In Texas, the increased demand for eggs has resulted in egg prices jumping 300% or more for generic eggs.  For the most part, these prices are passed on to retail customers.

5.      Cal-Maine is the dominant egg supplier in Texas. Cal-Maine sells most of its eggs at the prevailing market price at the time of the sale. In the recent past, the prices for Cal-Maine's generic eggs have hovered around $1. During the COVID-19 pandemic, the market has driven generic egg market prices over $3 per dozen and Cal-Maine has charged its customers accordingly. On information and belief, Cal-Maine has not experienced any supply issues or other disruptions that are driving it to charge more for eggs. It is simply charging more because it can, or, more specifically, because the pandemic caused market demand to jump.

6.      In summary, Cal-Maine is taking advantage of a disaster by offering for sale, and/or selling, eggs at exorbitant or excessive prices after Texas Governor Abbott declared a disaster on March 13, 2020 under Chapter 418 of the Texas Government Code.

### III.      NATURE OF THIS SUIT

7.      The Attorney General, acting within the scope of his official duties under the authority granted to him under the Constitution and the laws of the State of Texas, brings this lawsuit in the name of the State of Texas through his Consumer Protection Division ("CPD") against the named defendants for violations of the Texas Deceptive Trade Practices—Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41–17.63.  The DTPA grants authority to the Attorney General to seek injunctive relief and civil penalties for violations of its provisions.  DTPA § 17.47.

### IV.      DEFENDANTS

8.      **Cal-Maine Foods, Inc. d/b/a Wharton** is a Delaware corporation doing business in Harris

County, Texas, and is registered as a foreign corporation with the Texas Secretary of State. Defendant's principal office is located at 3320 W. Woodrow Wilson Ave, Jackson, Mississippi, 39209 and defendant may be served with process through its Texas registered agent, CT Corporation System, 1999 Bryan St., Suite 990, Dallas, Texas, 75201.

9.     **Wharton County Foods, LLC,** is a Texas limited liability company doing business in Harris County, Texas. Defendant is 100% owned by Cal-Maine Foods, Inc. Defendant's principal office is listed as a P.O. Box in Jackson, Mississippi, and defendant may be served with process through its Texas registered agent, CT Corporation System, 1999 Bryan St., Suite 990, Dallas, Texas, 75201.

10.     **"Defendants"** or **"Cal-Maine"** means the aforementioned defendants: Cal-Maine Foods, Inc. d/b/a Wharton and Wharton County Foods, LLC.

## V.     JURISDICTION

11.     This Court has jurisdiction over this action pursuant to DTPA § 17.47(b).

## VI.     VENUE

12.     Venue of this suit lies in Harris County, Texas, under DTPA § 17.47(b), for the following reasons:

(a)     The transactions forming the basis of this suit occurred in Harris County, Texas.

(b)     Defendants have done business in Harris County, Texas.

## VII.     PUBLIC INTEREST

13.     Plaintiff, the State of Texas, has reason to believe Defendants are engaging in, have engaged in, or are about to engage in, the unlawful acts or practices set forth below, that Defendants have, by means of these unlawful acts and practices, caused damage to, harm to, and/or acquired

money or property from persons, and that Defendants have adversely affected the lawful conduct of trade and commerce, thereby directly or indirectly affecting the people of this State. Therefore, the Consumer Protection Division of the Office of the Attorney General of the State of Texas believes, and is of the opinion, that these proceedings are in the public interest. *See* DTPA § 17.47(a). Furthermore, the Consumer Protection Division has good cause to believe that immediate and irreparable injury, loss, or damage may occur in the near future, *see* DTPA § 17.47(a), given that Defendants appear to be continuing to advertise products at exorbitant or excessive prices. (*See*, *e.g.*, Ex. D, Cal-Maine Foods, Inc. Weekly Price Sheet.)

## VIII.   TRADE AND COMMERCE

14.    Defendants have, at all times described below, engaged in conduct which constitutes "trade" and "commerce," as those terms are defined in section 17.45(6) of the DTPA.

## IX.    ACTS OF AGENTS

15.    Whenever in this petition, Plaintiff alleges a particular defendant or defendants did any act, Plaintiff means that that the officers, agents, partners, or employees of that particular defendant or defendants performed or participated in the act on behalf of, and under the authority of, the particular defendant or defendants.

## X.    APPLICABLE LAW

16.    The DTPA prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." DTPA § 17.46 (a).

17.    The DTPA also prohibits taking advantage of a disaster declared by the governor under Chapter 418 of the Texas Government Code by offering, demanding in connection with the sale, and/or selling at an exorbitant or excessive price, fuel, food, medicine, or other necessities. *See*

DTPA § 17.46(b)(27)(A), (B).

18.     Section 418.014 of the Texas Government Code provides:

(a)     The governor by executive order or proclamation may declare a state of disaster if the governor finds a disaster has occurred or that the occurrence or threat of disaster is imminent.

(b)     Except as provided by Subsection (c), the state of disaster continues until the governor:

> (1) finds that:

>> (A) the threat or danger has passed; or

>> (B) the disaster has been dealt with to the extent that emergency conditions no longer exist; and

> (2)  terminates the state of disaster by executive order.

(c)     A state of disaster may not continue for more than 30 days unless renewed by the governor.

## XI.     FACTUAL ALLEGATIONS

### A.  Governor's Disaster Declaration

19.     On March 13, 2020 at 11:20 a.m., pursuant to Texas Government Code section 481.014, Texas Governor Greg Abbott issued a statewide disaster proclamation because of COVID-19, a contagious respiratory virus.  (Ex. A, Governor's Disaster Declaration.)  The governor renewed the disaster proclamation on April 12, 2020. (Ex. B, Governor's Renewed Disaster Declaration.) The statewide disaster remains in effect at this time.

### B.  U.S. and Texas Egg price jumps

20.     During the current pandemic, egg pricing has skyrocketed in America, and Texas is no exception. Cal-Maine, the largest producer and marketer of shell eggs in America[1], has said market

---

[1] Cal-Maine Foods, Inc., February 29, 2020 Form 10-Q [hereinafter 2020Q3 Form 10-Q], https://www.sec.gov/Archives/edgar/data/16160/000001616020000056/calm-20200229.htm, at 19; *see also* Cal-Maine Foods, Inc., June 1, 2019 Form 10-K [hereinafter 2019 Form 10-K],

prices for producers "have moved . . . to record levels"[2]. The key fact is that producers' pricing is squeezing consumers as well as small and large businesses, with prices recently being "$3.01 a dozen . . . compared with 94 cents" earlier in March.[3] In fact, Cal-Maine says generic egg pricing rose to **$3.18** in March 2020.[4]

21.     Cal-Maine's Texas prices have exceeded the national trend. As recently as April 9, 2020, Cal-Maine delivered a batch of generic eggs to a Texas mom-and-pop business, charging **$3.32** for a dozen generic jumbo eggs, and **$3.44** for a dozen generic large brown eggs. (Ex. E, Cal-Maine Invoice.) This was a huge jump from Cal-Maine's average generic egg price from December 2019 to February 2020, which was **$1.02.**[5]

**C.  Cal-Maine Background, Financial Strength, and Corporate Structure**

*Cal-Maine dominance nationally and in Texas.*

22.     Cal-Maine is the largest producer and marketer of shell eggs in the United States, with a 19% overall market share.[6] Cal-Maine is almost twice the size of America's next largest egg producer.[7] Cal-Maine is an integrated producer, meaning it does everything, including maintaining

---

https://www.sec.gov/Archives/edgar/data/16160/000001616019000048/calm-2019x06x01x10k.htm, at 3.

    [2] 2020Q3 Form 10-Q at 20.
    [3] Jaewon Kang and Jacob Bunge, *For Grocers, Eggs Are Getting More Expensive Amid Coronavirus*, THE WALL STREET JOURNAL (April 6, 2020), https://www.wsj.com/articles/for-grocers-eggs-are-getting-more-expensive-amid-coronavirus-11586172611.
    [4] 2020Q3 Form 10-Q at 20.
    [5] 2020Q3 Form 10-Q at 24.
    [6] *Cal-Maine Investor Presentation 3rd Quarter 2020* [hereinafter Investor Presentation], CALMAINEFOODS.COM, https://www.calmainefoods.com/media/1124/investor-presentation-09-2020-3q.pdf (last visited April 18, 2020).
    [7] Watt Ag, *Top 20 US egg producers in 2020*, WATT AG NET (Feb. 6, 2020), https://www.wattagnet.com/articles/39458-top-20-us-egg-producersin-2020 (last visited April 20, 2020).

flocks, processing eggs, and distributing and delivering eggs.[8]

23.    Cal-Maine produces eggs for the two main segments of the retail egg market, non-specialty eggs and specialty eggs. Non-specialty eggs are also referred to as commodity, generic, or store-branded eggs, and are much cheaper than specialty eggs, which consist of cage-free, organic, and nationally-branded eggs. Both in terms of volume and sales, Cal-Maine's main business is non-specialty (generic) eggs.[9] These shell eggs are sold to national and regional grocery store chains, club stores, and foodservice distributors.[10] Indeed, Cal-Maine also has the largest market share in the retail grocery egg segment.[11]

24.    As for the shell egg market in Texas, Cal-Maine is the dominant player. Even as of 2015, it operated over 90% of the largest processing facilities in Texas.[12] Cal-Maine operates more processing facilities in Texas than in any other state but Florida.[13] Texans would recognize the many brands Cal-Maine markets, including Egg-Land's Best, Land O' Lakes, Farmhouse, and 4-Grain. Plus, "[t]he majority of [Cal-Maine's] customers rely on [them] to provide most of their shell egg needs, including specialty and non-specialty eggs."[14] In summary, Cal-Maine is a powerhouse nationally, a powerhouse in Texas, and, for any store supplied by Cal-Maine,

---

[8] 2020Q3 Form 10-Q at 19.
[9] *See generally* 2019 Form 10-K at 65 (Cal-Maine also has a minor egg products business (e.g. liquid eggs), but this is an immaterial 3% of its revenues).
[10] 2019 Form 10-K at 4.
[11] 2019 Form 10-K at 4.
[12] UT Center for Transportation Research, *Commodity-based Approach for Evaluating the Value of Freight Moving on Texas' Roadway Network*, U. OF TEXAS (August 2017), at 159, http://library.ctr.utexas.edu/ctr-publications/0-6898-1.pdf.
[13] *Properties & Facilities*, CALMAINEFOODS.COM, https://www.calmainefoods.com/company/properties-facilities/ (last visited April 18, 2020).
[14] 2020Q3 Form 10-Q at 19.

Cal-Maine is likely that store's primary egg supplier.

*Profitability and financial strength.*

25.     While Cal-Maine is successful in terms of scale, it is also a financial success. In its most recent earnings presentation, Cal-Maine touts its "Solid financial position" and "State-of-the-art" facilities.[15] In 2019, Cal-Maine paid out $41.7 million in dividends.[16] Cal-Maine's financial resources allowed it to spend $45.5 million a few months ago to acquire a Texas-based egg production and distribution firm.[17] In the most recent fiscal quarter, Cal-Maine's net income was $13.7 million, despite generic eggs selling for an average price of **$1.02** per dozen.[18]

*Entity structure, Texas operations, and Harris County connections.*

26.     As for its corporate structure, Cal-Maine Foods, Inc. is a large conglomerate composed of its own operations as well as those of its subsidiaries, including Wharton County Foods, LLC. Cal-Maine Foods, Inc. itself "deliver[s]" goods to Harris County purchasers. (Ex. F, Cal-Maine Collection Lawsuit at 2.) Cal-Maine Foods, Inc.'s own employees are the sales force for the enterprise, and orders are received at its "CMFOODS.com" domain. (*See*, *e.g.*, Ex. D, Cal-Maine Weekly Price Sheet (sales rep's signature block shows logo of Cal-Maine Foods, Inc.).)  Finally, Wharton County Foods, LLC operates in the Houston-area. (*See*, *e.g.*, Ex. F, Cal-Maine Collection Lawsuit (*see* attached Wharton County Foods, LLC business records).)

---

[15] Investor Presentation.
[16] 2019 Form 10-K at 42.
[17] 2020Q3 Form 10-Q at 8.
[18] 2020Q3 Form 10-Q at 5, 24.

## D. Cal-Maine's Business Model

*Nothing forces or mandates Cal-Maine to charge exorbitant prices.*

27.     The most important part of Cal-Maine's business model is that it is an *integrated* producer, doing everything from hatching chicks to delivering eggs to grocery stores.[19] It is not a middleman, passing along the cost of eggs it purchased from a supplier. During the COVID-19 pandemic, Cal-Maine's egg supply has remained stable, and production and distribution costs have been stable as well. Specifically, "supplies of corn and soybeans are favorable . . . and [Cal-Maine] will continue to have an adequate supply of both" for feeding hens.[20] Cal-Maine also stated, "our facilities have been fully operational and we have not experienced any supply chain or delivery disruptions."[21] *Pandemic egg price jumps are not due to any increase in Cal-Maine's costs.*

28.     Cal-Maine is not legally compelled or otherwise obligated to sell eggs at exorbitant prices. While Cal-Maine has "long-term [customer] relationships," its customers are generally "free to acquire shell eggs from other sources."[22] Also, its financials reveal no long-term contracts (with either customers or its own suppliers) or other legal obligations which could theoretically *compel* Cal-Maine to sell eggs at $3.00 levels.[23] *During this pandemic, neither production costs nor contractual obligations forced Cal-Maine to charge exorbitant prices.*

*Cal-Maine and the rest of the industry mostly sell on the spot market.*

29.     Grocers, food distributors, and foodservice suppliers buy eggs on the spot market (i.e. at market price). One reason is that long-term contracts which mandate the purchase of specific

---

[19] 2019 Form 10-K at 6.
[20] 2020Q3 Form 10-Q at 21.
[21] 2020Q3 Form 10-Q at 33.
[22] 2019 Form 10-K at 7.
[23] *See generally*, 2019 Form 10-K.

quantities can increase the risk of having too much perishable inventory on hand.[24] In fact, "the majority of shell eggs sold in the U.S. in the retail and foodservice channels are sold at independently quoted wholesale market prices for shell eggs."[25] Cal-Maine's own average egg prices align with wholesale "Egg Market" pricing, and Cal-Maine's financials emphasize that "spot egg market" pricing drives its operating results."[26]

## E.  Cal-Maine's Historical and COVID-19-Era Pricing

*Cal-Maine's non-specialty egg prices are normally in the $1 per dozen range.*

30.     Cal-Maine's normal egg pricing levels are available publicly and, generally over time, are in the $1 range and often trend slightly below regional egg index prices. One illustrative period is the ten-year period from 2005 to 2014. During that period, regional egg index prices "ranged from a low of $0.72 during 2005 to a high of $1.43 [in] 2014."[27]

31.     Pricing was in that normal range prior to the COVID-19 pandemic's arrival. From December 2019 through February 2020, Cal-Maine's average selling prices per dozen were **$1.02** for generics and **$1.89** for lower-volume specialty eggs.[28] Even at those levels, Cal-Maine was profitable, making $13.7 million in net income for the quarter.[29]

---

[24] *See generally* Watts and Associates, Inc., *Final Study for the Study on Poultry Catastrophic Disease* [hereinafter USDA Study on Poultry Catastrophic Disease], U.S. DEPT. OF AG., https://legacy.rma.usda.gov/pubs/2015/poultrydisease.pdf ("spot market transactions . . . are a matter of routine . . . as a way to deal with inventory fluctuations").

[25] 2019 Form 10-K at 5.

[26] 2019 Form 10-K at 24.

[27] Cal-Maine Foods, Inc., May 31, 2014 Form 10-K [hereinafter 2014 Form 10-K], https://www.sec.gov/Archives/edgar/data/16160/000001616014000015/calm-20140531x10k.htm, at 21.

[28] 2020Q3 Form 10-Q at 24.

[29] 2020Q3 Form 10-Q at 5.

*Egg prices have jumped in the past, but not above $3.*

32.    During periods in which egg-yield declines or when demand jumps, spot market egg prices will jump because of the inelasticity (relatively fixed nature) of demand. For example, the 2015 avian flu outbreak made prices skyrocket. This outbreak decimated potentially 12% of the national flock of laying hens.[30]

33.    During the peak of the 2015 outbreak, Cal-Maine said egg pricing in the southeast hit a "peak of **$2.97** during August [2015]."[31] Cal-Maine's own quarterly generic average price was **$2.16**.[32] After the epidemic, as companies reestablished flocks and the egg supply returned to normal, pricing also returned to normal. *Because no influenza outbreaks occurred at Cal-Maine facilities[33], Cal-Maine saw windfall quarterly net income of $143 million.[34]* No disaster was declared during the avian flu epidemic.

*Cal-Maine is on track to make windfall profits from COVID-19.*

34.    As discussed, Cal-Maine's pre-pandemic prices were **$1.02** for generics and **$1.89** for specialty eggs.[35] Then, during March and April 2020, Cal-Maine and the rest of the industry's commodity egg prices skyrocketed, with a regional market index hitting **$3.18** in March 2020.[36] As of April 2020, Cal-Maine followed that trend in Texas, charging, for example, a mom-and-pop

---

[30] Cal-Maine Foods, Inc., November 28, 2015 Form 10-Q [hereinafter 2016Q2 Form 10-Q], https://www.sec.gov/Archives/edgar/data/16160/000001616015000043/calm-20151128x10q.htm, at 14.
[31] 2016Q2 Form 10-Q at 14.
[32] Cal-Maine Foods, Inc., August 29, 2015 Form 10-Q [hereinafter 2016Q1 Form 10-Q], https://www.sec.gov/Archives/edgar/data/16160/000001616015000035/calm-20150829x10q.htm, at 17 (calculated by dividing quarterly data consisting of non-specialty sales of $422,921,000 by non-specialty egg dozens sold of 195,352,000).
[33] 2016Q1 Form 10-Q at 15.
[34] 2016Q1 Form 10-Q at 3.
[35] 2020Q3 Form 10-Q at 24.
[36] 2020Q3 Form 10-Q at 20.

business **$3.32** for a dozen generic jumbo eggs, and **$3.44** for a dozen generic large brown eggs. (Ex. E, Cal-Maine Invoice.)

35.     Cal-Maine appears to have ignored the governor's disaster declaration and increased pricing by 300% or more.

36.     Furthermore, Cal-Maine's price jumps were exorbitant and excessive for the following reasons.

   a.   *Supply did not change like it did during the avian flu epidemic.* Cal-Maine's "facilities have been fully operational and [they] have not experienced any supply chain or delivery disruptions."[37]

   b.   *Cal-Maine's generic eggs are costing more than the $2-plus levels seen during the 2015 avian flu pandemic.* Cal-Maine has admitted that pricing is at "record levels."[38]

   c.   *Cal-Maine's generic eggs pricing (e.g. the $3.32 and $3.42 pricing on the invoice supra) makes generics cost more than Cal-Maine specialty eggs (priced around $1.89).* Nothing has happened that would justify generic eggs costing more than specialty eggs. In fact, upon reason and belief, Cal-Maine's specialty egg brand Egg-land's Best has *remained at 2019 pricing levels.*

37.     In conclusion, Cal-Maine's March and April 2020 generic egg pricing is exorbitant, excessive, and unjustified. *Because this year's exorbitant and excessive price increases occurred during a declared disaster, they violate the DTPA.*

---

[37] 2020Q3 Form 10-Q at 33.
[38] 2020Q3 Form 10-Q at 20.

**F. Cal-Maine makes misleading statements which deflect blame for exorbitant prices.**

38.    Cal-Maine makes misleading public statements about the effect of market prices on its egg prices. For example, during April, Cal-Maine's website stated, "wholesale shell egg market prices . . . are outside of our control."[39] This is misleading, because as a producer selling on the spot market, Cal-Maine can *offer* purchasers whichever price it chooses.

39.    Additionally, Cal-Maine's financials claim pricing is based on "independently quoted wholesale market prices"[40] and that pricing is affected by "market quotations"[41]. Other discussions mention "Spot Egg Market Quotations."[42] These statements imply there is a regulated "market," like the stock market, where one can observe actual prices paid by commodity purchasers (i.e. price "Quotations"). In fact, there is no egg market exchange.

40.    Instead, a company called Urner Barry publishes an industry newsletter and maintains an accompanying website where it publishes various price indexes. Urner Barry gets information from "[d]ata submitters [who] provide transactional and market data on a voluntary basis."[43] In other words, companies submit data voluntarily, and Urner Barry generates egg-related price indexes. But no public market exchange exists, as Cal-Maine implies. When Cal-Maine discusses "market prices" (when no market exchange exists) and market forces that are "outside of our control" (when Cal-Maine can exert control), it misleads purchasers who seek answers as to why

---

[39] *Volatility of Egg Prices*, CALMAINEFOODS.COM, https://www.calmainefoods.com/investors/volatility-of-egg-prices/ (last visited April 18, 2020); *see also* 2020Q3 10-Q at 20 (financials filed after the disaster declaration similarly state "egg prices . . . are outside of our control")

[40] 2019 Form 10-K at 24.

[41] 2019 Form 10-K at 7.

[42] 2019 Form 10-K at 24.

[43] *Data Submitter Policy*, URNER BARRY, https://www.urnerbarry.com/pdf/methodology/UB_Data_Submitter_Policy.pdf (last visited April 18, 2020).

pandemic egg prices have jumped.

## XII.    DTPA VIOLATIONS

41.    The State incorporates and adopts by reference the allegations contained in each and every preceding paragraph of this petition.

42.    Defendants, as alleged above, are engaging or have engaged in false, misleading, or deceptive acts or practices in the conduct of trade or commerce violation of DTPA § 17.46(a).

43.    Defendants, as alleged above, are engaging or have engaged in false, misleading, or deceptive acts or practices in the conduct of trade or commerce, in violation of DTPA §§ 17.46(b)(27)(A) and (B), by offering, demanding in connection with the sale, and/or selling at an exorbitant or excessive price during a declared state of disaster, shell eggs.

44.    Defendants, as alleged above, are engaging or have engaged in false, misleading, or deceptive acts or practices in the conduct of trade or commerce, in violation of DTPA 17.46(b) as follows:

   a.   "[R]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not," DTPA § 17.46(b)(5)); and

   b.   "[F]ailing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed," DTPA § 17.46(b)(24).

## XIII.    INJURY TO CONSUMERS

45.    Defendants have, by means of these unlawful acts and practices, obtained money or

property from consumers who are entitled to restitution, or in the alternative, has caused actual damages to identifiable persons who are entitled to compensation.

46.     Because Defendants have engaged in the unlawful acts and practices described above, Defendants have violated the law as alleged in this petition.  Unless restrained by this Honorable Court, Defendants will continue to violate the laws of the State of Texas and cause injury to the general public.

## XIV.   APPLICATION FOR TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

47.     The State alleges that by reason of the foregoing, Defendants should not continue to sell or offer to sell goods in violation of the laws of Texas.   Unless immediately restrained by this Honorable Court, Defendants will continue to violate the laws of the State of Texas and cause immediate, irreparable injury, loss and damage to the State of Texas and to the general public.  The interests of the State of Texas and the public require immediate action to keep Defendants from continuing to sell necessary goods at exorbitant or excessive prices.  Further, unless injunctive relief is granted, Defendants will continue collecting monies from consumers by use of false, misleading, or deceptive trade practices.  Therefore, the State requests a Temporary Injunction and Permanent Injunction, as indicated below.

48.     The State of Texas requests that, after notice and hearing, the Court issue a Temporary Injunction, and ORDER that Defendants, their officers, agents, servants, employees, attorneys and any other persons in active concert or participation with them, who receive actual notice of the order by personal service or otherwise, be restrained from engaging in the following acts or practices:

     a.   Selling eggs at a price per dozen which is exorbitant or excessive.

     b.   Concealing, withholding, destroying, mutilating, altering, falsifying, or removing from

the jurisdiction of this Court any books, records, documents, invoices, receipts, or other written materials relating to the business of Defendants currently or hereafter in Defendants' possession, custody or control except in response to further orders or subpoenas in this cause; and

c. Representing, directly or by implication, that this Court, the State of Texas, or the Office of the Attorney General has approved any good or service sold or offered for sale by any of Defendants or approved of any of Defendants' business practices or pricing.

49.   The State requests leave of this Court to conduct discovery prior to any scheduled Temporary Injunction Hearing and prior to Defendants' answer date with reasonably shortened deadlines.   Any discovery and depositions, telephonic or otherwise, would be conducted with reasonable shortened notice to Defendants and their attorneys, if known.

50.   The State further requests that this Court order Defendants to provide Plaintiff the following information within five (5) business days after the entry of the Temporary Injunction:

a.   A copy of all contracts or other arrangements in effect during 2020 which govern the prices of non-specialty eggs and prices of specialty eggs which Cal-Maine supplies to Cal-Maine's ten-largest customers in Texas;

b.   A copy of all weekly or daily price sheets advertising egg prices which were sent to Cal-Maine's ten-largest customers in Texas during 2020;

c.   A copy of any and all non-attorney-client-privileged emails mentioning or discussing price-gouging during 2020;

d.   A copy of any and all policy and procedure manuals in effect during 2020 discussing compliance with statutes pertaining to price-gouging, regardless of the jurisdiction; and

e.   A copy of any and all data submitted during the months of March 2020 and April 2020 to any company or business with "Urner Barry" or "ComTell" in the company or business name.

51.     For the reasons set forth above, the State of Texas requests, after notice and hearing, that the Court issue Temporary and Permanent Injunctions, enjoining the acts set out in paragraphs 22, 23, 24, and 28 above, as authorized by sections 17.47(a) of the DTPA.

## XV.     CONDITIONS PRECEDENT

52.     All conditions precedent to the State's claim for relief have been performed or have occurred.

## XVI.   TRIAL BY JURY

53.     The State demands a jury trial and tenders the appropriate fee with this petition.

## XVII.  PRAYER

54.     WHEREFORE, Plaintiff prays that Defendants be cited according to law to appear and answer herein; that after due notice and hearing a TEMPORARY INJUNCTION be issued; and upon final hearing a PERMANENT INJUNCTION be issued, restraining and enjoining Defendants, their officers, agents, servants, employees and attorneys and any other person in active concert or participation with any of the Defendants from engaging, directly or indirectly, in the acts or practices set out in paragraphs 22, 23, 24, and 28, above.

55.     In addition, Plaintiff, State of Texas, respectfully prays that this Court:

   a.   Award civil penalties in favor of Plaintiff, State of Texas, in the amount not to exceed more than $10,000.00 per violation, and $250,000 in the event the deception impacts anyone over 65 years of age;

   b.   Order Defendants to restore all money or other property acquired by means of unlawful acts or practices, or in the alternative, to compensate identifiable persons for actual damages;

c.   Award Plaintiff reasonable attorney's fees and court costs pursuant to Texas Government Code section 402.006;

d.   Award Plaintiff pre-judgment and post-judgment interest at the highest lawful rate;

e.   Appoint a receiver or sequester Defendants' assets if any one or more of Defendants has been ordered by this Court to make restitution and the applicable Defendant or Defendants have failed to do so within three (3) months after the order to make restitution has become final and nonappealable;

f.   Adjudge that all fines, penalties or forfeitures payable to and for the benefit of the State are not dischargeable under bankruptcy pursuant to 11 U.S.C. section 523(a)(7).

56.   Further, Plaintiff, State of Texas, respectfully prays for all other relief to which Plaintiff, State of Texas, may be justly entitled.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

JENNIFER S. JACKSON
Chief, Consumer Protection Division


/s/ Daniel Zwart
DANIEL ZWART
Assistant Attorney General
State Bar No. 24070906
Daniel.Zwart@oag.texas.gov
713-225-8921

RICK BERLIN
Assistant Attorney General
State Bar No. 24055161
Rick.Berlin@oag.texas.gov
713-225-8917
WILLIAM CARPENTER, JR.
Assistant Attorney General
State Bars No. 24081560
William.Carpenter@oag.texas.gov
Office of the Attorney General
Consumer Protection Division
808 Travis, Suite 1520
Houston, Texas 77002
Telephone: (713) 225-8921
Facsimile: (713) 223-5821

PEDRO PEREZ, JR.
Deputy Chief, Consumer Protection Division
State Bar No. 00788184
Pedro.Perez@oag.texas.gov
Office of the Attorney General
Consumer Protection Division
P.O. Box 12548
Austin, Texas 78711
Telephone: (512) 475-4656
Facsimile: (512) 473-8301

**ATTORNEYS FOR THE STATE OF TEXAS**



GOVERNOR GREG ABBOTT

March 13, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
11:20 AM O'CLOCK

MAR 13 2020

_____
Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas 78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

A proclamation certifying that COVID-19 poses an imminent threat of disaster in the state and declaring a state of disaster for all counties in Texas.

The original proclamation is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

Unofficial Copy Office of Marilyn Burgess District Clerk

POST OFFICE BOX 12428 AUSTIN, TEXAS 78711 512-463-2000 (VOICE) DIAL 7-1-1 FOR RELAY SERVICES

EXHIBIT
A

# PROCLAMATION

BY THE

## Governor of the State of Texas

TO ALL TO WHOM THESE PRESENTS SHALL COME:

WHEREAS, the novel coronavirus (COVID-19) has been recognized globally as a contagious respiratory virus; and

WHEREAS, as of March 13, 2020, there are more than 30 confirmed cases of COVID-19 located in multiple Texas counties; and

WHEREAS, there are more than 50 Texans with pending tests for COVID-19 in Texas; and

WHEREAS, some schools, universities, and other governmental entities are beginning to alter their schedules, and some venues are beginning to temporarily close, as precautionary responses to the increasing presence of COVID-19 in Texas; and

WHEREAS, costs incurred to prepare for and respond to COVID-19 are beginning to mount at the state and local levels; and

WHEREAS, the State of Texas has already taken numerous steps to prepare for COVID-19, such as increasing laboratory testing capacity, coordinating preparedness efforts across state agencies, and working with local partners to promote appropriate mitigation efforts; and

WHEREAS, it is critical to take additional steps to prepare for, respond to, and mitigate the spread of COVID-19 to protect the health and welfare of Texans; and

WHEREAS, declaring a state of disaster will facilitate and expedite the use and deployment of resources to enhance preparedness and response.

NOW, THEREFORE, I, GREG ABBOTT, Governor of the State of Texas, do hereby certify that COVID-19 poses an imminent threat of disaster. In accordance with the authority vested in me by Section 418.014 of the Texas Government Code, I hereby declare a state of disaster for all counties in Texas.

Pursuant to Section 418.017 of the code, I authorize the use of all available resources of state government and of political subdivisions that are reasonably necessary to cope with this disaster.

Pursuant to Section 418.016 of the code, any regulatory statute prescribing the procedures for conduct of state business or any order or rule of a state agency that would in any way prevent, hinder, or delay necessary action in coping with this disaster shall be suspended upon written approval of the Office of the Governor. However, to the extent that the enforcement of any state statute or administrative rule regarding contracting or procurement would impede any state agency's emergency response that is necessary to cope with this declared disaster, I hereby suspend such statutes and rules for the duration of this declared disaster for that limited purpose.

In accordance with the statutory requirements, copies of this proclamation shall be filed

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
11:26AM   O'CLOCK
MAR 1 3 2020

*Governor Greg Abbott*
March 13, 2020

*Proclamation*
Page 2

with the applicable authorities.



IN TESTIMONY WHEREOF, I have hereunto signed my name and have officially caused the Seal of State to be affixed at my office in the City of Austin, Texas, this the 13th day of March, 2020.

GREG ABBOTT
Governor

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

Unofficial Copy Office of Marilyn Burgess District Clerk

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
11:20 A.M. O'CLOCK

MAR 1 3 2020



GOVERNOR GREG ABBOTT

April 12, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
12:15PM O'CLOCK
APR 12 2020
Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas 78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

A proclamation renewing the declaration of March 13, 2020, stating that the novel
coronavirus (COVID-19) poses an imminent threat of disaster for all counties in
Texas.

The original proclamation is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

Unofficial Copy Office of Marilyn Burgess District Clerk

EXHIBIT
B

POST OFFICE BOX 12428 AUSTIN, TEXAS 78711 512-463-2000 (VOICE) DIAL 7-1-1 FOR RELAY SERVICES

# PROCLAMATION
BY THE
## Governor of the State of Texas

TO ALL TO WHOM THESE PRESENTS SHALL COME:

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, the Commissioner of the Texas Department of State Health Services, Dr. John Hellerstedt, has determined that COVID-19 represents a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code; and

WHEREAS, I have issued numerous executive orders and suspensions of Texas laws in response to COVID-19, aimed at protecting the health and safety of Texans and ensuring an effective response to this disaster; and

WHEREAS, a state of disaster continues to exist in all counties due to the spread of COVID-19.

NOW, THEREFORE, in accordance with the authority vested in me by Section 418.014 of the Texas Government Code, I do hereby renew the disaster proclamation for all counties in Texas.

Pursuant to Section 418.017, I authorize the use of all available resources of state government and of political subdivisions that are reasonably necessary to cope with this disaster.

Pursuant to Section 418.016, any regulatory statute prescribing the procedures for conduct of state business or any order or rule of a state agency that would in any way prevent, hinder, or delay necessary action in coping with this disaster shall be suspended upon written approval of the Office of the Governor. However, to the extent that the enforcement of any state statute or administrative rule regarding contracting or procurement would impede any state agency's emergency response that is necessary to cope with this declared disaster, I hereby suspend such statutes and rules for the duration of this declared disaster for that limited purpose.

In accordance with the statutory requirements, copies of this proclamation shall be filed with the applicable authorities.



IN TESTIMONY WHEREOF, I have hereunto signed my name and have officially caused the Seal of State to be affixed at my office in the City of Austin, Texas, this the 12th day of April, 2020.

GREG ABBOTT
Governor

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
12:15AM   O'CLOCK

APR 1 2 2020

*Governor Greg Abbott*
April 12, 2020

*Proclamation*
Page 2

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
12:15 PM O'CLOCK

APR 1 2 2020

STATE OF TEXAS                                  §
                                                §
COUNTY OF HARRIS                                §

### AFFIDAVIT OF CHARLENE GALE

Before me, the undersigned notary, on this day personally appeared Charlene Gale, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

1.  "My name is Charlene Gale. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.  I am an Investigator at the Office of the Attorney General of Texas, Consumer Protection Division. I have been employed by the Attorney General's Office since 2005. My regular duties include assisting the Division attorneys with investigations of potential defendants.

3.  I downloaded from the internet and have reviewed true and correct copies of the documents referenced in the footnotes to the petition. Based on my review of those documents, the statements in the petition referencing those documents are true and correct.

4.  I have reviewed Exhibits D and E to the petition, and they are true and correct copies of documents our agency obtained in the process of following up on a consumer complaint our office had received. Based on my review of those documents, the statements in the petition referencing those documents are true and correct.

5.  I have reviewed Exhibit F to the petition, and it is a true and correct excerpt of the first 8 pages of the lawsuit I downloaded from the Harris County Clerk's website. Based on my review of that document, the statements in the petition referencing that document are true and correct.

_____
Charlene Gale

SUBSCRIBED AND SWORN TO BEFORE ME on this 22nd day of April, 2020, to certify which witness my hand and official seal.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

MISSY LORD
Notary Public-State of Texas
Notary ID #6914397
Commission Exp. MAR. 13, 2022
Notary without Bond

**EXHIBIT C**

Affidavit of Charlene Gale                                      Page 1 of 1

To   Page 2 of 2                                4/9/2020 1:02:50 PM CDT

**WHARTON COUNTY FOODS, LLC**
A Cal-Maine Company
P.O. Box 609
BOLING, TX 77420
(979) 657-2891   FAX (979) 657-3506

DATE:   4/9/2020



PHARR TX 78577

STORE:

FAX #:

| DELIVER DAYS & ORDER DAYS |
|---|
| ORDER MONDAY FOR THURSDAY DELIV BEFORE 10:00 AM |
| ORDER THURSDAY FOR MONDAY DELIV BEFORE 2:00 PM |

DELIVERY DATE: _____

EFFECTIVE PRICES FOR WEEK OF   4/12/2020   THRU   4/18/2020

PLEASE E-MAIL ORDERS TO:  wcforders@cmfoods.com

| PRODUCT DESCRIPTION | ORDER | DZ PRICE | CS PRICE |
|---|---|---|---|
| SUNUP JUMBO CTN (12DZ/CS) | | $2.82 | $33.84 |
| SUNUP EXTRA LARGE CTN (15DZ/CS) | | $2.73 | $40.95 |
| SUNUP LARGE (15DZ/CS) | | $2.72 | $40.80 |
| SUNUP MEDIUM CTN (30DZ/CS) | | $1.53 | $45.90 |
| SUNUP LARGE 18 PACK (15DZ/CS) | | $2.72 | $40.80 |
| SUNUP LARGE 18 PACK (30DZ/CS) | | $8.19 | $81.90 |
| SUNUP LARGE BROWN CTN (15DZ/CS) | | $2.94 | $44.10 |

Mail Payments to our Lock Box Address: Wharton County Foods
P. O. Box 675015
Dallas, TX  75267-5015

We appreciate your business!
Thank You!

Bryan Wonders Sales (ext. 37)
(979) 657-2891 Ext 37


Cal-Maine Foods, Inc.

| EXHIBIT |
|---|
| D |



**Wharton County Foods, LLC**
**A Cal-Maine Foods Company**
4429 FM 442 Rd
Boling, TX 77420
979-657-2692
Animal Husbandry # 103

**INVOICE DOCUMENT**

Order #
Delivery Date          04/09/2020
Customer #
PO #

| Ship To: | | Terms: 14 Days |
|---|---|---|

(PHARR, TX 78577 USA)

**METHOD OF DELIVERY**

| | | | |
|---|---|---|---|
| GRD ID | CONTRACT # | | COMPANY 1 |
| ROUTE # | DAY | STOP # | SHIP DATE 04/09/2020 |
| DELIVERY PO # | DELIVERY DATE | SALES LOC | COMPLEX 1 |

| TYPE | ITEM CODE | DESCRIPTION | QTY | SH | PACK | UM | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| GE | 01367770 | Lrg EuroUps GR A 12pk Ctn 15dz C6 White-F | | | 192.00 | DZN | 3.3200 | 637.44 |
| GE | 02312770 | Xlg SunUps GR A 12pk Ctn 15dz C6 White-F | | | 15.00 | DZN | 3.2300 | 48.45 |
| GE | 03312770 | Lrg SunUps GR A 12pk Ctn 15dz C6 White-F | | | 10.00 | 15 PK | 4.6900 | 46.90 |
| GE | 23H20770 | Lrg EuroUps GR A 30pk Ctn 30dz C6 White-F | | | 30.00 | DZN | 3.2300 | 96.90 |
| C6 | 33312770 | Lrg SunUps GR A 12pk Ctn 15dz C6 Brown-F | | | 15.00 | DZN | 3.6600 | 54.90 |

| | | | 20 | 202 | | TOTAL | ▶ | 882.59 |

COMMENTS

| MANTAIN TEMP | TRACTOR # | TRAILER # | SEAL # | LOADED BY |
|---|---|---|---|---|
| 36 | | 4981 | 7104445 | Zeferino |

| VERIFICATION ACTION | | DATE | TIME | SATISFACTORY | CHECKED BY |
|---|---|---|---|---|---|
| Security, functionality of unit and temp. monitored in transit | | | a p | Y  N | |
| At least once if over 4 hours; prior to delivery if < 4 hours | | | a p | Y  N | |
| Functionality of unit and temp. monitored at delivery | | | a p | Y  N | |

| PLEASE REMIT PAYMENT TO: | RETURNED / DAMAGED | QTY | TYPE | IN | OUT |
|---|---|---|---|---|---|
| CAL-MAINE FOODS, INC. | | | CHEP PALLETS | | |
| PO BOX 675015 | | | PALLETS | | |
| DALLAS, TX 75267-5015 | | | CASES | | |
| | | | BASKETS | | |
| | | | CARTS | | |

**TEMPERATURE REQUIREMENT**

FDA requires that ambient temperature be maintained between 33 - 45° Fahrenheit.

ABOVE RECEIVED IN GOOD CONDITION B

DRIVER NAME                    DATE                                                    DATE

EXHIBIT
E

Office of Maine Foods Inc.com

9/27/2018 9:18 AM
Stan Stanart
County Clerk
Harris County

**1118154**

Cause No. _____

| | | |
|---|---|---|
| CAL-MAINE FOODS, INC. | § | IN THE COUNTY CIVIL COURT |
| | § | |
| vs. | § | AT LAW NO._____ |
| | § | |
| HOUSTON INTERNATIONAL PRODUCE | § | HARRIS COUNTY, TEXAS |
| INC. AKA AND DBA HOUSTON | § | |
| INTERNATIONAL PRODUCE; AND JOSE | § | |
| GONZALEZ AKA AND BSPA JOSE A. | § | |
| TURCIOS GONZALEZ, JOE GONZALEZ, | § | |
| JOSE A. TURCIOS, JOSE TURCIOS, J. A. | § | |
| TURCIOS, JOSE A. T. GONZALEZ, AND J. | § | |
| A. T. GONZALEZ | § | |

<u>PLAINTIFF'S ORIGINAL PETITION</u>

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, CAL-MAINE FOODS, INC., a corporation, hereinafter referred to as
*Plaintiff*, and files this Original Petition complaining of HOUSTON INTERNATIONAL
PRODUCE INC., a corporation, also known as, being the same entity as and doing business as
HOUSTON INTERNATIONAL PRODUCE; AND JOSE GONZALEZ, individually, also known
as and being the same person as JOSE A. TURCIOS GONZALEZ, JOE GONZALEZ, JOSE A.
TURCIOS, JOSE TURCIOS, J. A. TURCIOS, JOSE A. T. GONZALEZ, AND J. A. T.
GONZALEZ, jointly and severally, hereinafter referred to as *Defendants*, and for cause of action
would show unto the Honorable Court:

I.

Plaintiff affirmatively pleads that it seeks only monetary relief of $100,000.00 or less,
including damages of any kind, penalties, costs, expenses, pre-judgment interest and attorneys'
fees. Plaintiff intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure.

EXHIBIT
F

II.

Venue is appropriate as all or a substantial part of the events or omissions giving rise to this claim occurred in Harris County.

HOUSTON INTERNATIONAL PRODUCE INC., a corporation, also known as, being the same entity as and doing business as HOUSTON INTERNATIONAL PRODUCE, may be served with citation  by delivering the citation to JOSE A TURCIOS GONZALEZ, registered agent for service or to any President or to any Vice President at 4105 AIRLINE DR, HOUSTON, TX 77022  (registered office) or wherever he may be found.

JOSE GONZALEZ, individually, also known as and being the same person as JOSE A. TURCIOS GONZALEZ, JOE GONZALEZ, JOSE A. TURCIOS, JOSE TURCIOS, J. A. TURCIOS, JOSE A. T. GONZALEZ, AND J. A. T. GONZALEZ, may be served with citation at 4105 AIRLINE DR, HOUSTON, TX 77022  or wherever he may be found.

III.

That, on the dates as shown in the itemized and verified account attached hereto as Plaintiff's Exhibit "A", reference to which is prayed, Plaintiff, at the special instance and request of Defendants, did sell and deliver to Defendants the goods, wares, merchandise and/or services described in said Exhibit "A", at the prices therein charged, the same being the reasonable market value and agreed price therefor.

IV.

That, at the time of the incurrence of the obligation, made the basis of this, Plaintiff's Original Petition, the said HOUSTON INTERNATIONAL PRODUCE INC., had its right to do business in the State of Texas, forfeited by the Secretary of State, for failure to pay its franchise

taxes or penalties, and/or for its failure to file a required report. Said forfeiture of the right to do business occurred on October 2, 2017 and the charter was forfeited on February 2, 2018. The corporation has not been reinstated.

V.

That, JOSE GONZALEZ, was at the time of the incurrence of this obligation, made the basis of this suit, an officer and/or director of said HOUSTON INTERNATIONAL PRODUCE INC. at the time of the incurrence of the debt made the basis of this suit, the said JOSE GONZALEZ, had direct knowledge of the incurrence of the obligation or derived such knowledge within the reasonable course of business of the corporation and that, further said JOSE GONZALEZ, did consent to and approve of the incurrence of the obligation made the basis of this suit. That, therefore, under and by virtue of the laws of the State of Texas, JOSE GONZALEZ is liable for the obligation sued upon.

VI.

In the alternative, without waiving any of the foregoing, Plaintiff would show that the receipt of the goods, wares, merchandise, money and/or services described in Plaintiff's Exhibit "A" were beneficial to Defendants. Defendants will be unjustly enriched if allowed to retain the goods, wares, merchandise, money and/or services, without paying Plaintiff for same.

VII.

All conditions precedent have occurred, have been met, or have been waived. That Defendants did promise to pay Plaintiff for same, and although often requested to do so, the Defendants failed and refused, and still fails and refuses to pay the said account, all to Plaintiff's damages in the sum of $9,969.00 together with interest and attorneys' fees as hereinafter alleged.

VIII.

That Plaintiff has made written demand upon the Defendants for payment of said account, more than thirty (30) days prior to the filing of this Petition, and that Plaintiff would show the Court that the recovery of attorneys' fees is authorized, made and provided, under and according to the provisions of Chapter 38, Texas Civil Practice and Remedies Code, the agreement between the parties, and the principles of equity. Plaintiff further sues Defendants for reasonable attorneys' fees, inasmuch as Plaintiff has been required to employ the undersigned attorneys to file this suit and has agreed to pay them a reasonable fee for their services, all of which Plaintiff alleges to be in at least the sum of $3,325.00.

IX.

## REQUEST FOR DISCLOSURE

Under Texas Rule of Civil Procedure 194, Plaintiff requests that Defendant disclose, within fifty (50) days of the service of this request, the information or material described in Rule 194.2.(a)-(k), Tex.R. Civ. P.

WHEREFORE, premises considered, your Plaintiff prays unto this Honorable Court that the Defendants be cited to appear and answer herein, and that upon a final hearing hereof, Plaintiff do have and recover judgment against Defendants, jointly and severally, in the sum and amount of $9,969.00 together with interest thereon at the rate of six percent (6%) per annum from the 30th day after each invoice came due to the date of judgment, costs of court, reasonable attorneys' fees as hereinabove alleged, statutory interest at the rate for judgments prevailing in the

State of Texas at the time the Judgment is entered on the total amount of the Judgment until paid, and for such further and other relief, general or special, in law or in equity, to which Plaintiff may be entitled.

Respectfully submitted,

TOTZ ELLISON & TOTZ, P.C.

By: _____

JON D. TOTZ
TBA # 20148000
2211 Norfolk, Suite 810
Houston, Texas 77098
Phone: 713-275-0303
Fax: 713-275-0304
Email: jtotz@tetlegal.com
E-Service: service@tetlegal.com

ATTORNEYS FOR PLAINTIFF

LAW OFFICES OF
TOTZ ELLISON & TOTZ, P. C.
A PROFESSIONAL CORPORATION
2211 Norfolk, Suite 510, Houston, TX 77098-4096
Phone (713) 275-0303
Fax (713) 275-0304

STATE OF _Mississippi_

COUNTY OF _Hinds_

BEFORE ME, the undersigned authority, on this day personally appeared _Michael D. Castleberry_
who, being by me duly sworn, states on oath that _he is the Vice President Controller_

1. An individual trading as _____

2. Agent of _____, a partnership, and that _____ is duly qualified to make this affidavit.

3. Agent of _Cal-Maine Foods, Inc._ a _Corporation_, duly incorporated and existing under and by virtue of the laws of the State of _Delaware_ with its principal office and domicile in the City of _Jackson_, County of _Hinds_, and State of _Mississippi_, and is duly qualified and authorized to make this affidavit.

4. That the foregoing and annexed account, claim, and cause of action is favor of
_Cal-Maine Foods, Inc._
and against HOUSTON INTERNATIONAL PRODUCE, INC., a corporation, also known as, being the same entity as, and doing business as HOUSTON INTERNATIONAL PRODUCE; and JOSE GONZALEZ, individually, also known as and being the same person as JOSE A. TURCIOS GONZALEZ, JOE GONZALEZ, JOSE A. TURCIOS, JOSE TURCIOS, J. A. TURCIOS, JOSE A. T. GONZALEZ, and J. A. T. GONZALEZ, both jointly and severally, in the sum of _$9,964.00_ dollars is within the personal knowledge of affiant just and true, that it is due, that all just and lawful offsets, payments and credits have been allowed, and that the facts in this affidavit are true.

SWORN TO AND SUBSCRIBED BEFORE ME, this _13_ day of _September_ A.D. 2018.

_Eugenia Davis_
NOTARY PUBLIC IN AND FOR THE
STATE OF _MS_
My commission expires _01-15-2019_

IF AN INDIVIDUAL, COMPLETE PARAGRAPH 1; IF A PARTNERSHIP, COMPLETE PARAGRAPH 2; IF A CORPORATION, COMPLETE PARAGRAPH 3. THE SECTION OF AFFIDAVIT AND PARAGRAPH 4 MUST BE COMPLETED. AFFIDAVIT MUST BE SIGNED AND NOTARIZED.



## Customer Aging Report

Company: WI - Wharton County Foods, LLC  Division: 001 - Wharton County Foods

AS OF: 03/16/2018

| Short Name | | | | Last PMT Date | Last PMT Amount | | | | | | Sales Group |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Customer Name | | | | | | On Back | Phone | Terms | Contact #2 | | |
| Invoice Date | Invoice No | Typ | Salesperson | Current | 8-14 Days | 15-21 Days | 22-30 Days | 31-45 Days | 46-60 Days | Over 60 Days | Balance Owed |
| 0040010 - HOUSTON INTERNATIONAL | | | | 07/24/2017 | 1,402.20 | | 832-787-0099 | | | | Balance Owed |
| 07/03/2017 | 10952291 | I | | | | | | | | 1,214.00 | |
| 07/05/2017 | 10954354 | I | | | | | | | | 528.00 | |
| 07/05/2017 | 10955265 | I | | | | | | | | 1,056.00 | |
| 08/08/2017 | 10980105 | I | | | | | | | | 1,386.00 | |
| 09/22/2017 | 10992642 | I | | | | | | | | 1,971.00 | |
| 10/18/2017 | 10045592 | I | | | | | | | | 2,798.00 | |
| 10/24/2017 | 11008852 | I | | | | | | | | 898.00 | |
| Customer 0040010 | | | | | | | | | | 9,859.00 | 3,749.00 |

Unofficial Copy Office of Marilyn Burgess District Clerk

EXHIBIT

A



**WHARTON**
4429 FM 442 Rd.
Boling, TX 77420
979-657-2882
Animal Husbandry #: 103

**INVOICE**

| | |
|---|---|
| Invoice #: | 029-1922233 |
| Invoice Date: | 07/03/2017 |
| Order #: | 1537878 |
| Order Date: | 07/03/2017 |

Sold To:
HOUSTON INTERNATIONAL
4105 AIRLINR DR
HOUSTON, TX 77022

Ship To:
HOUSTON INTERNATIONAL
4105 AIRLINR DR
HOUSTON, TX 77022

| CUSTOMER # | TERMS | P.O. # | REF # |
|---|---|---|---|
| | COD | | |

| ITEM CODE | DESCRIPTION | CASES | PACK | DOZENS | UNIT PRICE | TOTAL PRICE |
|---|---|---|---|---|---|---|
| 22812678 | Xlrg NonBrand GR AA Loz 15dz Cs White-Q | 120 | 15 | 1,800 | .7300 | $1,314.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REMIT TO: CAL-MAINE FOODS, INC.
PO BOX 676015
DALLAS, TX 75267-6015

| 120 | | 1,800 | TOTAL | $1,314.00 |
|---|---|---|---|---|

| COMMENTS |
|---|
| |

Version 1.1.7 © 2010 Agrisoft Solutions, LLC                    Page 3 of 3

Unofficial Copy Office of Marilyn Burgess District Clerk

# EXHIBIT B

6/26/2020 7:53 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 44092133
By: Joshua Bovell
Filed: 6/26/2020 7:53 PM

## CAUSE NO. 2020-25427

| | | |
|---|---|---|
| **STATE OF TEXAS,** | § | **IN THE DISTRICT COURT OF** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **CAL-MAINE FOODS, INC. D/B/A** | § | |
| **WHARTON and WHARTON COUNTY** | § | |
| **FOODS, LLC,** | § | |
| **Defendants.** | § | **215TH JUDICIAL DISTRICT** |

**DEFENDANTS CAL-MAINE FOODS, INC.'S AND WHARTON
COUNTY FOODS, LLC'S RULE 91A MOTION TO
<u>DISMISS THE STATE OF TEXAS'S ORIGINAL PETITION</u>**

# TABLE OF CONTENTS

I.      Background ...................................................................................................4

II.     Standard of Review ...................................................................................11

III.    Argument ....................................................................................................13

        A.      DTPA § 17.46(b)(27) Is Unconstitutional Facially and As Applied ....................13

                1.      DTPA § 17.46(b)(27) Is Unconstitutionally Vague....................................13

                        a.      Unconstitutionally Vague on Its Face.............................13

                        b.      Unconstitutionally Vague as Applied ............................15

                2.      DTPA § 17.46(b)(27) Violates the Dormant Commerce Clause by Regulating Extraterritorially and Impeding Interstate Commerce ...................................................................................16

                        a.      DTPA § 17.46(b)(27) Has Impermissible Extraterritorial Effects .............................................................................17

                        b.      As Applied to CMF and WCF, the DTPA § 17.46(b)(27)'s Burden on Interstate Commerce Far Outweighs Any Claimed Benefits .........................................................................19

                3.      The State's Claims Constitute an Unconstitutional Taking Without Just Compensation .....................................................................21

                        a.      Nature of the Government Action.................................23

                        b.      Economic Impact on CMF and WCF ...........................24

                        c.      Interference with Reasonable Investment-Backed Expectations...26

        B.      The State's Claims Under DTPA § 17.46(b)(27) Are Legally and Factually Baseless Because the State Admits CMF and WCF Charged Market Prices, which Are Not Exorbitant or Excessive as a Matter of Law ............................................27

        C.      The State's Claims Under DTPA § 17.46(b)(27) Are Legally and Factually Baseless Because the State Admits CMF and WCF Did Not "Take Advantage of the Disaster." ........................................................................................31

        D.      The State's Claims Under DTPA § 17.46(b)(27) With Respect to Specialty Eggs Are Legally and Factually Baseless Because the State Admits that CMF and WCF's Specialty Egg Prices Have Not Changed ...................................................32

E.    The State's Claims Under DTPA § 17.46(b)(27) Are Legally and Factually
      Baseless to the Extent the State Asserts Claims Based on Transactions Exempt
      from the DTPA under DTPA § 17.49(g) ............................................................33

F.    The State's Misrepresentation Claims Are Legally and Factually Baseless
      Because the State Fails to Allege CMF/WCF Made Any Misrepresentations at
      All—Much Less Misrepresentations Directed to CMF/WCF's Customers ..........35

V.    Conclusion ....................................................................................................................38

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                     **Page(s)**

*In re Abbott,*
— S.W.3d —, 2020 WL 1943226 (Tex. Apr. 23, 2020) .........................................1

*Ass'n for Accessible Medicines v. Frosh,*
887 F.3d 664 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1168 (2019)...........................17, 18, 20

*Ass'n for Accessible Medicines v. Frosh,*
No. CV MJG-17-1860, 2017 WL 4347818 (D. Md. Sept. 29, 2017), *rev'd*, 887
F.3d 664 (4th Cir. 2018) ....................................................................................15, 18

*Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.,*
595 S.W.3d 651 (Tex. 2020)................................................................................12

*Brown v. De La Cruz,*
156 S.W.3d 560 (Tex. 2004)................................................................................28

*Citizens Nat'l Bank v. Allen Rae Invs., Inc.,*
142 S.W.3d 459 (Tex. App.—Fort Worth 2004, no pet.) .......................................33

*City of Austin v. Liberty Mut. Ins.,*
431 S.W.3d 817 (Tex. App.—Austin 2014, no pet.) ........................................12, 27

*City of Crowley v. Ray,*
558 S.W.3d 335 (Tex. App.—Fort Worth 2018, pet. denied) ................................22

*Coates v. City of Cincinnati,*
402 U.S. 611 (1971).............................................................................................14

*Comm'n for Lawyer Discipline v. Benton,*
980 S.W.2d 425 (Tex. 1998).......................................................................13, 14, 16

*Comptroller of Treasury of Md. v. Wynne,*
575 U.S. 542 (2015).............................................................................................13

*Connolly v. Pension Ben. Guar. Corp.,*
475 U.S. 211 (1986).............................................................................................23

*Dickerson v. Bailey,*
336 F.3d 388 (5th Cir. 2003) ..............................................................................17

*E. Enters. v. Apfel,*
524 U.S. 498 (1998).............................................................................................23

*E. Hill Marine, Inc. v. Rinker Boat Co.,*
229 S.W.3d 813 (Tex. App.—Fort Worth 2007, pet. denied) ...........................33, 34

*Fla. Rock Indus., Inc. v. United States*,
  18 F.3d 1560 (Fed. Cir. 1994) ................................................................................24

*Flores v. Millennium Interests, Ltd.*,
  185 S.W.3d 427 (Tex. 2005) ...........................................................................28, 29

*Glob. Int'l, LLC, v. ProBalance, Inc.*,
  No. 3:15-CV-0677-N, 2016 WL 6646225 (N.D. Tex. Nov. 9, 2016) ....................34

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
  425 F.3d 158 (2d Cir. 2005) .................................................................................19

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ..............................................................................................13

*Green Tree Acceptance, Inc. v. Holmes*,
  803 S.W.2d 458 (Tex. App.—Fort Worth 1991, writ denied) ...............................38

*Guillory v. Seaton*,
  LLC, 470 S.W.3d 237 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) .........12, 36, 37, 38

*Healy v. Beer Inst., Inc.*,
  491 U.S. 324 (1989) ...................................................................................17, 18, 20

*Hovel v. Batzri*,
  490 S.W.3d 132 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).......................28, 29, 30

*Int'l Dairy Foods Ass'n v. Boggs*,
  622 F.3d 628 (6th Cir. 2010) .........................................................................17, 19

*Jaster v. Comet II Const., Inc.*,
  438 S.W.3d 556 (Tex. 2014)..................................................................................29

*Kassel v. Consolidated Freightways Corp. of Del.*,
  450 U.S. 662 (1981) ........................................................................................18, 20

*KT & G Corp. v. Att'y Gen. of Okla.*,
  535 F.3d 1114 (10th Cir. 2008) ...........................................................................19

*MHC Fin., Ltd. v. City of San Rafael*,
  No. C-00-03785 VRW, 2008 WL 440282 (N.D. Cal. Jan. 29, 2008) ....................24

*Nollan v. Ca. Coastal Comm'n*,
  483 U.S. 825 (1987)...............................................................................................23

*Paske v. Fitzgerald*,
  499 S.W.3d 465 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ...........................28

*Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*,
128 F.3d 910 (5th Cir. 1997) ...............................................................................17, 19

*Penn Cent. Transp. Co. v. New York City*,
438 U.S. 104 (1978).............................................................................................22, 23

*Penn. Coal Co. v. Mahon*,
260 U.S. 393 (1922)...................................................................................................22

*Pharm. Research & Mfrs. of Am. v. D.C.*,
406 F. Supp. 2d 56 (D.D.C. 2005), *aff'd sub nom. Biotechnology Indus. Org.
v. D.C.*, 496 F.3d 1362 (Fed. Cir. 2007) ...................................................................17

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970)...............................................................................................17, 19

*Sheffield Dev. Co. v. City of Glenn Heights*,
140 S.W.3d 660 (Tex. 2004)......................................................................................22

*Smith v. Goguen*,
415 U.S. 566 (1974).....................................................................................................14

*SPRAJ Props. LLC v. Regions Bank*,
No. 3:13-CV-3472-N, 2015 WL 11120528 (N.D. Tex. May 12, 2015).................34

*State v. Cent. Expressway Sign Assocs.*,
302 S.W.3d 866 (Tex. 2009).......................................................................................38

*State v. Strong Oil Co.*,
433 N.Y.S.2d 345 (N.Y. Sup. Ct. 1980) ..................................................................16

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*,
560 U.S. 702 (2010).....................................................................................................22

*Tenoco Oil Co. v. Dep't of Consumer Affairs*,
876 F.2d 1013 (1st Cir. 1989).......................................................................22, 24, 25

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
413 U.S. 548 (1973).....................................................................................................14

*U.S. Fid. & Guar. Co. v. McKeithen*,
226 F.3d 412 (5th Cir. 2000) .......................................................23, 24, 26, 27

*United States v. L. Cohen Grocery Co.*,
255 U.S. 81 (1921).......................................................................................................15

*Vaqueria Tres Monjitas, Inc. v. Laboy*,
    No. CIV. 04-1840 DRD, 2007 WL 7733665 (D.P.R. July 13, 2007), *aff'd sub*
    *nom. Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464 (1st Cir. 2009) ........................22

*Wooley v. Schaffer*,
    447 S.W.3d 71 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ......................12, 16, 21

## Constitutions & Statutes

FLA. STAT. ANN. § 501.160(1)(b), (5)..............................................................................19

KY. REV. STAT. ANN. § 367.374(1)(c) ...........................................................................15

S.C. CODE ANN. § 39-5-145(A)(5)(a)(i), (I) ...................................................................19

TENN. CODE ANN. § 47-18-5103(b)(1) ...........................................................................20

TEX. BUS. & COM. CODE ANN. § 17.45 ..........................................................................18

TEX. BUS. & COM. CODE ANN. § 17.46..................................................................*passim*

TEX. BUS. & COM. CODE ANN. § 17.47 ..........................................................................28

TEX. BUS. & COM. CODE ANN. § 17.49..............................................................3, 33, 34

TEX. BUS. & COM. CODE ANN. § 17.4625 .......................................................................14

TEX. CONST. art. I, § 17..........................................................................................21, 22

TEX. R. CIV. P. 59 ...............................................................................................12, 13

TEX. R. CIV. P. 91a........................................................................1, 12, 21, 32, 35

U.S. CONST. AMEND. V ..............................................................................................21

U.S. CONST. AMEND. XIV..........................................................................................22

U.S. CONST. art. I, § 8, cl. 3 .....................................................................................17

## Other Authorities

Excessive, MERRIAM-WEBSTER.COM, https://www.merriam-
    webster.com/dictionary/excessive (last visited June 25, 2020) ...............................................29

Exorbitant, MERRIAM-WEBSTER.COM https://www.merriam-
    webster.com/dictionary/exorbitant (last visited June 25, 2020) ...............................................29

The State believes it can govern and set prices for the national shell egg market and two egg producers. The U.S. and Texas Constitutions disagree. The pandemic does not change the analysis because "[t]he Constitution is not suspended when the government declares a state of disaster." *In re Abbott*, — S.W.3d — , 2020 WL 1943226, at *1 (Tex. Apr. 23, 2020). Therefore, pursuant to Texas Rule of Civil Procedure 91a, defendants Cal-Maine Foods, Inc. ("CMF")[1] and Wharton County Foods, LLC ("WCF") file this Motion to Dismiss the State of Texas's Original Petition (the "Petition").

CMF and WCF do not sell eggs to individual consumers and have no control of retail egg prices, which are set by retailers. CMF and WCF sell to businesses—mostly large multi-billion-dollar retailers. For CMF and WCF's conventional fresh shell eggs,[2] pricing is typically based on preexisting, negotiated agreements tied to independent third-party published pricing indexes, just like many other foods, grains, crops, oil and gas, and a host of other products. Nonetheless, the State has singled out *only* conventional fresh shell eggs, and *only* CMF and WCF within the conventional fresh shell egg market, to allege that CMF and WCF engaged in price gouging in violation of the Texas Deceptive Trade Practices Act ("DTPA"). The State does so even while acknowledging that CMF and WCF charged market prices for fresh shell eggs based on prices tied to national and regional market indexes, the vast majority of which are fixed in longstanding pricing agreements. The State has gone too far. The State does not have the power

---

[1] CMF has been incorrectly sued as "d/b/a Wharton." To be clear, CMF does not do business under the name "Wharton," and Wharton County Foods, LLC is a separate and distinct legal entity from CMF.

[2] Conventional fresh shell eggs, sometimes called generic eggs, are distinct from eggs that have been cracked and processed to be sold in liquid or in dried form, and are also distinct from specialty fresh shell eggs (*e.g.*, organic, brown, or free range), which are typically priced on a cost-plus or fixed-price basis and for which the State concedes prices have not fluctuated. Disc. *infra* Part III.D.

to regulate national pricing for eggs, or for any other products that are priced based on published indexes.

The State does not allege—because it cannot—that CMF and WCF's prices fell outside of the range of prices that were charged across the country for fresh shell eggs. It simply disagrees with the national market and believes it can act as central planner to decide what prices are and are not acceptable. But, like the DTPA itself, the State does not identify what an alleged "proper" price would be for a good whose wholesale (as opposed to retail) price varies significantly throughout the year during normal times (*e.g.*, less expensive and usually sold at a loss in the summer, more expensive during fall and winter months and during the holidays, like Easter). Nor could it. This case really is about the State's unconstitutional rejection (and attempted manipulation) of the free market and existing contracts between sophisticated businesses. The State's position is especially unusual given that its mandate is to protect consumers, but the State is focused instead on sales to large national and regional retailers whose transactions are exempt from the DTPA. Disc. *infra* at Part III.E.

Ultimately, the State proposes excluding Texas egg farmers, retailers, and consumers from the national market for shell eggs, instead requiring egg farmers to sell fresh shell eggs at an unknown and arbitrary price set by the State. In asserting these claims, the State blithely ignores the increased costs that CMF and WCF incurred to enact rigorous controls and screening to ensure the safety of their employees and the continued production and supply of shell eggs during the outbreak of COVID-19. The State likewise ignores that beyond the increased crisis pay, other employment costs, and costs of production, CMF and WCF also incurred other cost increases such as for additional transportation and logistics. Nor does the State acknowledge that CMF and WCF themselves paid market prices purchasing eggs on the spot market—in other words, at prices

directly tied to the national and regional market indexes—in order to supply them to retailers seeking additional supply.  Rather than acknowledge these business realities, the State seeks to punish CMF and WCF for these efforts with a scheme that would not actually protect Texas consumers, as is the State's mandate, but would effectively divert fresh shell eggs away from Texas consumers, punish Texas farmers, and reward other companies involved in the production, sale or distribution of fresh shell eggs.  That is not simply poor policy, but more importantly for this Court, it is also unconstitutional.

The State's suit should be dismissed with prejudice for multiple, independent constitutional and inadequate pleading grounds:

***Constitutional Grounds***

1. The DTPA is void for vagueness both facially and as applied.  In particular, the statute prohibits "exorbitant or excessive" prices without any guidance as to what those terms mean, which the State has used to arbitrarily punish sales wholly in line with national and regional market prices.

2. The DTPA statutory provisions at issue violate the dormant Commerce Clause by having an extraterritorial effect and by interfering with interstate commerce.

3. The State's theories, if successful, would result in unconstitutional takings from CMF and WCF.

***Pleading Grounds***

1. The State admits that CMF and WCF merely charged or offered market prices, which are not "excessive and exorbitant" under the DTPA as a matter of law.

2. The State admits in its Petition that CMF and WCF did not change their long-standing pricing structure or take any action to "take advantage" of the disaster as required by the DTPA.

3. The State failed to allege facts demonstrating that the transactions on which it bases its claims are not exempt from the DTPA under Section 17.49(g), which excludes from the DTPA any transactions or sets of transactions exceeding $500,000.

4. The State's claims based on alleged misrepresentations must be dismissed because the statements at issue are true, as the State acknowledges.

# I.   <u>Background</u>[3]

CMF and WCF maintain chicken flocks and process conventional fresh shell eggs for sale to wholesale customers.  *See* Pet. ¶ 22.  CMF and WCF do not sell fresh shell eggs to individual consumers but to national and regional grocery store chains, club stores, and foodservice distributors.  *Id.* ¶ 23.  CMF and WCF's customers are primarily large corporations; in fiscal year 2019 69.8% of CMF and WCF's $1.3 billion in shell egg sales were made to some of the largest grocery store chains and suppliers in not only the United States but the entire world.  Ex. 1, Cal-Maine   Foods   Inc.,   Investor   Presentation   3rd   Quarter   -   2020, https://www.calmainefoods.com/media/1124/investor-presentation-09-2020-3q.pdf   ("CMF Investor Presentation") at 12 (cited at Pet. ¶ 22 n.6); Ex. 2, Cal-Maine Foods, Inc. Feb. 29, 2020 Form 10-Q for FY 2019 ("CMF Feb. 29, 2020 10-Q") at 19 (cited at Pet. ¶ 20 n.1, *passim*).  CMF and WCF operate nationally with operations and sales in many states other than Texas.  Ex. 1, CMF Investor Presentation at 7.

While CMF and WCF produce the majority of conventional fresh shell eggs that they sell at farms owned and operated by CMF and WCF, they purchase a significant number of shell eggs from outside producers on the egg spot market.  Ex. 3, Cal-Maine Foods, Inc. June 1, 2019 Form 10-K ("CMF 2019 10-K") at 6, 23 (cited at Pet. ¶ 20 n.1, *passim*) (explaining that CMF purchased approximately 16% of the shell eggs it sold on the open market).  Thus, CMF and WCF pay market prices for these eggs, yet the State claims it can punish CMF and WCF if they do not sell these eggs at a loss.

---

[3] For purposes of this Motion and without waiving the right to later contest, CMF and WCF accept the allegations as true (although not all are) unless otherwise noted.

CMF and WCF sell two general categories of shell eggs, specialty shell eggs and generic shell eggs. Pet. ¶ 23. Specialty shell eggs include nutritionally enhanced, cage free, organic, and brown eggs. *Id*. ¶ 23, n.9. Specialty shell eggs are a much smaller part of the overall egg market and are typically priced on a cost-plus or fixed-price basis. As a result, their prices are not tied to a market index (that involve sales at profits or sales at losses depending on the movement of the market) and therefore specialty egg prices remain more stable than non-specialty shell eggs. *See* Ex. 2, CMF Feb. 29, 2020 10-Q at 32.

Conventional or generic fresh shell eggs, in contrast, are much more abundant and widely bought and sold as standardized product by retailers, for which "independently quoted wholesale market prices" exist for each of the various types of generic conventional fresh shell eggs (medium large, extra-large, and jumbo). Pet. ¶ 29. As the State admits, "the majority of shell eggs sold in the U.S. in the retail and foodservice channels are sold at independently quoted wholesale market prices for shell eggs." *Id*. Consistent with this industry-wide practice, CMF and WCF sell generic shell eggs at the prevailing market price at the time of sale or pursuant to pricing agreements that specify a price based on a discount or premium to the prevailing market price and have done so for decades. *Id*. ¶¶ 5, 29.

The shell egg production industry is highly fragmented and competitive, and market prices for generic shell eggs are extremely volatile. *See* Ex. 3, CMF 2019 10-K at 4, 8, 9, 22. Generic shell egg market prices fluctuate wildly and are outside of CMF and WCF's control. *Id.* at 7, 10, 22. As the State recognizes in its Petition, the average market price for generic shell eggs before the pandemic have varied from as low as $0.72 a dozen in 2005 to $2.97 a dozen in 2015.[4]

---

[4] The documents cited by the State in further aid and explanation of the allegations in the Petition identify average market prices for shell eggs in some regions varying to an even greater extent. *See* Ex. 3, CMF 2019 10-K at 22 ("For example, the Urner-Barry Southeastern Regional Large

Pet. ¶¶ 30, 33.  This allegation thus confirms that over time, prices fluctuate by large percentages, with an approximately 312% difference between the 2005 low and 2015 high.  The market prices for generic shell eggs are driven by the market forces of supply and demand and thus when demand for shell eggs increases, spot market egg prices generally increase.  *Id*. ¶ 32.  Small decreases in production or increases in demand can significantly impact shell egg prices because supply cannot be adjusted quickly to meet new demand as it entails growing additional hens to a mature laying age, which takes months.  *See* Ex. 3, CMF 2019 10-K at 22.

Wholesale shell egg prices fluctuate cyclically by season; generally, conventional fresh shell egg prices rise during the fall and winter months, and are highest around holidays, including Easter.  *Id.* at 10, 22.  Due to these fluctuations, conventional fresh shell egg producers experience periods of profitability followed by periods of significant losses, and financial results for CMF and WCF change dramatically even between quarters in the same fiscal year.  *Id.* at 10, 22, 24.

### COVID-19 and Egg Prices

On March 13, 2020, Texas Governor Greg Abbott issued a statewide disaster proclamation as a result of the global outbreak of COVID-19, which affected not just Texas, but the entire nation and world (the "Declared Disaster").  Pet. ¶ 4, Ex. A, Governor's Disaster Declaration, & Ex. B, Governor's Renewed Disaster Declaration.  Of course, Governor Abbott was not alone in his declaration as most of America was ordered home to shelter in place.  As a result, demand for

---

Egg Market Price per dozen eggs, for our fiscal 2006-2019 ranged from a low of $0.55 during fiscal 2006 to a high of $3.00 during fiscal 2018.").  These price swings occur for a number of reasons related to fluctuations in supply and demand.  For example, wholesale shell egg prices reached $3.00 in 2018, as noted above, due to the "retail wars" when retailers increased demand by turning eggs into a promotional item to compete for customers.  *Id.*, Ex. 4, Brian A. Moscogiuri, *2017-2018 YTD Egg Market Review*, 13 Urner Barry's Rep. (No. 3) 10, 11 (2018), https://www.urnerbarry.com/reporter/issues/ReporterV13N3_WEB.pdf.

home groceries skyrocketed, with some estimating a 400% surge in grocery stores' demand for shell eggs. Ex. 5, *Coronavirus Special Report*, URNER BARRY, 7 (Mar. 25, 2020).

The State acknowledges that demand shifted dramatically from restaurant to home consumption. In particular, the State's petition notes that the spread of COVID-19 in the United States resulted in restaurants shutting down and consumers stocking up on groceries as they shifted to eating almost entirely at home. Pet. ¶ 4. This sudden increase in demand for groceries in late March resulted in increased market prices for shell eggs across the country, along with increased prices for other grocery staples like beef, chicken, and dairy products. Ex. 6, Jaewon Kang & Jacob Bunge, *For Grocers, Eggs Are Getting More Expensive Amid Coronavirus,* THE WALL STREET J. (Apr. 6, 2020), https://www.wsj.com/articles/forgrocers-eggs-are-getting-more-expensive-amid-coronavirus-11586172611 ("WSJ Article") (cited at Pet. ¶ 10 n.3).

As the State admits, "during March and April 2020, Cal-Maine and the rest of the industry's commodity egg prices skyrocketed, with a regional market index hitting $3.18 in March 2020." Pet. ¶ 34 (emphasis removed). This skyrocketing demand followed a period of losses for United States egg producers, including CMF; for the thirty-nine weeks ending in late February 2020, CMF's gross profits decreased about 70% from the same period the year before. Ex. 2, CMF Feb. 29, 2020 Form 10-Q at 27; *see also* Ex. 7, Megan Poinski, *How Coronavirus Scrambled Eggs*, FOOD DIVE (June 15, 2020), https://www.fooddive.com/news/how-coronavirus-scrambled-eggs/579253/ ("Food Dive Article") (explaining that shell egg producers lost about 2.7 cents per dozen of eggs sold in 2019). As a result of these losses, egg producers had been shrinking their flocks to account for the demand-supply imbalance and depressed market prices, resulting in decreased supply just when consumers arrived to stores with abrupt, unanticipated and unprecedented demand. Ex. 2, CMF Feb. 29, 2020 10-Q at 20 (discussing decreased hen numbers);

Ex. 6, WSJ Article.  As it takes months to raise hens to egg-laying age, egg producers could not respond fast enough to increase supply.  *See* Ex. 6, WSJ Article; Ex. 8, Watts and Associates, Inc., *Final Study on Poultry Catastrophic Disease*, U.S. DEPT. OF AG., 25 (Sept. 30, 2015), https://legacy.rma.usda.gov/pubs/2015/poultrydisease.pdf (explaining that hens cannot lay eggs until they are eighteen- to twenty-two-weeks-old) (cited at Pet. ¶ 10 n.24).

The United States Food and Drug Administration recognized the supply problem and instituted a temporary policy on April 6, 2020, that permitted the sale to retail customers of shell eggs that were originally destined for the foodservice industry.  Ex. 9, *Temporary Policy Regarding Packaging and Labeling of Shell Eggs Sold by Retail Food Establishments During the COVID-19 Public Health Emergency*, U.S. Dept. of Health and Human Servs., Food and Drug Admin. (Apr. 6, 2020), https://www.fda.gov/media/136671/download.  This temporary policy helped meet the increased demand for home consumption and contributed to prices falling back to and below pre-COVID-19 levels.[5]

The spike in demand also corresponded with the Easter season, when fresh shell egg prices typically are at their highest.[6]  *See* Ex. 3, CMF 10-K at 10, 22; Ex. 12, *Volatility of Egg Prices*,

---

[5] In fact, market analysts estimate producers will incur "losses of at least $0.10 per dozen during the month of June."  Ex. 10, LEAP Market Analytics, EGG MARKET SUMMARY AND OUTLOOK 1, 19 (June 19, 2020) ("LEAP Market Analytics") (projecting that Urner Barry prices for white large shell eggs in the South Central region would average $0.91 during the month of June).

[6] The State makes much of shell egg prices during the avian flu ("AI") epidemic in 2015 not rising as high as prices during COVID-19.  *See* Pet. ¶ 36.a.  Initially, it must be stated that the Urner Barry South Central price rose to $2.97 per dozen in 2015 due to AI.  Ex. 3, CMF 2019 10-K at 23.  However, a number of factors makes these two situations different.  COVID-19 caused a sudden shift of almost the entire country to eating at home instead of at schools or restaurants, which use different types of egg products than are sold at grocery stores; no such rapid shift occurred in 2015.  In addition, AI impacted supply primarily during the summer, when demand for and prices of shell eggs are usually at their lowest every year.  *See* Ex. 11, Cal-Maine Foods, Inc. Nov. 28, 2015 Form 10-Q at 14 (cited at Pet. ¶ 32 n.30).  The COVID-19 spike in demand for shell eggs corresponded with the Easter holiday, when fresh shell egg prices are usually at their

CAL-MAINE FOODS, INC., https://www.calmainefoods.com/investors/volatility-of-egg-prices/ (last visited June 24, 2020) (cited at Pet. ¶ 28 n.39) (explaining that shell egg prices are highest every year around the Thanksgiving, Christmas, and Easter holidays). Notably, prices decreased to pre-COVID-19 prices by May 2020, once producers were able to begin selling eggs originally packaged for the food service industry to retailers, panic buying slowed, and the demand spike dissipated (even though the pandemic has continued), and since then fell even more. See Ex. 7, Food Dive Article (presenting weekly average prices of a dozen white shell eggs at supermarkets); Ex. 10, LEAP Market Analytics at 1.

Because CMF and WCF's conventional fresh shell egg prices are tied to regional or national market indexes as well as long-term pricing agreements tied to those same regional or national market indexes, CMF and WCF's prices increased consistent with the market prices on the regional or national market indexes. Pet. ¶ 34. For the vast majority of CMF and WCF's sales, these price increases were self-executing based on the negotiated contract terms because the prices float up (and down) with the index prices. Retailers demand terms tied to these indexes because they enjoy very low prices for most of the year, and then pay more when demand is higher—and they are able to charge more.

While market prices for conventional fresh eggs increased during the pandemic, the State ignores that CMF and WCF's costs also increased. CMF and WCF incurred significant burdens and costs to continue to provide eggs to their customers' increasing demands despite the risks of COVID-19. For example, CMF and WCF employed additional screening and personal protective equipment for employees and all of CMF and WCF's facilities to minimize the risk of spreading COVID-19. *See, e.g.*, Ex. 2, CMF Feb. 29, 2020 10-Q at 21 (noting the implementation of

---

highest, and followed a period of sustained losses due to low market prices.

procedures and policies according to Centers for Disease Control and other government health agency guidelines and "strict sanitation protocols and biosecurity measures").  CMF and WCF hired temporary workers to try and keep up with demand and also provided hazard pay to all their employees.  They also purchased fresh shell eggs on the open market to meet their customers' increased demand.  CMF and WCF's efforts have largely been successful, and as the State acknowledges, as of March 30, 2020, CMF and WCF's "facilities have been fully operational and [CMF and WCF] ha[d] not experienced any supply chain or delivery disruptions." Pet. ¶ 27.  The State, however, fails to acknowledge the additional investment necessary and increased costs that CMF and WCF had to incur in order to continue to fulfill its contractual obligations resulting from unprecedented consumer demand.

CMF and WCF's specialty egg prices are not tied to a market index but instead priced on a cost-plus or fixed-price basis.  As a result, those prices did not generally increase and stayed at 2019 levels during the pandemic. Pet. ¶ 36(c).  The State apparently agrees that specialty eggs are not relevant to this action as it concedes that CMF and WCF's prices for their specialty shell egg brand Eggland's Best remained virtually the same during the pandemic.  *Id.*

**The State's Claims**

The State, indifferent to historic volatility and economic realities of the shell egg market and CMF and WCF's increased costs, now seeks to increase the burdens by asserting that CMF and WCF have violated the DTPA simply by pricing conventional fresh shell eggs in the same manner that they have always priced fresh shell eggs—based on national and regional market indexes (and pursuant to longstanding contracts and pricing arrangements tied to those indexes that their own customers agreed to or demanded).  To the State's thinking, evidently CMF and WCF are the only fresh shell egg producers who are not allowed to price their eggs in line with

national and regional indexes.  The State's argument, if accepted, also would rewrite contracts negotiated at arm's length between CMF and WCF on the one hand, and some of the largest, most sophisticated retailers in the nation on the other.

Specifically, the Petition alleges that CMF and WCF (1) violated DTPA Section 17.46(b)(27)(A) and (B) by selling, or offering for sale, shell eggs at an "exorbitant or excessive price" during a declared state of disaster by selling eggs at prices in line with national and regional market indexes.  Pet. ¶¶ 37, 43; TEX. BUS. & COM. CODE ANN. § 17.46(b)(27).  The State also alleges baseless misrepresentation claims under DTPA Sections 17.46(b)(5) and (24) based on representations by CMF and WCF that the State admits are true in its own Petition.  *See* Pet. ¶ 44; TEX. BUS. & COM. CODE ANN. § 17.46(b)(5), (24).

As purported remedies, the State seeks a temporary and permanent injunction against CMF and WCF to prevent the "[s]elling eggs at a price per dozen which is exorbitant or excessive," and prevent any written evidence related to CMF and WCF's business from being destroyed or removed from the jurisdiction of the Court.  Pet. ¶ 48.  The State also requests certain discovery from CMF and WCF after any entry of a temporary injunction.  *Id.* ¶ 50.  Finally, the State requests the imposition of fines up to $10,000 per alleged violation, or $250,000 if the event impacts anyone over the age of sixty-five-years-old; restitution; attorneys' fees and costs; pre- and post-judgment interest; the appointment of a receiver or sequestration of assets; and a Court order that all fines, penalties, or forfeitures payable to the State are not dischargeable under bankruptcy.  *Id.* ¶ 55.

All of these claims fail as a matter of law and should be dismissed.

## II.   Standard of Review

Texas Rule of Civil Procedure 91a provides that "a party may move to dismiss a cause of action on the grounds that it has no basis in law or fact."  TEX. R. CIV. P. 91a.1.  "A cause of action

has no basis in fact if no reasonable person could believe the facts pleaded." *Id.* In evaluating the factual allegations of the pleadings, "a legal conclusion need not be taken as true"; instead, the plaintiff must include "an allegation of facts supporting that conclusion." *City of Austin v. Liberty Mut. Ins.*, 431 S.W.3d 817, 826 (Tex. App.—Austin 2014, no pet.).

"A cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought." Tex. R. Civ. P. 91a.1. This occurs if "the petition alleges too few facts to demonstrate a viable, legally cognizable right to relief" or if "the petition alleges additional facts that, if true, bar recovery." *Guillory v. Seaton*, LLC, 470 S.W.3d 237, 240 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Therefore, a claim is legally baseless under Rule 91a if it is barred as a matter of law. *Wooley v. Schaffer*, 447 S.W.3d 71, 74, 76-78 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Similarly, "Rule 91a permits motions to dismiss based on affirmative defenses" if the affirmative defense is "conclusively established by the facts in a plaintiff's petition." *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651, 656 (Tex. 2020).

In considering a Rule 91a Motion, the Court may consider the pleadings, in addition to pleading exhibits permitted under Rule 59. Tex. R. Civ. P. 91a.6. Rule 59 describes pleading exhibits as "records, and all other written instruments, constituting, in whole or in part, the claim sued on," including any documents "attached or filed" with the Petition or "cop[ied] . . . in the body of the pleading in aid and explanations of the allegations in the petition . . . made in reference to said instruments." Tex. R. Civ. P. 59. Accordingly, this Court may consider each of the documents on which the State cites and relies "cop[ied] . . . in the body of the pleading" or cited "in aid and explanation of the allegations in the petition." *See id.*

### III.   Argument

**A.  DTPA § 17.46(b)(27) Is Unconstitutional Facially and As Applied.**

There are three independent constitutional ways in which the statute and the State's petition are infirm: (1) void for vagueness, (2) violating the dormant Commerce Clause, and (3) resulting in a taking.  Each justifies dismissal of the State's DTPA price gouging claims.

### 1.   DTPA § 17.46(b)(27) Is Unconstitutionally Vague.

#### a.   Unconstitutionally Vague on Its Face.

DTPA Section 17.46(b)(27) is unconstitutionally vague facially and as applied by its prohibition on "exorbitant or excessive" prices.  Each basis is addressed in turn.

On its face, Section 17.46(b)(27) fails to provide constitutionally required notice of the scope of behavior that it bans.  A statute "is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Courts apply "a stricter vagueness standard" to statutes, like Section 17.46(b)(27), that "threaten to inhibit the exercise of constitutional rights" than those that "regulate[] unprotected conduct."  *Comm'n for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 438 (Tex. 1998).  Because Section 17.46(b)(27) burdens CMF's and WCF's right to engage in interstate commerce, Section 17.46(b)(27) must be reviewed under this stricter vagueness standard.  *See Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542 (2015) (recognizing that laws that burdened interstate commerce are unconstitutional).

Vague statutes violate due process in two ways.  First, a vague statute "fails to give fair notice of what conduct may be punished, forcing people to guess at the statute's meaning, and threatening to trap the innocent."  *Benton*, 980 S.W.2d at 437 (citing *Grayned*, 408 U.S. at 108; *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).  Second, a vague statute "invites arbitrary and discriminatory enforcement by failing to establish guidelines for those charged with enforcing

13

the law, 'allow[ing] policemen, prosecutors, and juries to pursue their personal predilections.'"

*Benton*, 980 S.W.2d at 437 (citing *Smith v. Goguen*, 415 U.S. 566, 575 (1974)).

Section 17.46(b)(27) does both.

> Section 17.46(b)(27) provides that the following consists of unfair trade practices:
>
> [S]ubject to Section 17.4625,[7] taking advantage of a disaster declared by the governor under Chapter 418, Government Code, or by the president of the United States by:
>
>> (A) selling or leasing fuel, food, medicine, lodging, building materials, construction tools, or another necessity at an exorbitant or excessive price; or
>>
>> (B) demanding an exorbitant or excessive price in connection with the sale or lease of fuel, food, medicine, lodging, building materials, construction tools, or another necessity;

TEX. BUS. & COM. CODE ANN. § 17.46(b)(27).

Starting with the plain language, the statute does not define what is an "exorbitant or excessive price," nor are those terms clearly or commonly determined. This failure makes it impossible for any person to understand or comply with the Section 17.46(b)(27). *See Benton*, 980 S.W.2d at 437 (explaining that vague statutes fail to give "fair notice to those to whom [they are] directed" (citing *Grayned*, 408 U.S. at 112)). Additionally, the statute fails to provide guidance on how to interpret "exorbitant or excessive price," thus failing to provide the required notice by "set[ting] out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 579 (1973).

Without any guidance or clarity in the statute about what prices are "exorbitant or excessive," no person, including CMF or WCF, can know what prices are prohibited. The result

---

[7] Section 17.4625 referenced in this provision merely defines a "designated disaster period." TEX. BUS. & COM. CODE ANN. § 17.4625.

is that it is impossible from a plain reading of the statute to know whether prices based on national and regional indexes could be "exorbitant or excessive," particularly when the prices (and indexes) reflect how willing buyers and sellers price shell eggs across the country.   We know of no other similarly vague statutes that have ever been upheld when challenged.   Rather vague statutes that fail to give *any* indication of what constitutes an unlawfully excessive price are unconstitutional, as governing authority has long held.   *See United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89, (1921) (holding that statute making it unlawful "to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries" was unconstitutionally vague); *Ass'n for Accessible Medicines v. Frosh*, No. CV MJG-17-1860, 2017 WL 4347818, at *11 (D. Md. Sept. 29, 2017), *rev'd*, 887 F.3d 664 (4th Cir. 2018) (reversed and struck down statute on other grounds) (refusing to dismiss vagueness challenge because the term "excessive" is a comparative term that must be evaluated in relation to a benchmark).   Consequently, it is void for vagueness on its face.

### b.   Unconstitutionally Vague as Applied.

Section 17.46(b)(27) is also vague as applied here because the State is claiming that prices in line with or based on national or regional shell egg market indexes somehow could be "exorbitant or excessive."   Pet. ¶ 5.   If even market prices, which the State admits are the customary, usual, and normal prices, can be exorbitant or excessive, then there is no clear guide to determine acceptable prices during an emergency.   *See id.* ¶ 29.   Tellingly, laws in other states provide clarity, recognizing that market prices should be the baseline from which exorbitant or excessive prices are measured.   *See, e.g.*, KY. REV. STAT. ANN. § 367.374(1)(c) (explaining that prices are not unlawful if they are "consistent with fluctuations in applicable commodity, regional, national, or international markets, or seasonal fluctuations," or follow the "contract price, or the result of a price formula, established" before the emergency); *State v. Strong Oil Co.*, 433 N.Y.S.2d 345, 358 (N.Y. Sup. Ct. 1980) (holding that under the New York price gouging

statute prohibiting "unconscionably excessive" prices, "[a]n unconscionable price is a significant variant from the market price for these goods as defined by the statute").  Lacking a similar approach, Section 17.46(b)(27) fails to pass muster.

The application of Section 17.46(b)(27) here results in the type of guessing that due process prohibits.  The statute's vagueness allows the State to enforce the statute arbitrarily when it encounters prices it disapproves of, which is exactly what occurred here, where the State claims that admittedly market prices are somehow exorbitant or excessive.  *See Benton*, 980 S.W.2d at 437 (noting vague statutes "allow[] policemen, prosecutors, and juries to pursue their personal predilections") (internal citation omitted).  Notably, although prices rose for numerous other goods, the State is selectively prosecuting a single fresh shell egg producer and one of its affiliates but not a single retailer or other producer.  Because Section 17.46(b)(27) is unconstitutionally vague, the State's claims under Section 17.46(b)(27) are constitutionally barred and should be dismissed.  *See Wooley*, 447 S.W.3d at 74, 76-78.

### 2. DTPA § 17.46(b)(27) Violates the Dormant Commerce Clause by Regulating Extraterritorially and Impeding Interstate Commerce.

The State's claims must also be dismissed because Section 17.46(b)(27) violates the dormant Commerce Clause of the United States Constitution both facially and as applied in this case.  Specifically, Section 17.46(b)(27) purports to regulate transactions wholly outside of Texas and the State's application of Section 17.46(b)(27) here unduly interferes with the interstate market for shell eggs.

Because Congress has full power to regulate interstate commerce under the Commerce Clause, Article I, Section 8, Clause 3 of the Constitution, the corollary doctrine—the dormant Commerce Clause—holds that "states lack the power to impede this interstate commerce with their own regulations."  *Dickerson v. Bailey*, 336 F.3d 388, 395 (5th Cir. 2003).

State statutes that are protectionist or that control commerce outside the state's borders are *per se* invalid.  *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989); *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 646 (6th Cir. 2010).  A state law can also violate the dormant Commerce Clause if, as applied, it places burdens on interstate commerce that are "clearly excessive in relation to the putative local benefits."  *Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970); *see also Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*, 128 F.3d 910, 918 (5th Cir. 1997).

### a.  DTPA § 17.46(b)(27) Has Impermissible Extraterritorial Effects.

Section 17.46(b)(27) unlawfully impacts sales outside the state of Texas in "practical effect" and is thus invalid.  A state law with the practical effect of exterritorial control of interstate commerce violates the dormant Commerce Clause "regardless of whether the statute's extraterritorial reach was intended by the legislature."  *Healy*, 491 U.S. at 336.

Price gouging statutes must not have the practical effect of regulating "upstream pricing" for transactions that occur wholly outside the state.  *Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664, 666 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1168 (2019); *see also Pharm. Research & Mfrs. of Am. v. D.C*., 406 F. Supp. 2d 56, 67-71 (D.D.C. 2005), *aff'd sub nom. Biotechnology Indus. Org. v. D.C*., 496 F.3d 1362 (Fed. Cir. 2007) (finding price gouging statute had a *per se* invalid extraterritorial reach as it applied to transactions between manufacturers and wholesalers that occur wholly outside the District of Columbia).

By setting prices at which national companies can sell their goods, including to national retailers, Section 17.46(b)(27) impacts upstream sales out-of-state by mandating only in Texas a certain price methodology that would necessarily impact pricing throughout the distribution chain, including for example for out-of-state sales to retailers with operations both in and outside of Texas

(given Texas' position that the contracts applicable to sales to any retailer based on national and regional market indexes are invalid in Texas during any declared disaster).

Like the unconstitutional price control statute in *Frosh* that did "not limit the Act's application to sales that actually occurred within Maryland," nothing in Section 17.46(b)(27) limits its application to transactions in Texas.  887 F.3d at 671.  Instead, Section 17.46(b)(27) applies on its face to all transactions in any state with respect to any goods "wherever situated," including trade merely "indirectly affecting the people of this state."  TEX. BUS. & COM. CODE ANN. § 17.45(6).

Section 17.46(b)(27)'s extraterritorial impact is more evident when considering the effect of every state adopting similar legislation, a key test the United States Supreme Court outlined in *Healy*: "[T]he practical effect of the statute must be evaluated . . . by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." 491 U.S. at 337.  If every state had a different price gouging statute in effect during emergencies, with different definitions of unlawful prices, it would be virtually impossible for a company to conduct interstate business while complying with a patchwork of different statutes.  *See Kassel v. Consolidated Freightways Corp. of Del.*, 450 U.S. 662, 671-75 (1981).  And as noted below, this web of conflicting state price gouging laws unfortunately is a reality here.

Because Section 17.46(b)(27) is not limited to transactions in Texas and includes upstream transactions in other states, it has the practical effect of impermissibly regulating extraterritorial transactions and is thus *per se* unconstitutional under the dormant Commerce Clause.[8]  *See KT &*

---

[8] The discovery sought by the State in this action demonstrates the extraterritorial enforcement of Section 17.46(b)(27):  the State issued a third party subpoena to Grocers Supply International, LLC at its offices in New Hampshire.

*G Corp. v. Att'y Gen. of Okla.*, 535 F.3d 1114, 1143 (10th Cir. 2008) ( "[A] statute will be invalid *per se* if it has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question.") (citing *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 168 (2d Cir. 2005)); see also *Int'l Dairy Foods Ass'n*, 622 F.3d at 645.

### b. As Applied to CMF and WCF, the DTPA § 17.46(b)(27)'s Burden on Interstate Commerce Far Outweighs Any Claimed Benefits.

Even if Section 17.46(b)(27) were not *per se* unconstitutional by virtue of its impermissible extraterritorial effects as described above, the statute as applied in this case would still violate the dormant Commerce Clause, as the "burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142; *Pelican Chapter*, 128 F.3d at 918.

As applied to CMF and WCF, who operate in a number of states across the country, the statute excessively burdens interstate commerce. As pointed out in documents that the State cited, CMF has significant agreements with national grocers, such as Wal-Mart Stores and Sam's Club, which alone accounted for over thirty percent of CMF's national sales in fiscal year 2019. Ex. 3, CMF 2019 10-K at 7. Wal-Mart Stores and Sam's Club operate across the country, and CMF supplies eggs to them in several states. Several states, recognizing the volatility of food commodity pricing, exempt such commodities from those price gouging statutes or set market prices as the baseline price (if they have price gouging statutes at all). *See*, *e.g.*, FLA. STAT. ANN. § 501.160(1)(b), (5) (excluding from the price gouging statute prices that increase due to "regional, national, or international market trends" and exempting "growers, producers, or processors of raw or processed food products"); S.C. CODE ANN. § 39-5-145(A)(5)(a)(i), (I) (excluding from the price gouging statute prices that increase due to "local, regional, national, or international market trends" and exempting "sales by growers, producers, or processors of raw or processed food

products"); TENN. CODE ANN. § 47-18-5103(b)(1) (excluding from the price gouging statute "[p]rice increases in applicable regional, national, or international commodity markets").

Because of these varying statutes, and the State's unreasonable interpretation of Section 17.46(b)(27) in this suit, CMF would have to enter into multiple contracts with most of its top customers: one contract for Texas stores, and others for contracts in other states. Therefore, Section 17.46(b)(27) and the State's application of that Section would force CMF to "enter into a separate transaction for each state in order to tailor their conduct so as not to violate any state's price restrictions" and thus unduly burdens interstate commerce in violation of the dormant Commerce Clause. *Frosh*, 887 F.3d at 673-74; *see also Healy*, 491 U.S. at 337; *Kassel*, 450 U.S. at 671-75.

Importantly, the State's interference in interstate commerce through invocation of the DTPA does not serve the public's interest in having affordable goods and services during an emergency.[9] The State's application of Section 17.46(b)(27) simply encourages CMF and WCF, and any other egg producer, to sell shell eggs in states other than Texas where market prices are permissible, and at the very least increases the cost of doing business in Texas, all making it more difficult for Texas grocers to buy eggs and consumers to access groceries. The State's application of Section 17.46(b)(27) in this suit against CMF and WCF *for offering market-based prices* discourages these companies—and other national companies who fear being the next target of the

---

[9] CMF and WCF play no role in setting grocers' shell egg prices; CMF and WCF sell shell eggs at wholesale only to retailers and grocers, *not the public*. These pricing agreements were reached and in place before the declaration with both sides bearing the risk that prices could go up or down. The State's decision to target CMF and WCF under these circumstances, without addressing the prices that consumers actually pay, merely shifts profits from one group of companies to another. The DTPA was not created for a transfer of profit from one private entity to another.

State—from selling their products in Texas during a declared disaster when these prices are recognized as reasonable under various other state's price gouging statutes.

Because Section 17.46(b)(27) and the State's application of it here violates the dormant Commerce Clause, the State's claims under Section 17.46(b)(27) are legally baseless and must be dismissed. *See Wooley*, 447 S.W.3d at 74, 76-78 (holding that claims that are legally barred are legally baseless under Rule 91a).

### 3. The State's Claims Constitute an Unconstitutional Taking Without Just Compensation.

The State's claims, if accepted, would result in a taking in two distinct ways:  (1) forcing CMF and WCF to sell fresh shell eggs that they purchased on the open spot market for less than they paid in all cases and (2) to sell fresh shell eggs for less than their fair market value pursuant to previously existing pricing agreements, regardless of whether those prices allow CMF and WCF to recoup the costs of producing these fresh shell eggs.[10]  In effect, the State seeks to take CMF and WCF's property without just compensation in violation of the Takings Clauses of the United States and Texas Constitutions.  This unconstitutional action must be dismissed.

The Takings Clause of the Fifth Amendment of the United States Constitution prohibits "private property" from being "taken for public use, without just compensation."  U.S. CONST.

---

[10] The Petition seeks an injunction preventing CMF and WCF from the "acts or prices set out in paragraphs 22, 23, 24, and 28."  Pet. ¶¶ 51, 54.  As explained in CMF and WCF's Motion to Transfer Venue and Original Answer, Affirmative Defenses, and Special Exceptions to the State of Texas's Original Petition ("Answer"), paragraphs 22, 23, 24, and 28 of the Petition are merely background allegations purporting to describe CMF and WCF's operations, business, and market share; they do not even contain allegations of acts by CMF or WCF that the State claims are prohibited by the DTPA.  Answer at 8.  Taken at face value, the State asks this Court to enjoin CMF and WCF from operating their business at all.  Surely that is not the State's goal. Accordingly, CMF and WCF request that the State's claims for injunctive relief in the Petition at paragraphs 51 and 54 be dismissed or that the State be required to allege a claim for relief consistent with its allegations of conduct it alleges is unlawful under the DTPA.  *Id.*

AMEND. V.  The Takings Clause applies to the states through the Fourteenth Amendment Due Process Clause.  *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot*., 560 U.S. 702, 707 (2010).  Article I, Section 17, of the Texas Constitution includes a provision similar the Takings Clause, which states:  "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person."  The same legal standard guides application of the federal and Texas Takings Clauses. *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 669 (Tex. 2004); *City of Crowley v. Ray*, 558 S.W.3d 335, 342 (Tex. App.—Fort Worth 2018, pet. denied) ("[W]e look to federal jurisprudence construing and applying the Fifth Amendment when analyzing article I, section 17.").

Beyond the physical taking of property, the Takings Clause also prevents government regulatory actions that "go[] too far."  *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); *see also Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978).  When the government uses regulations to force sellers to lower their prices below just and reasonable levels, to prices so low that merchants cannot recover costs or make a profit, these regulations constitute takings that require compensation.  *Tenoco Oil Co. v. Dep't of Consumer Affairs*, 876 F.2d 1013, 1023 (1st Cir. 1989); *Vaqueria Tres Monjitas, Inc. v. Laboy*, No. CIV. 04-1840 DRD, 2007 WL 7733665, at *38 (D.P.R. July 13, 2007), *aff'd sub nom. Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464 (1st Cir. 2009).

The State's application of DTPA Section 17.46(b)(27) against CMF and WCF is an impermissible regulatory taking.  To determine whether a regulatory action constitutes a taking, the Court will conduct a factually intense *ad hoc* analysis.  *Penn. Central*, 438 U.S. at 124.  The three most significant factors in the inquiry include: (1) the character of the government action,

(2) the impact of the regulation on the defendant, and (3) the extent to which the regulation interfered with the defendant's reasonable investment-backed expectations. *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 224-25 (1986) (citing *Penn Central*, 438 U.S. at 124). All three factors indicate that the State's action against CMF and WCF constitutes an unconstitutional taking.

### a.  Nature of the Government Action.

The nature of the State's action as a selective prosecution of only CMF and WCF for alleged price gouging of conventional fresh shell eggs—while no other shell egg producers and no retailers have been targeted—indicates that the State's action is an unconstitutional taking. The State has not sued the producers of other agricultural/food products whose products similarly experienced commodity price spikes during the pandemic due to changes in demand. In choosing to selectively prosecute CMF and WCF for pricing strategies employed by nearly all (if not all) egg producers, packers, and retailers that at all times before and after the pandemic remained consistent—and seeking to extract a significant fine for following regional and national market prices—the State is "forcing some people alone to bear public burdens, which, in all fairness and justice, should be borne by the public as a whole." *U.S. Fid. & Guar. Co. v. McKeithen*, 226 F.3d 412, 416 (5th Cir. 2000) (citing *E. Enters. v. Apfel*, 524 U.S. 498, 522 (1998)).

The Takings Clause was created to prevent the government from unfairly targeting one business among many in this way. When the state "single[s] out" only one party as it has here for charging market-dictated prices, the regulatory enforcement is more likely to be a taking. *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 835 n.4 (1987) ("If the Nollans were being singled out to bear the burden of California's attempt to remedy these problems, although they had not contributed to it more than other coastal landowners, the State's action, even if otherwise valid,

might violate . . . the . . . Takings Clause."); *MHC Fin., Ltd. v. City of San Rafael*, No. C-00-03785 VRW, 2008 WL 440282, at \*16 (N.D. Cal. Jan. 29, 2008) (finding city's low cost housing ordinance that targeted one mobile home property owner with rent increase caps was a regulatory taking, explaining, "[h]ousing prices are set by market-wide forces, not the unilateral decisions of real estate providers").  Conventional shell egg prices have long been pegged to market-wide forces, not the unilateral decisions of CMF or WCF (of which none were made in any event); thus, the State's approach here would result in a taking.

### b.  Economic Impact on CMF and WCF.

The economic impact on CMF and WCF of the fines and price cap the State seeks would impose a "considerable, novel financial burden" on CMF and WCF, also weighing in favor of finding the State's action a taking.  *U.S. Fidelity & Guar. Co*., 226 F.3d at 416.  The analysis of the economic impact of the regulation requires the Court to consider the owner's opportunity to recoup its investment or better as well as recoup losses from an investment due to a cyclical or fluctuating market.  *See Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1567 (Fed. Cir. 1994) (explaining that analysis of economic impact of a regulation includes considering "the owner's opportunity to recoup its investment or better"); *Tenoco Oil Co*., 876 F.2d at 27 ("A price regulation which forces wholesalers to sell gasoline for a price which does not cover operating costs and a reasonable profit may, in short order, become so onerous that the wholesalers will be unable ever to recover their earlier cumulative losses through subsequent price increases and may be forced out of business.").

Forcing CMF and WCF to charge prices for conventional shell eggs below their cost or market prices charged by others and/or set by contract would undermine their business.  As noted previously, CMF and WCF purchase a significant portion of their shell eggs on the open market

to fulfill customer demand; CMF, for example, purchases approximately 16% of the fresh shell eggs it sells from outside producers.  Ex. 3, CMF 2019 10-K at 6, 23.  The State now seeks to force CMF and WCF to sell the shell eggs they purchase on the market below their own cost.

Moreover, due to the constantly fluctuating prices in the conventional shell egg market, CMF, WCF, and other egg producers experience periods of losses followed by periods of gains. Therefore, as in *Tenoco Oil Co*., 876 F.2d at 1027, if the State were to intervene in an efficient market and force CMF and WCF to sell shell eggs below market price, particularly around Easter, which is a more profitable period for CMF and WCF (allowing CMF and WCF to make up for losses that occur during other periods of the year), CMF and WCF would not be able to compensate for prior losses when market-set prices were lower, including recent losses due to the low market price of fresh shell eggs prior to COVID-19.  *See*, *e.g.*, Ex. 2, CMF Feb. 29, 2020 10-Q at 13 (noting the losses suffered by CMF for the thirty-nine weeks ending in late February 2020 and disclosing that CMF had cumulative losses of $61.9 million); Ex. 3, CMF 2019 10-K at 7, 10 (explaining that the cyclical nature of egg prices means egg prices are at their highest—and CMF has periods of profitability—during holiday periods like Easter); Ex. 6, WSJ Article (noting that U.S. egg producers including CMF had a "tough period" in 2019, who lost an average of 2.7 cents per dozen eggs they produced last year).

Additionally, CMF, WCF and their customers agree on pricing arrangements linked to a market index with full knowledge and expectation that there will at times be profits and at times losses, and the long term nature of the relationships equitably spread the risk for the mutual benefit of the parties.  The State now seeks to force CMF and WCF to bear the entire risk of low markets without the opportunity to make those losses up during profitable times.

Finally, the State's selective prosecution is putting CMF and WCF at a competitive disadvantage.  On top of the significant additional costs and burdens incurred due to Covid-19, CMF and WCF now have to spend considerable sums defending themselves against the State of Texas when their competitors and others in the shell egg markets do not.

As the State's action threatens the ability of CMF and WCF to operate to profitability in Texas, it constitutes a taking that, if uncompensated, could drive CMF and WCF out of the Texas market completely.  This economic impact is particularly harsh in light of CMF and WCF's substantial investment in the Texas market.

### c.  Interference with Reasonable Investment-Backed Expectations.

The State's attempt to limit wholesale fresh shell egg prices—and collect tremendous fines for completed transactions—is unprecedented and unforeseeable to CMF, WCF, and their investors.  Despite being passed in 1995, few cases interpret Section 17.46(b)(27), giving companies no indication as to how the statute would be enforced.  And as noted in Part III.A.1, Section 17.46(b)(27) provides no direction on what prices are permissible (presumably those set in an efficient, national market following historical patterns would be permissible, but the State contends otherwise).  But it was particularly unforeseeable that the State would assert that market prices, including market prices charged pursuant to longstanding customer pricing models, constitute price gouging.  This attempt to collect fines for CMF and WCF's past sales "upset[s] legitimate expectations and settled transactions," *U.S. Fidelity & Guar. Co.*, 226 F.3d at 418, between CMF and WCF and their customers engaged in longstanding distribution arrangements in a system in which the State admits "the majority of shell eggs sold in the U.S. in the retail and foodservice channels are sold at independently quoted wholesale market prices for shell eggs,"

Pet. ¶ 29. *See U.S. Fidelity & Guar. Co*., 226 F.3d at 419 (considering whether parties suspected the retroactive enforcement of a regulation based on the state's established "pattern of conduct").

It is unjust and unforeseeable for the State to force CMF and WCF to set fresh shell egg prices below regional or national market prices, to prevent CMF and WCF from recouping its costs of production along with a profit margin and the costs of shell eggs it has purchased on the spot market for resale, and to fine CMF and WCF for honoring the pricing terms in its many long-standing customer agreements that are pegged to the national and regional price indexes the State seeks to declare retroactively improper in the State of Texas. Combined with the State's selective targeting of CMF and WCF, the State's suit and requested relief constitutes an unconstitutional taking. As such, the State's claims are legally barred and thus legally baseless and must be dismissed.

*     *     *

Any one of these constitutional grounds is sufficient to dismiss the State's price gouging claims under the DTPA with prejudice.

**B. The State's Claims Under DTPA § 17.46(b)(27) Are Legally and Factually Baseless Because the State Admits CMF and WCF Charged Market Prices, which Are Not Exorbitant or Excessive as a Matter of Law.**

The State's claims are legally and factually baseless because as a matter of law, market prices are not exorbitant or excessive under DTPA.

While the State repeatedly and in conclusory fashion alleges that CMF and WCF charged or offered prices that were "exorbitant or excessive," these bare allegations of "a legal conclusion need not be taken as true." *Liberty Mut. Ins.*, 431 S.W.3d at 826. Instead, the State is required to make "an allegation of facts supporting that conclusion." *Id.* The State fails to make any such factual allegations but merely alleges that CMF and WCF charged or offered prices consistent with market prices. Pet. ¶ 34 (alleging that "during March and April 2020, Cal-Maine and the rest of

the industry's commodity egg prices skyrocketed, with a regional market index hitting $3.18 in March 2020," and "Cal-Maine followed that trend in Texas").

As noted above, Section 17.46(b)(27) does not define what prices are "exorbitant or excessive" in violation of the Section nor does it set any standard for doing so and is thus unconstitutionally void for vagueness. This is particularly true if Section 17.46(b)(27) prohibits national or regional market prices as the State alleges. To the extent that this Court finds Section 17.46(b)(27) is nonetheless constitutional, the Court must determine what an "exorbitant or excessive price" is in a manner consistent with the United States and Texas Constitutions to determine whether the State has alleged that CMF and WCF have charged or offered an "exorbitant or excessive price." Yet by any reasonable standard of interpreting these terms, the State has failed to allege that CMF and WCF charged or offered an "exorbitant or excessive price."

In interpreting a statute, the object is to "ascertain and give effect to the Legislature's intent." *Paske v. Fitzgerald*, 499 S.W.3d 465, 473 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Statutes that impose civil penalties without reference to any actual loss or injury are penal statutes, and "penal statutes should be strictly construed." *Hovel v. Batzri*, 490 S.W.3d 132, 148 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (citing *Brown v. De La Cruz*, 156 S.W.3d 560, 565 (Tex. 2004); *see, e.g.*, *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 433 (Tex. 2005) ("[S]tatute providing for a daily penalty unrelated to actual losses must be strictly construed.") (internal citation omitted). In strictly construing a penal statute, "the statute is read in its entirety in a way that benefits the party facing the possibility of a penalty if a fair reading permits it." *Hovel*, 490 S.W.3d at 137. The purpose of strict construction is "to protect individuals against whom liability is sought." *Id.*

The State brings this action under Section 17.47, which provides for "a civil penalty to be paid to the state" of $10,000 per violation, or $250,000 if the event impacts anyone over the age of sixty-five-years-old, that is not based on compensable damages and the State specifically seeks "civil penalties" under Section 17.46(b)(27). Pet. ¶ 55(a). Because the State seeks civil penalties for violations of Section 17.46(b)(27), Section 17.46(b)(27) "must be strictly construed to protect [CMF and WCF]." *See Hovel*, 490 S.W.3d at 137 (internal citation omitted); *see also Flores*, 185 S.W.3d at 433.

"When a statute uses a word that it does not define," courts must "determine and apply the word's common, ordinary meaning" by looking to "a wide variety of sources, including dictionary definitions." *Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014).

According to the Merriam-Webster Dictionary, the term "exorbitant" is defined as "exceeding the customary or appropriate limits in intensity, quality, amount or size."[11] And the term "excessive" is defined as "exceeding what is usual, proper, necessary, or normal."[12] Accordingly, to determine what an "exorbitant or excessive" price is under Section 17.46(b)(27) and thus whether the State has alleged that CMF and WCF charged or offered an exorbitant or excessive price, the Court must determine what the customary, usual, or normal price is and if the prices the State claims are exorbitant or excessive exceed that price.[13]

---

[11] Exorbitant, MERRIAM-WEBSTER.COM https://www.merriam-webster.com/dictionary/exorbitant (last visited June 25, 2020).

[12] Excessive, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/excessive (last visited June 25, 2020).

[13] The definitions also include the vague terms "proper" and "appropriate," but these subjective terms are far too vague to provide any guidance as to what prices are "exorbitant and excessive" and would permit the State to make arbitrary determinations of what prices are "proper" or "appropriate," as it does here. Such a reading would be blatantly unconstitutional as explained above, and would contradict the Court's responsibility to strictly construe this penal statute against

As the State admits, "the majority of shell eggs sold in the U.S. in the retail and foodservice channels are sold at independently quoted wholesale market prices for shell eggs." Pet. ¶ 29. And CMF and WCF's average "normal egg pricing levels are available publicly and . . . often trend slightly below regional egg index prices." *Id*. ¶ 30. As the State further admits, these market prices based on regional egg index prices have ranged from $0.72 a dozen in 2005 to $2.97 a dozen in 2015. *Id*. ¶¶ 30, 33. Because the price for shell eggs can and has ranged so dramatically historically (and certainly will again in the future due to the volatility of the market), no specific price or price range can be considered customary, usual, or normal. Instead, the only price that is customary, usual, or normal is the independently quoted national or regional shell egg index prices, which, as the State admits, is the generally accepted price in the industry at which the majority of shell eggs are sold in the United States. *Id*. ¶¶ 29-30. The only commonality among the prices for shell eggs historically is that they are pegged to national and regional shell egg indexes, and this is the only standard against which the customary, usual, or normal price can be determined in order to identify if prices are "exorbitant or excessive" in exceeding that price.

Yet the State admits here that the "industry's commodity egg prices skyrocketed" and CMF and WCF's pricing merely "followed that trend." *Id*. ¶ 34. The State further admits that the prices observed during COVID-19 were not unusual or abnormal but expected and completely normal based on the massive increase in demand nationally, admitting that due to the natural forces of supply and demand "[d]uring periods in which egg-yield declines or when demand jumps, spot market egg prices will jump," *id*. ¶ 32, and "the pandemic caused market demand to jump," *id*. ¶ 5. In other words, the State alleges merely that the market prices—*i.e.*, the customary, usual, or

---

the State. *See Hovel*, 490 S.W.3d at 137.

normal prices—increased, and thus the customary, usual, or normal price charged by CMF and WCF, whose prices are *automatically set* based on market prices, likewise increased.

Because the State fails to allege any facts demonstrating that CMF and WCF charged or offered "exorbitant or excessive" prices, but instead merely alleges that CMF and WCF charged market prices consistent with the customary, usual, or normal price, the State's claims under Section 17.46(b)(27) are legally baseless.

**C.  The State's Claims Under DTPA § 17.46(b)(27) Are Legally and Factually Baseless Because the State Admits CMF and WCF Did Not "Take Advantage of the Disaster."**

The State's claims are also legally and factually baseless because the State failed to and cannot allege that CMF and WCF engaged in any acts that would constitute "taking advantage of a disaster," as required by Section 17.46(b)(27).  Section 17.46(b)(27) requires that the State allege and prove not just that prices charged or offered were "exorbitant or excessive" but that the "exorbitant or excessive prices" were charged or offered for the purpose of "taking advantage of a disaster declared by the governor."  DTPA § 17.46(b)(27).  The State must therefore allege and ultimately prove that CMF and WCF took some action or changed its behavior in order to "take advantage" of the Declared Disaster.  Yet the State alleges no such acts.  Nor could it—because CMF and WCF in fact took no action.  Instead, the State admits that CMF priced generic fresh shell eggs based on market prices before, during, and after the Declared Disaster.

The State admits that "Cal-Maine sells most of its eggs at the prevailing market price at the time of the sale," Pet. ¶ 5, and "Cal-Maine's own average egg prices align with the wholesale 'Egg Market' pricing."  *Id*. ¶ 29.  The State further admits that following the outbreak of COVID-19, "egg pricing has skyrocketed in America, and Texas is no exception," *id*. ¶ 20, and that "during March and April 2020, Cal-Maine and the rest of the industry's commodity egg prices skyrocketed, with a regional market index hitting $3.18 in March 2020," and "Cal-Maine followed that trend in

Texas," *id.* ¶ 34 (emphasis removed).  Notably, prices quickly dropped to about $1 per dozen. Ex. 13, *Weekly Combined Regional Shell Eggs*, USDA MARKET NEWS (June 26, 2020), https://www.ams.usda.gov/mnreports/wa_py001.txt (listing the average wholesale price for a dozen large shell eggs in the South Central region the week ending June 26, 2020 as $0.79).

The State therefore admits that CMF and WCF sold fresh shell eggs at the "prevailing market price at the time of sale" both before and after the Declared Disaster and did not change their pricing structures or take *any* action to take advantage of the Declared Disaster.  Pet. ¶ 5.  The State cannot plausibly allege that CMF and WCF—by simply charging and offering market prices for fresh shell eggs as they always had done—somehow took advantage of the disaster: their pricing model and behavior did not deviate from pre-pandemic practices.  *See* TEX. R. CIV. P. 91a.1 ("A cause of action has no basis in fact if no reasonable person could believe the facts pleaded.").

Absent any allegation by the State that CMF and WCF changed their behavior in any way in response to the Declared Disaster, the State has failed to allege any facts demonstrating that CMF and WCF took advantage of the disaster (and, in fact, they did not).  Accordingly, the State's claims under Section 17.46(b)(27) must be dismissed as baseless.

**D. The State's Claims Under DTPA § 17.46(b)(27) With Respect to Specialty Eggs Are Legally and Factually Baseless Because the State Admits that CMF and WCF's Specialty Egg Prices Have Not Changed.**

To the extent that the State alleges claims under DTPA § 17.46(b)(27) with respect to CMF and WCF's specialty shell egg sales, those claims must be dismissed as factually baseless, because the State does not allege any specialty shell egg prices during the Declared Disaster were excessive or exorbitant, and does not allege that the prices of specialty eggs changed at all following the Declared Disaster.  Indeed, the State's only allegation related to the price of specialty shell eggs is that the prices did not change at all: "Cal-Maine's specialty egg brand Egg-land's Best has *remained at 2019 levels*."  Pet. ¶ 36(c).  But that sole allegation does not factually support a claim

of price gouging.  Accordingly, absent any allegations related to specialty shell egg prices, the State's claims must be dismissed to the extent the State asserts claims that specialty shell egg prices were excessive or exorbitant under Section 17.46(b)(27).

### E.  The State's Claims Under DTPA § 17.46(b)(27) Are Legally and Factually Baseless to the Extent the State Asserts Claims Based on Transactions Exempt from the DTPA under DTPA § 17.49(g).

The State's claims are legally and factually baseless to the extent that they allege claims under the DTPA for transactions and sets of transactions that are specifically exempt from the DTPA under Section 17.49(g) that involve total consideration of more than $500,000.[14] Section 17.49(g) specifically exempts from the DTPA claims that relate to: "a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000." TEX. BUS. & COM. CODE ANN. § 17.49(g).  The exemption is intended to exempt large transactions between businesses—exactly the types of transactions between CMF/WCF and grocers on which the State bases its DTPA claims here.  *See E. Hill Marine, Inc. v. Rinker Boat Co.*, 229 S.W.3d 813, 821 (Tex. App.—Fort Worth 2007, pet. denied).

In assessing the amount of a transaction or set of transactions under Section 17.49(g), the court must consider not just the amount sought in the action, but the total amount of consideration paid or for which a party was obligated to pay in the transaction or set of transactions related to the same project.  *See Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 473-74 (Tex. App.—Fort Worth 2004, no pet.) (holding that $600,000 transaction was exempt from the DTPA

---

[14] Section 17.49(f) also exempts claims "arising out of a written contract if: (1) the contract relates to a transaction, a project, or a set of transactions related to the same project involving total consideration by the consumer of more than $100,000; (2) in negotiating the contract the consumer is represented by legal counsel." TEX. BUS. & COM. CODE ANN. § 17.49(f).  Many of CMF and WCF's transactions are similarly exempt under Section 17.49(f), but based on the facts pleaded and documents relied on in the Petition, CMF and WCF for now address only those transactions for which the State has pleaded or cited documents demonstrating that they are exempt under Section 17.49(g) as involving transactions of greater than $500,000.

under Section 17.49(g) even though the amount in controversy for the DTPA claim was less than $500,000. Additionally, "sets of transactions related to the same project can be valued collectively under the DTPA" in determining the consideration involved, and that set of transactions may be based on multiple contracts. *E. Hill Marine, Inc.*, 229 S.W.3d at 821. Under Section 17.49(g), "a long running distribution relationship between two parties constitute[s] a project." *SPRAJ Props. LLC v. Regions Bank*, No. 3:13-CV-3472-N, 2015 WL 11120528, at *7 (N.D. Tex. May 12, 2015); *see also Glob. Int'l, LLC, v. ProBalance, Inc*., No. 3:15-CV-0677-N, 2016 WL 6646225, at *5 (N.D. Tex. Nov. 9, 2016).

For example, in *Global International*, a manufacturer entered into a series of purchase orders with a store for nutritional supplements. *Glob. Int'l, LLC*, 2016 WL 6646225, at *5. The store attempted to assert a DTPA claim against the manufacturer based on the sale of approximately $300,000 of the supplements. *Id.* at *4. Yet over the course of a more than one-year relationship between the manufacturer and store, the store paid more than $1,000,000 to the manufacturer for various types of nutritional supplements. *Id.* The court found that this lengthy distribution relationship constituted a set of transactions relating to the same project involving total consideration by the consumer of more than $500,000 that were therefore exempt from the DTPA. *Id.* at *5.

The State alleges no facts demonstrating that any of the transactions on which it sues concern transactions or sets of transactions related to the same project of less than $500,000. Rather, the State's Petition demonstrates that the vast majority of CMF and WCF's transactions for which the State asserts its DTPA claims involve these same types of ongoing distribution relationships involving sets of transactions between CMF and WCF and their customers of more than $500,000. For example, the State cites CMF's Form 10-Q for the third quarter of fiscal year

2020, demonstrating that CMF sold $1.3 billion in shell eggs in fiscal year 2019, Pet. ¶ 20 n.1 (citing Ex. 2, CMF Feb. 29, 2020 10-Q), and cites CMF's investor presentation from Q3 2020 demonstrating that 69.8% of those sales were to just ten large corporations, Pet. ¶ 22 n.6 (citing Ex. 1, CMF Investor Presentation at 12).  Similarly, the State cites CMF's 2019 Form 10-K, which states that just two of its largest customers account for approximately 30% of that $1.3 billion in sales for fiscal year 2019.  Ex. 3, CMF 2019 10-K at 7.  The State therefore cannot reasonably allege that any of the sales to these customers fall under the DTPA, as the set of transactions CMF and WCF had with each of these customers involved consideration of more than $500,000.  *See* TEX. R. CIV. P. 91a.

The State nonetheless asserts DTPA claims based on these transactions as the State's Petition makes clear in its request for documents and information in the Petition specifically related to CMF and WCF's sales to its "ten-largest customers in Texas."  Pet. ¶ 50(a), (b).  Because the State fails to allege any facts demonstrating that its claims are for transactions or sets of transactions of less than $500,000, and admits in its Petition and the documents cited in its Petition that the vast majority of the transactions and sets of transactions for which it asserts claims are greater than $500,000, the State's DTPA claims are legally and factually baseless and must be dismissed.

## F. The State's Misrepresentation Claims Are Legally and Factually Baseless Because the State Fails to Allege CMF/WCF Made Any Misrepresentations at All—Much Less Misrepresentations Directed to CMF/WCF's Customers.

The State's misrepresentation claim's pursuant to Sections 17.46(b)(5) and (24) of the DTPA should be dismissed because they are legally and factually baseless in that the State fails to allege any representations or acts that could conceivably fall under Sections 17.46(b)(5) and (24). And for all representations the State does allege CMF or WCF made, the State admits they are true in the Petition.

Sections 17.46(b)(5) and (24) of the DTPA prohibit "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not," DTPA § 17.46(b)(5), and "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed," DTPA § 17.46(b)(24).

The State's claim under Section 17.46(b)(5) is baseless because the State does not identify any offending representations by CMF or WCF under the statute. Accordingly, because the State has failed to allege facts to "demonstrate a viable, legally cognizable right to relief," the State's claims under Section 17.46(b)(5) must be dismissed. *See Guillory*, 470 S.W.3d at 240.

The State's claims under Section 17.46(b)(24) are likewise baseless because the State does not identify any facts that CMF or WCF failed to disclose, much less any facts CMF or WCF failed to disclose that were intended to induce CMF and WCF's customers into transactions with CMF and WCF into which they would not have otherwise entered. *See* TEX. BUS. & COM. CODE ANN. § 17.46(b)(24). The State's claims under Section 17.46(b)(24) are therefore likewise baseless. *See Guillory*, 470 S.W.3d at 240.

The statements the State claims are misleading fall under neither Sections 17.46(b)(5) nor (24), and in any event, in its own Petition the State admits that those statements are true and not misrepresentations. Specifically, the State asserts that CMF and WCF misled customers by stating on their website that "wholesale shell egg **market** prices . . . are outside of our control." Pet. ¶ 38 (emphasis added). Yet, the State does not allege that wholesale shell egg **market** prices are in CMF's or WCF's control—and in fact, they are not. Instead, the State merely alleges that

this is misleading because CMF and WCF "can *offer* purchasers whichever prices it chooses." Pet. ¶ 38.   Putting aside that CMF and WCF cannot in fact offer whatever prices they choose because most of the prices they offer are governed by long-standing pricing arrangements, even if CMF and WCF could offer any prices they choose, this has no bearing whatsoever on whether wholesale shell egg market prices are outside of CMF and WCF's control (and in fact, they are). Because the State does not allege that wholesale shell egg market prices are within CMF and WCF's control, this misrepresentation claim is legally baseless.  *See Guillory*, 470 S.W.3d at 240.

The State also alleges that CMF and WCF mislead their customers by stating <u>in their</u> <u>financials</u> that CMF and WCF's pricing is based on "independently quoted wholesale **market** prices," which implies that there is a regulated market, which the State claims is false because "there is no egg market **exchange**."  Pet. ¶ 39 (emphases added).  The State thus seeks to insert the term "exchange" into one of CMF or WCF's statements, which simply is not present.  The State admits in its own Petition that CMF and WCF's statement is actually true as stated, alleging elsewhere in the Petition that "the majority of shell eggs sold in the U.S. in the retail and foodservice channels are sold at independently quoted wholesale **market** prices for shell eggs." *Id*. ¶ 29 (emphasis added).  And the State repeatedly admits that shell egg prices are based on market prices.  *Id.* ¶¶ 29, 32, 34.

The State also fails to allege how a representation that there is an independently quoted wholesale market for eggs suggests that there is an "egg market exchange," ostensibly trying to draw a comparison to a stock exchange.  The State does not allege that CMF and WCF ever referenced any type of "exchange" for shell eggs because CMF and WCF never made any such representation.  Instead, the State nonsensically claims that a reference to a market or market price is a misleading reference to an exchange despite Texas courts' and others' universal recognition

of markets and market prices a variety of markets where no exchange exists. *See*, *e.g.*, *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 874 (Tex. 2009) (recognizing a "real estate market" and market prices for real estate when there is no real property exchange); *Green Tree Acceptance, Inc. v. Holmes*, 803 S.W.2d 458, 461 (Tex. App.—Fort Worth 1991, writ denied) (recognizing a "used car market" and market prices for used cars when there is no used car exchange); *see also* Ex. 14, Federal Trade Commission, Chapter 15, INVESTIGATION OF GASOLINE PRICE MANIPULATION & POST–KATRINA GASOLINE PRICE INCREASES 81 n.1 (2006) (recognizing third-party market indexes virtually identical to Urner Barry data—Platts and Oil Price Information Service—as identifying market prices for petroleum products not traded on exchanges).

Because the State admits in its Petition that there is a shell egg market and CMF and WCF base their prices on shell egg market prices, CMF and WCF's statement that they base their prices on shell egg market prices is plainly true; therefore, the State's claim to the contrary is legally baseless. *See Guillory*, 470 S.W.3d at 240.

## V.    <u>Conclusion</u>

For the foregoing reasons, defendants CMF and WCF therefore respectfully request that the State's claims be dismissed with prejudice and that the State take nothing by its suit and that the Court award CMF and WCF all relief to which they are justly entitled.

Dated: June 26, 2020                         Respectfully submitted,

                                             KING & SPALDING LLP

                                             /s/ Craig A. Stanfield
                                             Craig A. Stanfield
                                             Texas Bar No. 24051371
                                             cstanfield@kslaw.com
                                             Chad E. Stewart
                                             Texas Bar No. 24083906
                                             cstewart@kslaw.com
                                             1100 Louisiana, Suite 4000
                                             Houston, Texas 77002
                                             (713) 276-7417 Telephone
                                             (713) 751-3290 Facsimile

                                             **ATTORNEYS FOR DEFENDANTS
                                             CAL-MAINE FOODS, INC. AND
                                             WHARTON COUNTY FOODS, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument was served

pursuant to Rules 21 and 21a of the Texas Rules of Civil Procedure, via the Court's electronic

filing system on the 26th day of June, 2020, upon all counsel of record.


*/s/ Craig A. Stanfield*
Craig A. Stanfield

40

# EXHIBIT C

6/26/2020 7:53:58 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 44092133
By: BOVELL, JOSHUA J
Filed: 6/26/2020 7:53:58 PM

CAUSE NO. 2020-25427

| | | |
|---|---|---|
| STATE OF TEXAS, | § | IN THE DISTRICT COURT OF |
|    Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| CAL-MAINE FOODS, INC. D/B/A | § | |
| WHARTON and WHARTON COUNTY | § | |
| FOODS, LLC, | § | |
|    Defendants. | § | 215TH JUDICIAL DISTRICT |

**[PROPOSED] ORDER ON DEFENDANTS CAL-MAINE FOODS, INC. AND WHARTON COUNTY FOODS, LLC'S RULE 91A MOTION TO DISMISS THE STATE OF TEXAS'S ORIGINAL PETITION**

Pending before the Court is Cal-Maine Foods, Inc. and Wharton County Foods, LLC's Rule 91a Motion to Dismiss the State of Texas's Original Petition ("Defendants' Motion"). After considering the Defendants' Motion, the responsive briefing, and the arguments of counsel, the Court concludes that Defendants' Motion should be GRANTED.

IT IS THEREFORE ORDERED that the State's Original Petition is DISMISSED with prejudice.

Signed on this _____ day of _____, 2020

Signed:
8/13/2020
12:01 PM

_____
Judge Presiding